**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| PROJECT ON GOVERNMENT OVERSIGHT, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 25-527 (JEB) |
| | ) | |
| DONALD J. TRUMP,     et al., | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ....................................................................................................................... 1

FACTUAL BACKGROUND ....................................................................................................... 3

STATUTORY BACKGROUND .................................................................................................. 6

    *The Presidential Records Act* ............................................................................................... 8

    *The Freedom of Information Act* ......................................................................................... 10

LEGAL STANDARD ................................................................................................................ 10

ARGUMENT ............................................................................................................................. 11

    I.     POGO IS LIKELY TO SUCCEED ON THE MERITS ........................................ 11

    II.    POGO WILL SUFFER IRREPARABLE INJURY

          ABSENT A PRELIMINARY INJUNCTION ....................................................... 16

    III.   DEFENDANTS WILL NOT BE HARMED

          BY THE REQUESTED RELIEF .......................................................................... 19

    IV.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST

          FAVOR THE REQUESTED RELIEF ................................................................. 20

CONCLUSION .......................................................................................................................... 20

# TABLE OF AUTHORITIES

## Cases

*Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) ............................................................. 10

*Am. Fed'n of State, Cty. & Mun. Emps. v. Social Sec. Admin.*, No. 25-cv-596-ELH (D. Md. Mar. 20, 2025) ...................................................................................................................... 15

*Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991) ...................................................................... 8

*Armstrong v. EOP*, 90 F.3d 553, 555 (D.C. Cir. 1996) ............................................................... 11

*Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) ........................... 11

*CREW v. Off. of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009) ..................................................... 12

*CREW v. U.S. DOGE Serv.*, No. 25-cv-511 (CRC), 2025 U.S. Dist. LEXIS 42869, *54 (D.D.C. Mar. 20, 2025) .................................................................................................................. passim

*Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976) ......................................................... 10

*Doe v. Musk*, No. 25-0462-TDC, 2025 U.S. Dist. LEXIS 49603 (D. Md.) .................................. 15

*Fed'n Of Lab. & Congr. Of Indus. Orgs. v. U.S. Dep't of Labor*, .................................................. 14

*Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980) ................. 10

*Meyer v. Bush*, 981 F.2d 1288, 1293 (D.C. Cir. 1993) ............................................................... 12

*Nken v. Holder*, 556 U.S. 418, 435 (2009) ................................................................................ 20

*Open Cmtys. All. v. Carson*, 286 F. Supp 3d 148, 179 (D.D.C. 2017) ....................................... 20

*U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991) ............................................................... 10

## Statutes

5 U.S.C. § 552(b) ........................................................................................................................ 10

5 U.S.C. § 552(e) ........................................................................................................................ 11

36 C.F.R. § 102-193.10(a) ............................................................................................................ 6

36 C.F.R. § 1230.14 ...................................................................................................................... 8

44 U.S.C. § 2902-09 ................................................................................................ 6

44 U.S.C. § 3101-07 ........................................................................................... 6, 7, 8

44 U.S.C. § 3301-24 .............................................................................................. 6, 7

44 U.S.C. § 2201(2)(A)(i) ......................................................................................... 9

44 U.S.C. § 2202 ...................................................................................................... 9

44 U.S.C. § 2203(a) .................................................................................................. 9

44 U.S.C. § 2204(a) ................................................................................................ 10

44 U.S.C. § 2204(c) ................................................................................................ 10

44 U.S.C. § 2209(a)(1)-(2) ....................................................................................... 9

44 U.S.C. § 2911 ...................................................................................................... 9

44 U.S.C. § 2911(a) .................................................................................................. 8

44 U.S.C. §§ 2101-18 ............................................................................................... 6

**Other Authorities**

Pub. L. 11113-187, 128 Stat. 2003 (2014) ............................................................... 9

## INTRODUCTION

From its inception the U.S. Department of Government Efficiency ("DOGE"), U.S. DOGE Service ("USDS"), and U.S. DOGE Service Temporary Organization ("USDSTO") (collectively "DOGE") have defied laws and norms, and challenged the authority of the judiciary to oversee their actions. Reaching into the corners of nearly every government agency, DOGE has impacted over one hundred thousand career government employees, numerous federal programs and policies, and U.S. citizens. Yet, in the face of mounting evidence that DOGE wields enormous authority with an almost never-before seen power and fury, DOGE insists it is not an agency subject to the records regime of the Federal Records Act ("FRA") and the transparency requirements of the Freedom of Information Act ("FOIA"). With this lawsuit Plaintiff Project On Government Oversight, Inc. ("POGO") asks this Court to conclude that, as other courts recently have concluded, DOGE is an agency and therefore judicially accountable for any failure to maintain and preserve all DOGE records as the FRA requires pursuant to a National Archives and Records Administration ("NARA")-approved recordkeeping policy formulated and implemented by DOGE's leadership.

DOGE's refusal to acknowledge its legal obligations under the FRA has potentially profound implications for Plaintiff and the public at large. Given the substantial independent authority DOGE yields, the records of how and why it yields that power are of enormous interest and import now and in the future. To ensure the preservation of those records Plaintiff sought assurances from Defendants that all DOGE records will be collected, retained, and preserved as the FRA requires during the pendency of Plaintiff's lawsuit. Defendants, however, refused to provide those assurances. Instead, Department of Justice ("DOJ") counsel stated merely that "USDS has taken all steps to preserve all USDS records consistent with its obligations under the

PRA [Presidential Records Act]." This tepid response, implicitly denying DOGE's obligations under the FRA and unsupported by any evidence or explanation, raises a very real threat of irreparable harm absent this Court's immediate intervention. Indeed, DOGE's past actions in contravention of their recordkeeping responsibilities amplify this threat.

To prevent this harm, POGO seeks a preliminary injunction requiring Defendants to collect, retain, and preserve their records, including all electronic records, pursuant to a recordkeeping policy that complies with the FRA and guidance from NARA. Such an injunction would prevent any irretrievable removal, loss, or destruction of DOGE records during the pendency of this case, while merely requiring Defendants to do what the FRA already mandates.

Defendants likely will argue that the unsupported statement from their counsel that they have taken all steps to preserve their records consistent with the PRA renders any injunction unnecessary. Defendants are not only wrong, but their insistence that the PRA governs their records exposes their desire to remain free from any judicial scrutiny. DOGE is operating with "unusual secrecy," *CREW v. U.S. DOGE Serv.*, No. 25-cv-511 (CRC), 2025 U.S. Dist. LEXIS 42869, *54 (D.D.C. Mar. 20, 2025) ("CREW v. DOGE"), with employees that "may not fully appreciate their obligations to preserve federal records," *id.*, and "may not be steeped in its document retention policies." *Id.* at 55. The secrecy with which DOGE operates, the ongoing reports of use by DOGE employees of Signal, an encrypted messaging apps with auto-delete functions, and the apparent willingness of this administration to ignore its legal obligations and court orders underline the need here for an injunction requiring Defendants to preserve all DOGE records consistent with the FRA.

**FACTUAL BACKDGROUND**

Even prior to assuming office, Defendant Donald J. Trump announced he was forming a Department of Government Efficiency "to dismantle Government Bureaucracy, slash excess regulations, cut wasteful expenditures, and restructure Federal Agencies." *CREW v. DOGE*, 2025 U.S. Dist. LEXIS 42869, *3 (cleaned up). He initially tapped Elon Musk and Vivek Ramaswamy to head DOGE. President Trump formalized that announcement on his first day in office with Executive Order 14158, entitled "Establishing and Implementing the President's 'Department of Government Efficiency.'" ("DOGE EO1"). Hours after he issued the DOGE EO1, Ramaswamy bowed out leaving DOGE headed solely by Musk. Compl. ¶ 4.

Section one of the DOGE EO1 states that its purpose is to "establish[] the Department of Government Efficiency to implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity." Section three renamed the United States Digital Service as the United States DOGE Service ("USDS") "reorganized . . . with the Executive Office of the President ("EOP")." *CREW v. DOGE*, U.S. Dist. LEXIS 42869, *5. The DOGE EO1 further establishes a USDS Administrator reporting to the White House Chief of Staff and establishes the U.S. DOGE Service Temporary Organization, ("USDSTO") headed by the USDS Administrator and charged with "advancing the President's 18-month DOGE agenda," DOGE EO1, Section 3(b).

The DOGE EO1 also directs each agency, in consultation with USDSTO, to establish a DOGE team "within their respective Agencies" consisting of at least four employees, who may include Special Government Employees. Agency heads are directed to coordinate the work of their DOGE Team Lead with USDS. Section four directs the USDSTO Administrator to "commence a Software Modernization initiative to improve the quality and efficiency of

government-wide software, network infrastructure, and information technology (IT) systems,"
working with agency heads. DOGE EO1, Sections 3(c) and 4(a).

These provisions mirror what Musk and Ramaswamy had promised in a November 20,
2024 opinion piece in the *Wall Street Journal*. Specifically, "they declared their intent to 'advise
DOGE at every step to pursue three major kinds of reform: regulatory rescissions, administrative
reductions, and cost savings.'" *CREW v. DOGE*, U.S. Dist. LEXIS 42869, *3 (citation omitted).
The two further "revealed that, from its inception, a major objective of the new department
would be 'mass head-count reductions across the federal bureaucracy.'" *Id.* at *4 (citation
omitted).

On February 11, 2025, Trump issued Executive Order 14210 ("DOGE EO2") that lays
out DOGE's role in "eliminating waste, bloat, and insularity" and its mandate to work with
agency heads to create and implement hiring plans, including anointing DOGE with the power to
decide which vacancies should be filled. DOGE EO2, Sections 1 and 3(b)(i). For new hires, the
Order directs agencies to consult with the DOGE Team Lead. DOGE EO2, Section 3(b)(ii). The
Order further directs agencies "not to fill any vacancies for career appointments that the DOGE
Team Lead assesses should not be filled, unless the Agency Head determines the positions
should be filled." DOGE EO2, Section 3(b)(ii)*; CREW v. DOGE*, U.S. Dist. LEXIS 42869, *8
(cleaned up). The Order obligates the Administrator to "submit a report to the President
regarding implementation of this order, including a recommendation as to whether any of its
provisions should be extended, modified, or terminated."  DOGE EO2, Section 3(f).

On February 3, 2025, the White House confirmed publicly that Musk was officially
joining the federal government as a special government employee and that he would submit a
financial disclosure report that would not be made public. Theodore Schleifer & Eric Lipton,

"Elon Musk's Financial Disclosure Will Not Be Made Public," *New York Times*, Feb. 11, 2025,

https://www.nytimes.com/2025/02/11/us/politics/elon-musk-finances.html?smid=nytcore-ios-

share&referringSource=article.Share. According to public reporting, Musk received both a

government email address and an office. *See, e.g.*, Francesca Chambers, "Trump makes DOGE

head Elon Musk a 'special government employee' amid accusations of a takeover, *USA Today*,

Feb. 3, 2025, https://www.usatoday.com/story/news/politics/2025/02/03/doge-elon-musk-

special-employee-federal-government/78185365007/. But the Administration has refused to

acknowledge his precise role, at times denying he is in charge of DOGE despite President

Trump's assertions to the contrary. *See* Andrea Shalal & Nandita Bose, "Trump appears to

contradict White House, says Musk in charge of DOGE," *Reuters*, Feb. 20, 2025,

https://www.reuters.com/world/us/trump-appearws-contradict-white-house-says-elon-musk-

charge-doge-2025-02-20/.

This secrecy carries over to the work of DOGE and the identities of its employees. As

Judge Cooper noted in *CREW v. DOGE*,

> USDS's operations thus far have been marked by unusual secrecy . . . For instance,
> USDS reportedly installed an outside server at OPM to store government staffers'
> personal information, including their names and email accounts . . . USDS
> employees have also reportedly declined to identify themselves to career officials
> on request . . . Indeed, Musk has said that posters who released the names of USDS
> employees online "committed a crime."

U.S. Dist. LEXIS 42869, *13-14 (cleaned up).

On February 21, 2025, POGO filed suit against Donald Trump, DOGE, USDS,

USDSTO, and the then-unnamed USDSTO Administrator. The complaint alleges that

Defendants, as an agency, are subject to the recordkeeping requirements of the FRA and their

records are publicly accessible through the FOIA. The complaint further challenges the failure of

the USDSTO Administrator to create and implement a recordkeeping policy that treats the records of DOGE, USDS, and USDSTO as agency records under the FRA.

By letter dated February 25, 2025, to the White House Counsel (Exhibit A hereto), POGO asked for assurances within one week that all DOGE and DOGE Service records will be collected, maintained, and preserved as of January 20, 2025, as the FRA requires. *See* Exhibit A. Receiving no response, counsel for POGO contacted Department of Justice ("DOJ") counsel by email on March 11, 2025, reiterating POGO's request for assurances that it made to the White House. *See* Exhibit B. By email dated March 14, 2025, DOJ counsel provided the following one-sentence response: "I can now confirm that USDS has taken all steps to preserve all USDS records consistent with its obligations under the PRA." *See id.* This statement echoes media reports stating that White House officials and DOGE advisors claim that the PRA applies. Brent D. Griffiths, "Elon Musk said DOGE would provide 'maximum transparency.' It may be years before its records are public," *Business Insider*, Feb. 7, 2025, https://www.businessinsider.com/musk-doge-records-public-information-foia-presidential-records-act-2025-2; Sean Michael Newhouse, "Multiple groups file lawsuits to get DOGE records," *Government Executive*, Feb. 27, 2025, https://www.govexec.com/oversight/2025/02/multiple-groups-file-lawsuits-get-doge-records/403343/.

## STATUTORY BACKGROUND

### *The Federal Records Act*

The FRA is a collection of statutes that governs the creation, management, and disposal of federal or agency records. 44 U.S.C. §§ 2101-18, 2902-09, 3101-07, and 3301-24. Congress enacted the FRA to ensure "[a]ccurate and complete documentation of the policies and transactions of the Federal Government." 36 C.F.R. § 102-193.10(a). Toward that end, the FRA

requires federal agencies to establish; (1) a program to make and preserve agency records; (2) effective controls over the creation, maintenance, and use of records; and (3) safeguards against the removal or loss of records. 44 U.S.C. §§ 3101, 3102, and 3105.

The FRA specifically mandates that "[t]he head of each Federal agency *shall make and preserve* records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency[.]" 44 U.S.C. § 3101 (emphasis added). The FRA defines the term "records" to include "all books, papers . . . or other documentary materials, regardless of physical form or characteristics . . . made or received by an agency of the United States Government under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency . . . as evidence of the organization, functions, policies, decisions, procedures, operations or other activities of the Government or because of the informational value of data in them." 44 U.S.C. § 3301.

The FRA provides the exclusive procedure by which all federal records may be disposed of or destroyed. *See* 44 U.S.C. § 3314. Under its provisions, federal records may be disposed of or destroyed only with the authorization of the Archivist either through General Records Schedules or NARA-approved agency-specific disposition schedules. 44 U.S.C. §§ 3303a(a) and (d).

The FRA generally requires that federal records, including those generated in personal electronic messaging accounts, be preserved in a government recordkeeping system. Consistent with this obligation the FRA prohibits agency officials from "create[ing] or send[ing] a record using a non-official electronic messaging account unless such officer or employee—(1) copies an official electronic messaging account of the officer or employee in the original creation or transmission of the records; or (2) forwards a complete copy of

the record to an official electronic messaging account of the officer or employee not later than 20 days after the original creation or transmission of the record." 44 U.S.C. § 2911(a).

To prevent the unlawful destruction or removal of records the FRA creates a "system of administrative enforcement." *Armstrong v. Bush*, 924 F.2d 282, 284 (D.C. Cir. 1991). This system imposes obligations on both agency heads and the Archivist of the United States. With respect to agency heads the FRA provides that if they become aware of "any actual, impending, or threatened unlawful removal, defacing, alteration, corruption, deletion, erasure, or other destruction of records in the custody of the agency" they must "notify the Archivist" and "with the assistance of the Archivist . . . initiate action through the Attorney General for the recovery" of such records. 44 U.S.C. § 3106(a); *see also* 36 C.F.R. § 1230.14 (implementing NARA regulation detailing how agencies "must report promptly any unlawful or accidental removal, defacing, alteration, or destruction of records in the custody of that agency to NARA").

*The Presidential Records Act*

In response to presidential misconduct revealed by the Watergate scandal, Congress enacted the PRA in 1978 to establish public ownership of presidential and vice-presidential records, to impose record-keeping requirements on the President and Vice President, and to authorize the NARA to preserve and make publicly available presidential records. *See* Carl Bretscher, The President and Judicial Review Under the Records Act, 60 Geo. Wash. L. Rev., 1477, 1483 (1992) (PRA passed "to prevent a repeat of Watergate's legal drama surrounding ownership of presidential records"). Toward that end, the PRA specifies that "[t]he United States shall reserve and retain complete ownership, possession, and control of Presidential records[.]" 44 U.S.C. § 2202.

The PRA directs the President to "take all such steps as may be necessary to assure that

the activities, deliberations, decisions, and policies that reflect the performance of his

constitutional, statutory, or other official or ceremonial duties are adequately documented and

that such records are maintained as Presidential records[.]" 44 U.S.C. § 2203(a). Critically here,

through the PRA Congress explicitly removed from the definition of presidential records "any

documentary materials that are . . . official records of an agency" under the APA's definition of

"agency." 44 U.S.C. § 2201(2)(A)(i). *See also Armstrong v. EOP*, 1 F.3d 1274, 1292 (D.C. Cir.

1993).

In 2014, Congress amended both the PRA and the FRA through the Presidential and

Federal Records Act Amendments of 2015, Pub. L. 11113-187, 128 Stat. 2003 (2014). The

Amendments sought to "modernize[] records management by focusing more directly on

electronic records." NARA Press Release, "National Archives Welcomes Presidential and

Federal Records Act Amendments of 2015," Dec. 1, 2014,  https://www.archives.gov/press/

press-releases/2015/nr15-23.html. For both federal and presidential records the Amendments

explicitly restrict the use of non-official electronic messaging accounts to create or send records

unless a complete version is preserved in an official electronic messaging account. *See* 44

U.S.C. § 2911 (federal records), 44 U.S.C. § 2209(a)(1)-(2) (presidential records). To

implement the 2014 Amendments, NARA issued guidance confirming that a "complete"

version of an electronic record—including electronic messages generated in non-official

accounts—should include the record's associated metadata, attachments, and functionality. *See,

e.g.*, NARA Bulletin 2015-02, July 29, 2015,  https://www.archives.gov/records-

mgmt/bulletins/2015/2015-02.html; NARA Bulletin 2015-04, Sept. 15, 2015,

https://www.archives.gov/records-mgmt/bulletins/2015/2015-04.html.

Beginning five years after a President leaves office, the public can access presidential

records from NARA through the procedures the FOIA establishes. 44 U.S.C. § 2204(c).

Although some materials can be withheld or redacted for an extended period of time, they too

eventually become publicly available. 44 U.S.C. § 2204(a).

*The Freedom of Information Act*

The FOIA, enacted in 1966, established a statutory right of public access upon

request to documents held by Executive Branch agencies. The FOIA carries a "strong

presumption in favor of disclosure," *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991),

and its "limited exceptions do not obscure the basic policy that disclosure, not secrecy, is the

dominant objective of the Act." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976).

Under the FOIA, virtually every record of a federal agency must be made publicly

available upon request unless it is specifically exempted pursuant to one or more of the

FOIA's nine exemptions. 5 U.S.C. § 552(b). Those government entities that fall outside of the

APA's definition of "agency" are not subject to the FOIA. *See, e.g.*, *Kissinger v. Reporters

Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980).

## LEGAL STANDARD

To qualify for a preliminary injunction the movant "must establish (1) that he is likely to

succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of

preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in

the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (cleaned up). While

the movant must demonstrate that all four factors weigh in favor of granting preliminary

injunctive relief, courts in this Circuit historically have used a "sliding scale" approach that

recognizes courts may award relief when "a strong showing on one factor could make up for a

weaker showing on another." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C.

Cir. 2022) (cleaned up) (noting, however, the sliding-scale approach "is arguably in tension with

intervening Supreme Court decisions" but that the D.C. Circuit "[i]n the past ha[s] noted this tension but reserved the question of whether the sliding-scale approach remains valid.").

Here, regardless of which standard applies, Plaintiff is entitled to a preliminary injunction requiring Defendants to maintain and preserve all agency records pursuant to recordkeeping guidance that conforms with the FRA and NARA guidance.

## ARGUMENT

### I.    POGO IS LIKELY TO SUCCEED ON THE MERITS.

The gravamen of POGO's complaint is that collectively DOGE, USDS, and USDSTO are an agency and therefore must comply with the recordkeeping requirements of the FRA pursuant to recordkeeping guidance issued by the Administrator. Controlling precedent and all the evidence available to date establish conclusively DOGE's agency status.

The D.C. Circuit recognized in *Armstrong v. EOP*, 90 F.3d 553, 555 (D.C. Cir. 1996), that "the coverage of the FRA is coextensive with the definition of 'agency' in the FOIA[.]" The FOIA in turn defines "agency" expansively to include 'any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency." 5 U.S.C. § 552(e).

Courts have formulated a three-factor test to determine whether an entity alleged to be an agency within the meaning of the FOIA (and the FRA) is "substantially independent" of the President and therefore has agency status or instead functions "solely to advise and assist the President" and therefore lacks agency status. *Meyer v. Bush*, 981 F.2d 1288, 1293 (D.C. Cir. 1993). That three-part test considers: "how close operationally the group is to the President, what the nature of its delegation from the President is, and whether it has a self-contained structure."

*Id.* A conclusion that "an EOP unit is subject to FOIA" as a federal agency must be based on "a finding that the entity in question 'wielded substantial authority independently of the President.'" *CREW v. Off. of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009).

Applying the three-factor test to DOGE based on the facts known to date demonstrates POGO will likely succeed in establishing DOGE is an agency wielding substantial independent authority. Judge Cooper reached this very conclusion in an opinion he recently issued in *CREW v. DOGE*. First, Judge Cooper pointed to the executive orders governing DOGE. The first, in establishing DOGE, "appears to give USDS the authority to implement the DOGE Agenda, not just to advise the President in doing so." U.S. Dist. LEXIS 42869, *34 (cleaned up). The text of Executive Order 14158 confirms the correctness of this conclusion by defining its purpose as "establish[ing] the Department of Government Efficiency to *implement the President's DOGE Agenda*." (emphasis added). Further President Trump's subsequent executive order concerning DOGE:

> directs that agencies 'shall not fill any vacancies for career appointments that the DOGE Team Lead assesses should not be filled, unless the Agency Head determines the positions should be filled' . . . [and] grants the USDS Team Lead the power to keep vacant career positions open unless an agency overrides that decision.

U.S. Dist. LEXIS 42869, *36. This second executive order "appears to contemplate that this authority will be exercised independent of the President." *Id.*

Second, Judge Cooper relied on the public statements of Elon Musk and President Trump, which "indicate that USDS is in fact exercising substantial independent authority." U.S. Dist. LEXIS 42869, *34. As he noted, at DOGE's "inception, President Trump trumpeted that USDS would have the power to 'to [sic] dismantle Government Bureaucracy, slash excess regulations, cut wasteful expenditures, and restructure Federal Agencies.'" *Id.* (citation omitted).

12

As for Musk, he also "indicated that USDS would take aggressive action to pursue its agenda," and that Musk and Ramaswamy "also suggested that USDS would have the power to identify regulations due for the chopping block." *Id.* at *37. In a more recent statement, "Musk noted . . . that he plans to use USDS to reduce the federal budget by $2 trillion," something that Judge Cooper noted "would require more than mere advice." *Id.* These and other statements Judge Cooper outlined "suggest that the President and USDS leadership view the department as wielding decision-making authority to make cuts across the federal government." *Id.*

Third, Judge Cooper catalogued "USDS's actions to date [that] demonstrate its substantial authority over vast swathes of the federal government." U.S. Dist. LEXIS 42869, *38. Those actions include: (1) decimating USAID, including placing nearly all of its employees on administrative leave (what Musk termed "feeding USAID into the wood chipper"), *id.* at *37; (2) eliminating 104 DEI-related contracts with the federal government; and (3) terminating 89 contracts with the Department of Education. *Id.* at *38. As Judge Cooper noted, "[d]oing any of those three things would appear to require substantial independent authority; to do all three surely does." *Id.* at *39.

Additional actions by DOGE that demonstrate its substantial independent authority include gaining "access to sensitive data and payment systems across federal agencies, and potentially to classified information, even over the objection of officials within those agencies." *Id.* They also include the "Fork in the Road deferred resignation offer sent to all federal employees"—a letter mirroring one Musk sent to Twitter employees upon his acquisition of Twitter. *Id.*

Notably, since Judge Cooper issued his memorandum opinion in *CREW v. DOGE*, new details have emerged regarding other actions DOGE has taken that indicate its substantial

13

independent authority. For example, on March 12, 2025, it was reported that "EPA is giving more authority to the Elon-Musk-backed Department of Government Efficiency," specifically "that DOGE must now sign off on any agency expenditure of more than $50,000 . . . as well as actions with no associated costs that could later create them." Eric Katz, "EPA begins eliminating offices as DOGE tightens grip on nearly all agency spending," *Government Executive*, Mar. 12, 2025, https://www.govexec.com/management/2025/03/epa-begins-eliminating-offices-doge-tightens-grip-nearly-all-agency-spending/403684/?oref=ge-home-top-story.

Just as significant, the impact of DOGE's actions is becoming more apparent. For example, a "small outpost" of the National Nuclear Security Administration "has lost a huge cadre of scientists, engineers, safety experts, project officers, accountants and lawyers" as a result of the DOGE-offered buyouts and DOGE-mandated cuts. Sharon LaFraniere, Minho Kim & Julie Tate, "DOGE Cuts Reach Key Nuclear Scientists, Bomb Engineers and Safety Experts," *New York Times*, Mar. 17, 2017, https://www.nytimes.com/2025/03/17/us/politics/federal-job-cuts-nuclear-bomb-engineers-scientists.html. DOGE's actions "are threatening the muscle and bone of operations that involve national security or other missions at the very heart of the federal government's responsibilities." *Id.*

Relying on comparable facts Judge Bates in *Am. Fed'n Of Lab. & Congr. Of Indus. Orgs. v. U.S. Dep't of Labor*, concluded that for purposes of the Economy Act DOGE is an agency. No. 25-0339 (D.D.C. Feb. 14, 2025), ECF No. 34. Among other things, "USDS is coordinating teams across multiple agencies with the goal of reworking and reconfiguring agency data, technology, and spending." These activities "[are] not the stuff of mere advice and assistance." *Id.* at 7. In reaching this conclusion the Court compared the definition of agency in the Economy

Act to similar definitions of agency in the FOIA and Administrative Procedure. *See also Am. Fed'n of State, Cty. & Mun. Emps. v. Social Sec. Admin.*, No. 25-cv-596-ELH (D. Md. Mar. 20, 2025), slip op. at 109-11 (agreeing with Judges Bates and Cooper that DOGE is an agency).

Similarly, in *Doe v. Musk*, No. 25-0462-TDC, 2025 U.S. Dist. LEXIS 49603 (D. Md.), the court considered whether DOGE's actions to shut down USAID violated the Constitution, including the Appointments Clause. The court catalogued the numerous actions DOGE had taken "without any apparent advanced approval by agency leadership" at the Department of Education, NIH, the Department of Agriculture, the Department of Energy, the National Nuclear Security Administration, USAID, and FEMA. *Id.* at *9-10. The court noted that similarly to USAID Musk was involved in shutting down CFPB's headquarters. *Id.* at *45. The absence of any "formal legal authority" conferred on Musk to take these actions did not overcome the 'actual authority" that Musk had exerted over USAID. *Id.* at *49. Although this case did not hinge on DOGE's status as an agency, its recognition of the extensive power DOGE unilaterally wields supports DOGE's agency status here.

Judge Cooper also determined that DOGE satisfies the third factor for agency status—the extent to which an agency has a self-contained structure. Specifically, "USDS has a defined staff: the USDS Administrator, a temporary organization operating within USDS, and DOGE teams that are embedded outside USDS within each executive branch agency." 2025 U.S. Dist. LEXIS 42869, *40. Moreover, "USDS also retains the authority to consult with agency heads regarding the selection of the outside USDS teams, thereby exerting influence over employees across federal agencies." *Id.*

Taken as a whole, the evidence detailed by Judge Cooper firmly establishes that DOGE is an agency under the FRA (and correspondingly under the FOIA).[1] Accordingly Plaintiff has a likelihood of success on the merits.

## II.    POGO WILL SUFFER IRREPARABLE INJURY ABSENT A PRELIMINARY INJUNCTION.

POGO will suffer irreparable injury absent a preliminary injunction requiring Defendants to comply with the requirements of the FRA in maintaining and preserving their records. POGO routinely uses FOIA requests as a basis for its reporting and policy reforms. Compl. ¶¶ 5-6. To date, DOGE has been a focus of several POGO stories, such as a March 7, 2025 story entitled "Musk's Deep Financial Ties to Top Feds Revealed," a February 18, 2025 story entitled "DOD Contractor Hires Trump-Aligned Lobbyists to Tackle DOGE," and a February 6, 2025 story entitled "Elon Musk's DOGE Teams Raise Vetting, Ethics Concerns." Without access to FOIA as a reporting tool, POGO will be constrained in its ability to document DOGE actions. Accordingly, absent the requested relief POGO—and the public at large—face harm from the likely destruction and failure to capture all agency records by DOGE and its several components.

As a direct consequence of its agency status, DOGE is governed by the FRA. Yet DOGE has resisted that conclusion, insisting instead it is subject to the PRA. To be sure, both statutes impose recordkeeping obligations on those entities subject to them. But under the PRA constitutional considerations shield the President from virtually any judicial review while in office, leaving him free to defy the statute's mandates. Indeed, during his first term in office Trump faced litigation over his document destruction practices, *see, e.g.*, Rebekah Entralgo,

---

[1] Judge Cooper acknowledged much of this evidence "derives from media reports" that DOGE chose not to refute. 2025 U.S. Dist. LEXIS 42869, *41. But refuting this mountain of evidence seems highly unlikely, particularly given this Court's observation in *Am. Fed'n Of Lab. & Congr. Of Indus. Orgs.* that DOGE's work "is not the stuff of mere advice and assistance."

"Trump Sued For Allegedly Violating Presidential Records Act, *NPR*, June 22, 2017, https://www.npr.org/sections/thetwo-way/2017/06/22/533977417/trump-sued-for-allegedly-violating-presidential-records-act, and a criminal indictment for leaving office with classified presidential records.

This is far from an abstract concern. According to a recently filed lawsuit, a Musk employee working with DOGE set up a new server at OPM that bypassed federal law and was intended for sending government-wide emails. *See* Compl. ¶ 47. Similarly, in February it was reported that OPM had ordered DOGE employees to stop using the encrypted messaging app Slack "while government lawyers attempt to transition the agency to one that is not subject to the Freedom of Information Act[.]" Jason Koebler & Joseph Cox, "DOGE Employees Ordered to Stop Using Slack While Agency Transitions to a Records System Not Subject to FOIA, *404media*, Feb. 5, 2025, https://www.404media.co/doge-employees-ordered-to-stop-using-slack-while-agency-transitions-to-a-records-system-not-subject-to-foia/. Nevertheless, as more recent reporting confirms, DOGE employees continue to use Slack. *See CREW v. DOGE*, 2025 U.S. Dist. LEXIS 42869, *53. Moreover Musk—the functional leader of DOGE—has "used the social media platform X to solicit job applications for USDS and to poll the public about courses of action that USDS is considering." *Id.*

At the same time, DOGE has operated in "unusual secrecy," *id.* *54, refusing to publicly acknowledge Musk's precise role at DOGE, and labelling the publication of names of USDS employees "a crime." *Id.* From this evidence Judge Cooper concluded, "gives rise to the possibility that representatives of the Defendant entities may not fully appreciate their obligations to preserve federal records." *Id.* *54-55. Heightening this concern, many USDS "staffers are reported to have joined the federal government only recently and, to put it

17

charitably, may not be steeped in its document retention policies." *Id.* \*55.  All this was enough for Judge Cooper to conclude that a preservation order was warranted, a conclusion this Court should reach as well.

The status of the Administrator, who bears the responsibility to develop and implement agency-wide recordkeeping guidance, further illustrates the secrecy in which DOGE has cloaked itself and the need for injunctive relief here. While the White House initially refused to publicly identify the Administrator, in February it eventually named Amy Gleason as the Administrator. In a recently unsealed court filing the Trump administration acknowledged Ms. Gleason had been detailed to HHS in February where she was "formally hired by the department as a 'consultant/expert' on March 4, while retaining her status as a DOGE employee as well." Kyle Cheney & Megan Messerly, "The person the White House says is leading DOGE has also been working at HHS," *Politico*, Mar. 18, 2025, https://www.politico.com/news/2025/03/18/doge-leader-human-services-gleason-00237827. Yet, despite earlier questions from federal judges about DOGE's leadership and chain of command, attorneys for DOGE never revealed Ms. Gleason's dual role. *Id.* Indeed, in the *CREW* case in support of its motion for reconsideration filed on March 14, 2025, Defendants filed a declaration from Ms. Gleason (ECF No. 20-2) attesting she is "a full-time government employee at USDS." Gleason Decl. ¶ 3 (Exhibit C hereto). Tellingly, Ms. Gleason makes no mention of her employment at HHS.

This newly revealed evidence undermines any confidence that, as Administrator, Ms. Gleason is properly and effectively fulfilling her recordkeeping responsibilities. The Gleason Declaration states only that USDS and USDSTO "have obligations to maintain records and do so pursuant to the [PRA]." Gleason Decl. ¶ 25. While Ms. Gleason states that USDS has informed employees of their need to "adhere to records-preservation requirements," *id.* ¶ 26, she does

explain what those requirements are what specifically employees have been told. These vague statements fall far short of evidence that Ms. Gleason and DOGE are satisfying their obligations under either statute.

Nor does the one-sentence assurance DOJ counsel provided—that USDS has taken all steps to preserve all USDS records consistent with its obligations under the PRA—assuage these concerns. Left unanswered are what those steps are and the underlying factual basis that would allow a testing of its accuracy. Indeed, we do not know whether a written recordkeeping policy even exists for DOGE's records and whether and to what extent that policy has been communicated to all DOGE employees. Facts to date, including the ongoing use of Signal, *see, e.g.*, Scott Patterson, Josh Dawsey & Brian Schwartz, "Inside DOGE's Clash With the Federal Workforce, *Wall Street Journal*, Feb. 27, 2025, https://www.wsj.com/politics/policy/inside-doge-elon-musk-government-employees-b87fc17a. suggest the answer is no.

In short, the secrecy with which DOGE operates, its past behavior exhibiting a disregard for its recordkeeping obligations, and the failure of its counsel to provide a full-throated assurance that all DOGE records will be preserved in accordance with the FRA during the pendency of this lawsuit illustrate that absent the requested preliminary injunction, Plaintiff will suffer irreparable injury. The possibility, if not likelihood, that we will lose part of this history forever is simply too great a risk to bear.

## III.    DEFENDANTS WILL NOT BE HARMED BY THE REQUESTED RELIEF.

The immediate relief Plaintiff seeks will require nothing more of Defendants than what the law already mandates: the collection, maintenance, and preservation of federal records pursuant to recordkeeping guidance that complies with the FRA and implementing guidance from NARA. Requiring Defendant to comply with the law cannot properly be characterized as a

19

burden, particularly where an injunction "merely ends an unlawful practice." *Open Cmtys. All. v. Carson*, 286 F. Supp 3d 148, 179 (D.D.C. 2017) (cleaned up).

## IV.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR THE REQUESTED RELIEF.

Finally, the balance of equities and the public interest, which "merge" when "the [g]overnment is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), weigh heavily in favor of the requested preliminary injunction.

Beyond the harm to Plaintiff, the public interest strongly favors a preliminary injunction requiring Defendants to comply with their obligations under the FRA. The enormous power that DOGE wields has impacted Americans across the country and from nearly every walk of life. DOGE bears responsibility for actions ranging from thousands of government workers losing their jobs to the decreased security and staffing of our nuclear arsenal. DOGE has amassed personal and private information about millions of Americans with no guarantee that information will be safely stored and not shared for improper purposes. Access to records that delineate and explain DOGE's actions is critical to hold the agency accountable. Balancing all the interests at stake leads to the inescapable conclusion that an injunction requiring DOGE to preserve its records is both necessary and warranted.

## <u>CONCLUSION</u>

For the foregoing reasons Plaintiff respectfully requests that the Court grant Plaintiff's request for a preliminary injunction.

Respectfully submitted,

*/s/ Anne L. Weismann*

20

Anne L. Weismann
D.C. Bar No. 298190
5335 Wisconsin Avenue,
N.W. Suite 640
Washington, D.C. 20015
(301) 717-6610
weismann.anne@gmail.com

Dated: March 24, 2025