## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PROJECT ON GOVERNMENT OVERSIGHT, INC. <br> 1100 13th Street, NW <br> Suite 800 <br> Washington, DC 20005, <br><br>            Plaintiff, <br><br>     v. <br><br> DONALD J. TRUMP, <br> In his official capacity as President of the United States <br> 1600 Pennsylvania Avenue, NW <br> Washington, DC 20500 <br><br> U.S. DEPARTMENT OF GOVERNMENT EFFICIENCY; U.S. DOGE SERVICE; U.S. DOGE SERVICE TEMPORARY ORGANIZATION; ADMINISTRATOR, U.S. DOGE SERVICE TEMPORARY ORGANIZATION <br> 736 Jackson Place, NW <br> Washington, DC 20503, <br><br>            Defendants. | No. 1:25-cv-527 |

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
## IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ......................................................................................iii

INTRODUCTION ................................................................................................1

STATUTORY FRAMEWORK ................................................................................2

FACTUAL AND PROCEDURAL BACKGROUND ...................................................4

    I.    Relevant Presidential Issuances Regarding USDS ...................................4

    II.    Pending FOIA Litigation .......................................................................7

    III.    Procedural History ...............................................................................8

ARGUMENT .......................................................................................................9

    I.    Legal Standard ....................................................................................9

    II.    Plaintiff Lacks Standing ......................................................................10

    III.    Plaintiff Fails To Demonstrate That It Will Suffer Irreparable Harm Absent an Emergency Injunction ...........................................................12

    IV.    Plaintiff Is Unlikely To Succeed on the Merits .....................................16

        A.    Plaintiff Is Barred from Bringing a Broad Programmatic Attack on USDS's Recordkeeping Practices ...............................................16

        B.    Plaintiff Fails To Establish that USDS Is an "Agency" ..............18

        C.    The Court Lacks Jurisdiction To Enjoin the President ...............23

    V.    The Balance of Hardships and Public Interest Do Not Favor Emergency Injunctive Relief...............................................................................25

CONCLUSION ..................................................................................................26

<u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>

*Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321 (D.D.C. 2018) ...................... 12

*Am. First Legal Found. v. Becerra*,
     No. 24-cv-1092 (RC), 2024 WL 3741402 (D.D.C. Aug. 9, 2024) ..................... 14

*Am. Hist. Ass'n v. NARA*, 310 F. Supp. 2d 216 (D.D.C. 2004) ................................... 11

*Am. Hist. Ass'n v. NARA*, 402 F. Supp. 2d 171 (D.D.C. 2005) ................................... 11

*Animal Legal Def. Fund, Inc. v. Vilsack*, 111 F.4th 1219 (D.C. Cir. 2024) ................... 18

*\*Armstrong v. Bush* ("*Armstrong I*"), 924 F.2d 282 (D.C. Cir. 1991) ................. 3, 17, 18

*\*Armstrong v. EOP* ("*Armstrong II*"),
     1 F.3d 1274 (D.C. Cir. 1993) ................................................ 2, 17, 18

*Armstrong v. EOP* ("*Armstrong III*"), 90 F.3d 553 (D.C. Cir. 1996) ............19, 20, 21, 23

*Aviles-Wynkoop v. Neal*, 978 F. Supp. 2d 15 (D.D.C. 2013) ........................................ 13

*Blue v. Fremont Inv. & Loan*, 584 F. Supp. 2d 10 (D.D.C. 2008) ...........................18-19

*Caudle v. D.C.,* 825 F. Supp. 2d 73 (D.D.C. 2011) ...................................................... 16

*Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716 (D.C. Cir. 2022) ...................... 10

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ........... 9

*CityFed Financial Corp. v. Office of Thrift Supervision*,
     58 F.3d 738 (D.C. Cir. 1995) ............................................................ 12

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ................................................... 10

*Cobell v. Norton*, 391 F.3d 251 (D.C. Cir. 2004) ......................................................... 9

*Competitive Enter. Inst. v. Off. of Science & Tech. Policy*,
     No. 14-cv-765, 2016 WL 10676292 (D.D.C. Dec. 12, 2016) ........................... 14

*Cornish v. Dudas*, 540 F. Supp. 2d 61 (D.D.C. 2008) .................................................. 13

*CREW v. Cheney*, 593 F. Supp. 2d 194 (D.D.C. 2009) ................................................. 11

*CREW v. DHS* ("*DHS I*"), 527 F. Supp. 2d 101 (D.D.C. 2007)  ..................................... 11

*CREW v. DHS*, 387 F. Supp. 3d 33 (D.D.C. 2019),
     *amended*, 2019 WL 11307644 (D.D.C. July 22, 2019)  ..................................... 17

*CREW v. DHS* ("*DHS II*"),
     No. 22-CV-3350 (TSC), 2024 WL 1178472 (D.D.C. Mar. 19, 2024), *vacated*
     *in part on unrelated grounds*, 2024 WL 4286031 (D.D.C. Sept. 25, 2024)  ........ 11

*CREW v. EOP*, 587 F. Supp. 2d 48 (D.D.C. 2008)  .................................................. 10-11

*CREW v. Off. of Admin.*, 593 F. Supp. 2d 156 (D.D.C. 2009)  ........................................... 8

*CREW v. Off. of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009)  ........................... 20, 21, 22

*CREW v. Pruitt*, 319 F. Supp. 3d 252 (D.D.C. 2018)  .................................................. 18

*CREW v. SEC*, 858 F. Supp. 2d 51 (D.D.C. 2012)  ........................................................ 10

*CREW v. Trump*, 924 F.3d 602 (D.C. Cir. 2019)  ............................................................ 3

*CREW v. USDS*, No. 1:25-cv-511, 2025 WL 752367 (D.D.C. Mar. 10, 2025) ..... 8, 23, 24

*Democracy Forward Found. v. Pompeo*, 474 F. Supp. 3d 138 (D.D.C. 2020)  ............... 15

*Democracy Forward Found. v. White House Office of Am. Innovation*,
     356 F. Supp. 3d 61 (D.D.C. 2019)  ................................................................. 4, 22

*Franklin v. Massachusetts*, 505 U.S. 788 (1992)  .......................................................... 25

*In re Navy Chaplaincy*, 738 F.3d 425 (D.C. Cir. 2013)  .................................................. 10

*Jones v. U.S. Secret Serv.,* 701 F. Supp. 3d 4 (D.D.C. 2023)  ......................................... 18

*Judicial Watch, Inc. v. DOJ*,
     No. 18-cv-154 (RBW), 2018 WL 11457399 (D.D.C. Nov. 13, 2018)  ............... 15

*Judicial Watch, Inc. v. Kerry*, 844 F.3d 952 (D.C. Cir. 2016)  ........................................ 17

*Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136 (1980)  ... 4, 17, 19

*L.A. v. Lyons,* 461 U.S. 95 (1983)  ................................................................................ 16

*League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)  .................................. 12

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992)  ............................................ 10

*Main St. Legal Servs., Inc. v. Nat'l Sec. Council*, 811 F.3d 542 (2d Cir. 2016) ......... 19-20

*Metro. Council of NAACP Branches v. FCC*, 46 F.3d 1154 (D.C. Cir. 1995) ............... 15

*Meyer v. Bush*, 981 F.2d 1288 (D.C. Cir. 1993) ................................................. 19, 20, 21

*Navajo Nation v. Azar*, 292 F. Supp. 3d 508 (D.D.C. 2018) ........................................ 12

*Newdow v. Roberts*, 603 F.3d 1002 (D.C. Cir. 2010) ..................................................... 25

*Nken v. Holder*, 556 U.S. 418 (2009) ...................................................................... 10, 25

\**Norton v. SUWA*, 542 U.S. 55 (2004) .......................................................................... 16

*NRDC v. Pena*, 147 F.3d 1012 (D.C. Cir. 1998) ........................................................... 10

*Pac. Legal Found. v. CEQ*, 636 F.2d 1259 (D.C. Cir. 1980) ......................................... 22

*Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038 (D.C. Cir. 1985) ..................... 20

*Sampson v. Murray*, 415 U.S. 61 (1974) ....................................................................... 12

*Severino v. Biden*, 71 F.4th 1038 (D.C. Cir. 2023) ....................................................... 25

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) ...................................................... 10

*Sierra Club v. Andrus*, 581 F.2d 895 (D.C. Cir. 1978),
    *rev'd on other grounds*, 442 U.S. 347 (1979) .................................................... 22

*Sinclair Wyo. Ref. Co. LLC v. EPA*, 114 F.4th 693 (D.C. Cir. 2024) ............................ 10

*Singh v. Carter*, 185 F. Supp. 3d 11 (D.D.C. 2016) ....................................................... 10

*Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971) ............................................... 19, 20, 22

*SPLC v. DHS*, No. 18-cv-0760, 2023 WL 2564119 (D.D.C. Mar. 15, 2023) ............... 19

*Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021) ...................................................... 9-10

*United States v. Philip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009) .................... 16

*U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136 (1989) ........................................... 23

*United to Protect Democracy v. Presidential Advisory Comm'n on Election Integrity*,
    288 F. Supp. 3d 99 (D.D.C. 2017) ...................................................................... 22

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ..................................... 9, 10

*Wisc. Gas Co. v. FERC*, 758 F.2d 66 (D.C. Cir. 1985) (per curiam) ............................. 13

## **Statutes**

Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 ............................................ 4, 19

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 ........................... 1, 17, 18

5 U.S.C. § 706 .................................................................................................. 17

5 U.S.C. § 3161 ................................................................................................... 5

15 U.S.C. § 1023 ............................................................................................... 20

Federal Records Act ("FRA"),
    44 U.S.C. Chapters 21, 29, 31, and 33 ..................................................... *passim*

Presidential Records Act of 1978 ("PRA"), 44 U.S.C. §§ 2201–2209 ................... *passim*

44 U.S.C. § 2201 ........................................................................................... 3, 4

44 U.S.C. § 2202 ................................................................................................ 3

44 U.S.C. § 2203 ................................................................................................ 3

44 U.S.C. § 2904 ................................................................................................ 2

44 U.S.C. § 2906 ................................................................................................ 2

44 U.S.C. § 3101 ................................................................................................ 2

44 U.S.C. § 3106 .............................................................................................. 18

44 U.S.C. § 3301 ................................................................................................ 2

## **Legislative Materials**

H.R. Conf. Rep. No. 1380, 93d Cong., 2d Sess. 15 (1974) ............................................ 19

## **Presidential Materials**

Executive Order ("EO") 12291 ......................................................................... 21

EO 14158 ................................................................................................. 4, 5, 23

EO 14170 ................................................................................................. 5, 6, 22

EO 14210 ................................................................................................. 6, 22

EO 14218 ................................................................................................. 6, 22

EO 14219 ................................................................................................. 6, 7, 22

EO 14222 ................................................................................................. 7, 22

EO 14248 ................................................................................................. 7, 22

Presidential Memorandum, *Hiring Freeze* (Jan. 20, 2025), *available at*
    https://www.whitehouse.gov/presidentialactions/2025/01/hiring-freeze/ ........... 7

Pursuant to the Court's March 27, 2025 Minute Order, Defendants respectfully submit this memorandum in opposition to Plaintiff Project on Government Oversight, Inc. ("POGO" or "Plaintiff")'s Motion for a Preliminary Injunction [ECF 11].

## <u>INTRODUCTION</u>

Plaintiff seeks preliminary injunctive relief against Defendants the President of the United States and the U.S. DOGE Service (USDS) to compel them to "collect, maintain, and preserve all their records" pursuant to the Federal Records Act (FRA)—a statute that applies neither to the President nor to presidential advisory entities like USDS. *See* Proposed Order [ECF 11-13]. Plaintiff fails to establish its entitlement to emergency relief—first and foremost because the only harm Plaintiff identifies is the speculative prospect that records responsive to FOIA requests that Plaintiff might someday submit (but never has, so far) might not be preserved. Such a remote and dubious injury is insufficient to establish Plaintiff's standing, much less irreparable harm. Moreover, although the USDS lacks the independent decision-making authority that would render it an "agency" subject to the FRA, it has established a records retention policy consistent with the law that does apply—the Presidential Records Act (PRA). Plaintiff has failed to explain why that is not sufficient. In essence, Plaintiff's Motion seeks an impermissible "obey-the-law" injunction, and its request should be rejected out of hand.

Plaintiff is also unlikely to succeed on the merits of its claims because those claims amount to a programmatic attack impermissible under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706. Rather than identifying any discrete defect in an existing policy, Plaintiff asks the Court to oversee USDS's establishment and implementation of an FRA-compliant recordkeeping program. Such an intrusion goes far beyond previous claims that have questioned whether an entity within the Executive Office of the President (EOP) is governed by the PRA or the FRA—most if

not all of which have properly arisen in response to a FOIA request that is already pending before the EOP entity at issue. Plaintiff also fails to show that USDS has been granted authority beyond providing advice to the President and other agencies, such that it could properly be deemed an "agency" itself. Plaintiff's request for emergency relief should be denied.

## STATUTORY FRAMEWORK

Executive Branch records are governed by either the FRA, 44 U.S.C. Chapters 21, 29, 31, and 33, or the PRA, 44 U.S.C. §§ 2201-2209. *See Armstrong v. EOP* ("*Armstrong II*"), 1 F.3d 1274, 1290 (D.C. Cir. 1993). The FRA governs records that are "made or received by a Federal agency under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government or because of the informational value of data in them." 44 U.S.C. § 3301(a)(1)(A). Under the FRA regime, agencies must "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities." 44 U.S.C. § 3101. In this endeavor, agencies are subject to the overarching authority of the National Archives and Records Administration (NARA), which is responsible for providing guidance and assistance to agencies in carrying out their recordkeeping obligations and, in limited circumstances, conducting inspections of an agency's records or records management practices. *Id.* §§ 2904, 2906.

The PRA, by contrast, applies to Presidential records—in other words, materials that are "created or received by the President, the President's immediate staff, or a unit or individual of the

Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2). The PRA directs the President to take "all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory or other official or ceremonial duties are adequately documented and that such records are maintained as Presidential records pursuant to the requirements of this section and other provisions of law." *Id.* § 2203(a). The PRA also directs the President, "to the extent practicable," to "categorize[]" materials as Presidential records or personal records "upon their creation or receipt" and to "file[] [them] separately." *Id.* § 2203(b). In light of this statutory language, the D.C. Circuit recognizes that "the PRA accords the President virtually complete control over his records during his term of office." *Armstrong v. Bush* ("*Armstrong II*"), 924 F.2d 282, 290 (D.C. Cir. 1991); *see CREW v. Trump*, 924 F.3d 602, 603 (D.C. Cir. 2019) ("Although the PRA makes clear that the United States, 'retain[s] complete ownership, possession, and control of Presidential records,' 44 U.S.C. § 2202, it also provides that the President, during his term in office, shall assume 'exclusive[] responsib[ility] for custody, control, and access to such Presidential records,' *id.* § 2203(f).").

The existence of two separate records regimes—one, under the FRA, governing agencies' federal records, and the other, under the PRA, governing Presidential records—thus reflects Congress's concern to avoid encroaching on the President's authority to manage his own records during his term in office. This concern is further reflected in the PRA's express exclusion from the definition of Presidential records any materials that qualify as "official records of an agency (as

defined in [the Freedom of Information Act (FOIA), 5 U.S.C. § 552(f)[1]])." 44 U.S.C. § 2201(2)(B). The Supreme Court has recognized that with respect to the EOP, "the President's immediate personal staff" as well as "units in the Executive Office whose sole function is to advise and assist the President" are not included within FOIA's definition of "agency." *See Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980). Thus, for example, the White House Office and the National Security Council are subject to the PRA rather than the FRA. *E.g.*, *Democracy Forward Found. v. White House Office of Am. Innovation*, 356 F. Supp. 3d 61, 66 (D.D.C. 2019).

Accordingly, both categories of EOP components are subject to recordkeeping obligations: An EOP component is governed either by the PRA or by the FRA, depending on whether that component is within the White House Office, which is categorically excluded from the definition of an agency, or, for components outside the White House Office, whether the component's sole function is to advise and assist the President.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    Relevant Presidential Issuances Regarding USDS

Shortly after taking office, the President signed a series of Executive Orders ("EOs") and a presidential memorandum that "describe distinct—and limited—roles for" USDS, a temporary organization within USDS called the U.S. DOGE Service Temporary Organization (USDSTO), and agency DOGE Teams. Declaration of Amy Gleason ("Gleason Decl.") ¶ 25 (attached to Plaintiff's PI Motion as Exhibit C [ECF 11-2, at 6]).

EO 14158, signed on January 20, 2025, directs changes to the previously established U.S.

---

[1] Although the PRA, 44 U.S.C. § 2201(2)(B), refers to subsection (e) of the FOIA, that subsection has been re-codified at 5 U.S.C. § 552(f).

Digital Service to implement the President's "DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity." EO 14158 § 1. This EO redesignated the U.S. Digital Service as the U.S. DOGE Service; moved it out of the Office of Management and Budget (OMB); and made it a free-standing EOP component, whose head (the USDS Administrator) reports directly to the White House Chief of Staff. *Id.* § 3(a). Similarly, pursuant to 5 U.S.C. § 3161, it established within USDS the temporary organization USDSTO, which will terminate on July 4, 2026. EO 14158 § 3(b). The USDSTO "shall be headed by the USDS Administrator and shall be dedicated to advancing the President's 18-month DOGE agenda." *Id.* "

EO 14158 also requires agency heads to "establish within their respective agencies a DOGE Team of at least four employees, which may include Special Government Employees." *Id.* § 3(c). Such teams, employed by and located within the agencies, must "coordinate their work with USDS and advise their respective Agency Heads on implementing the President's DOGE Agenda." *Id.* The EO further tasks USDS with "commenc[ing] a Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems" and directs agency heads to "take all necessary steps, in coordination with the USDS Administrator and to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems," while also noting that "USDS shall adhere to rigorous data protection standards." *Id.* §§ 4(a)-(b).

A collection of other EOs and a presidential memorandum describe other elements of the DOGE Agenda and the USDS Administrator's responsibilities, which include consulting with and advising agency personnel on various presidential initiatives. In particular, EO 14170, also signed

on January 20, 2025, directs the Assistant to the President for Domestic Policy, "in consultation with the Director of [OMB], the Director of the Office of Personnel Management, and the Administrator of" USDS to "develop and send to agency heads a Federal Hiring Plan that brings to the Federal workforce only highly skilled Americans dedicated to the furtherance of American ideals, values, and interests." *Id.* § 2(a). EO 14170 further states that the resulting federal hiring plan "shall provide specific best practices for the human resources function in each agency, which each agency head shall implement, *with advice and recommendations* as appropriate from" USDS. *Id.* § 2(d) (emphasis added).

EO 14210, signed on February 11, 2025, directs OMB to submit a plan to reduce the size of the Federal Government's workforce, *id.* § 3(a), and directs *agency heads* to, among other things, "promptly undertake preparations to initiate large-scale reductions in force," *id.* § 3(c). The Executive Order tasks the leader of each agency team, as defined in EO 14158, with certain responsibilities, including consulting with the agency head on a hiring plan, id. § 3(b); consulting on "new career appointment hiring decisions," *id.* § 3(b)(i); deciding whether "any vacancies for career appointments . . . should be filled," *id.* § 3(b)(ii); and providing the USDS Administrator "with a monthly hiring report for the agency," *id.* § 3(b)(iii).

EO 14218, signed on February 19, 2025, directs the OMB Director and the USDS Administrator, in coordination with the Assistant to the President for Domestic Policy, to "identify all other sources of Federal funding for illegal aliens," and to "*recommend* additional agency actions to align Federal spending with the purposes of this order, and, where relevant, enhance eligibility verification systems." EO 14218 § 2(b)(i)-(ii) (emphasis added).

EO 14219, also signed on February 19, 2025, directs that "Agency heads shall, in coordination with their DOGE Team Leads and the Director of [OMB], initiate a process to review

all regulations subject to their sole or joint jurisdiction for consistency with law and Administration policy." EO 14219 § 2. "Additionally, agency heads shall consult with their DOGE Team Leads and the Administrator of [the Office of Information and Regulatory Affairs] on potential new regulations as soon as practicable." *Id.* § 4.

EO 14222, signed on February 26, 2025, states that "[e]ach Agency Head shall, with assistance as requested from the agency's DOGE Team Lead," among other steps "build a centralized technological system within the agency to seamlessly record every payment issued by the agency." EO 14222 § 3(a); *see also id.* §§ 3(a)(i), (3)(b), 3(c), 3(d)(i) (identifying additional steps to be taken by agency heads in consultation with the agency's DOGE Team Lead). This EO also directs each DOGE Team Lead to provide the USDS Administrator with "a monthly informational report on contracting activities," *id.* § 3(d)(ii), and, "to the extent consistent with law," with a "monthly informational report listing each agency's justifications for non-essential travel," *id.* § 3(e).

Finally, EO 14248, signed on March 25, 2025, states that the USDS Administrator will "coordinat[e]" with the Department of Homeland Security (DHS) to enable DHS to "review each state's publicly available voter registration list . . . alongside Federal immigration databases and state records requested . . . , for consistency with Federal requirements." *Id.* § 2(b)(iii).

In addition to these EOs, a January 20, 2025 presidential memorandum directs the OMB Director, "in consultation with" the Office of Personnel Management (OPM) Director and USDS Administrator, to "submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition." Presidential Memorandum, *Hiring Freeze*, *available at* https://www.whitehouse.gov/presidentialactions/2025/01/hiring-freeze/. The memorandum further states that this hiring freeze will remain in place for the Internal Revenue Service (IRS)

"until the Secretary of the Treasury, in consultation with the Director of OMB and the Administrator of USDS, determines that it is in the national interest to lift the freeze." *Id.*

## II.    Pending FOIA Litigation

At least three cases filed before this case and still pending before members of this Court involve specific FOIA requests submitted to USDS on the theory that USDS is an "agency" subject to FOIA—a category that is "coextensive" with the category of agencies subject to the FRA, *CREW v. Off. of Admin.*, 593 F. Supp. 2d 156, 159 (D.D.C. 2009).  *See Ctr. for Biological Diversity v. OPM*, No. 1:25-cv-165 (D.D.C. filed Jan. 20, 2025); *Am. Oversight v. U.S. Dep't of Gov't Efficiency* ("*American Oversight* FOIA case"), No. 1:25-cv-409 (D.D.C. filed Feb. 11, 2025); *CREW v. USDS* ("*CREW* FOIA case"), No. 1:25-cv-511 (D.D.C. filed Feb. 20, 2025). On March 10, 2025, the Court in the *CREW* FOIA case issued an order requiring preservation of "all records that may be responsive to CREW's FOIA requests," though the Court declined to order production by a date certain. *CREW v. USDS*, No. 1:25-cv-511, 2025 WL 752367 (D.D.C. Mar. 10, 2025). On April 2, 2025, the Court in the *American Oversight* FOIA case similarly issued a preservation order covering "all records that may be responsive to any of plaintiff's FOIA requests at issue in this case." Order of Apr. 2, 2025, ECF 15, No. 1:25-cv-409 (D.D.C. Apr. 2, 2025).

## III.    Procedural History

Plaintiff filed its Complaint on February 21, 2025, naming as defendants President Trump, the "U.S. Department of Government Efficiency,"[2] USDS, USDSTO, and the USDSTO Administrator. Compl. [ECF 1]. Plaintiff asserts four claims: Count 1 seeks a declaratory judgment that the "policies and practices" of Defendants "to treat the records of DOGE and its agency

---

[2] As the above description indicates, the "U.S. Department of Government Efficiency," or DOGE, is the term used for the President's DOGE policy agenda. It is not a distinct entity separate from USDS, USDSTO, or agency DOGE Teams and is therefore not a proper defendant in this case.

components as subject to the PRA" rather than the FRA are "arbitrary, capricious, and contrary to law." Compl. ¶ 55. Count 2 seeks injunctive relief and a writ of mandamus requiring Defendants "to treat the records of DOGE and its agency components as agency records subject to the FRA and publicly accessible through the FOIA." *Id.* ¶ 60. Count 3 seeks a declaratory judgment that Defendant the USDS/USDSTO Administrator has violated the FRA by "fail[ing] to create and implement a recordkeeping policy under the FRA" to govern USDS and USDSTO records and that the Administrator's "policy and practice" of treating USDS and USDSTO records as subject to the PRA is "arbitrary, capricious, and contrary to law." *Id.* ¶¶ 68, 70-71. Count 4 seeks injunctive relief and a writ of mandamus requiring the Administrator to comply with the FRA. *Id.* ¶ 76.

Over a month later, on March 24, 2025, Plaintiff filed a Motion for Preliminary Injunction, seeking an order from the Court that would require Defendants "to collect, maintain, and preserve all their records pursuant to the requirements of the [FRA] and a recordkeeping policy consistent with the [FRA] and implementing guidance from NARA." [ECF 11.]

## ARGUMENT

### I.    Legal Standard

Preliminary injunctive relief is an "extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The party seeking relief must, "by a clear showing, carr[y] the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). A court should grant a preliminary injunction only when the moving party shows "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The third and fourth factors "merge when the government is the opposing party." *Trump v. Thompson*, 20 F.4th 10, 31 (D.C.

Cir. 2021) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).[3]

## II.    Plaintiff Lacks Standing

As an initial matter, Plaintiff lacks standing because, having never submitted a FOIA request to USDS, and with no concrete plan to do so, Plaintiff cannot identify a certainly impending injury. To establish an injury-in-fact sufficient for Article III standing, Plaintiff must "point to 'an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.'" *CREW v. SEC*, 858 F. Supp. 2d 51, 58 (D.D.C. 2012) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992) (internal citations and quotation omitted). Because Plaintiff seeks declaratory and injunctive relief, it must show "'a real and immediate—as opposed to merely conjectural or hypothetical—threat of future injury.'" *Id.* (quoting *NRDC v. Pena*, 147 F.3d 1012, 1022 (D.C. Cir. 1998)); *cf. Sinclair Wyo. Ref. Co. LLC v. EPA*, 114 F.4th 693, 722 (D.C. Cir. 2024) (injury in fact must be "certainly impending" when claim seeks future relief (citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013))).

The D.C. Circuit "has not yet addressed the issue of whether a party's impaired access to documents sought under FOIA constitutes sufficient injury under the FRA." *CREW v. SEC*, 858 F. Supp. 2d at 59-60. Courts in this District have held a plaintiff had standing for purposes of an FRA claim where it had a FOIA request pending with the agency at issue. *See id.* (citing *CREW v.*

---

[3] Although Plaintiff urges application of a "sliding scale" approach to the preliminary injunction factors, "[t]he continued viability of the sliding scale approach is highly questionable . . . in light of the Supreme Court's holding in *Winter*." *Singh v. Carter*, 185 F. Supp. 3d 11, 16 (D.D.C. 2016) (citing *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013), for the proposition that all four prongs of the preliminary injunction standard must be met before injunctive relief can be granted); *see also Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (recognizing "tension" between *Winter* and sliding-scale approach); *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011) (reading *Winter* "to suggest if not to hold" that likelihood of success is a free-standing requirement for a preliminary injunction). In any event, regardless of which standard is applied, preliminary injunctive relief is inappropriate here.

*EOP*, 587 F. Supp. 2d 48, 60-61 (D.D.C. 2008)). However, courts in this District have held plaintiffs lacked standing to raise any FRA-related claim "[i]n the absence of outstanding requests" because "a reasonable possibility" that the plaintiff would seek records in the future was insufficient to establish "an imminent, non-speculative injury-in-fact." *Id.* (quoting *CREW v. DHS* ("*DHS I*"), 527 F. Supp. 2d 101, 107 (D.D.C. 2007)); *see also CREW v. DHS* ("*DHS II*"), No. 22-CV-3350 (TSC), 2024 WL 1178472, at *4 (D.D.C. Mar. 19, 2024) ("A request for the records . . . must be imminent" to support an injury in fact), *vacated in part on unrelated grounds*, 2024 WL 4286031 (D.D.C. Sept. 25, 2024); *Am. Hist. Ass'n v. NARA*, 310 F. Supp. 2d 216, 228 (D.D.C. 2004) (plaintiffs lacked standing, despite "significant likelihood" that they would "again seek access to presidential records, and face indeterminate delays in accessing them," because they had "no outstanding requests").[4]

To be sure, the court in *CREW v. Cheney*, 593 F. Supp. 2d 194 (D.D.C. 2009), concluded the plaintiff had standing despite the absence of an outstanding record request. *Id.* at 226. There, however, the plaintiff sought to prohibit the Vice President from taking certain records with him when he left office, and indicated an intent to research the very subject of the records, which he deemed "crucial" to his research; the Court concluded that "it is certain what will occur when [the plaintiff] seeks access to documents that have not been preserved under the PRA—they will be unavailable to him." *Id.* at 228.

Here, unlike the plaintiffs in *SEC*, *DHS I*, and *DHS II*, Plaintiff alleges no pending FOIA request with USDS. And unlike the plaintiff in *Cheney*, Plaintiff identifies no particular area of

---

[4] In *Am. Hist. Ass'n v. NARA*, the Court later reconsidered its dismissal because, among other things, "Plaintiffs informed the Court" that in fact, contrary to the Court's original understanding, they did "have outstanding requests for presidential records." 402 F. Supp. 2d 171, 179 (D.D.C. 2005).

research that would require a future records request to USDS, nor does it link the subject of any future request to any imminent risk that those records will become unavailable; rather, Plaintiff vaguely suggests an interest in recordkeeping by "all federal agencies and agency heads" and asserts it has made past requests to other agencies for records "concerning . . . special government employees." Compl. ¶¶ 5-6. Plaintiff's allegations do not establish an injury in fact, which alone defeats its request for emergency relief.

## III.    Plaintiff Fails To Demonstrate That It Will Suffer Irreparable Harm Absent an Emergency Injunction

For similar reasons, Plaintiff also fails to establish irreparable harm. "[T]he basis of injunctive relief in the federal courts has always been irreparable harm." *CityFed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)). Indeed, "the failure to show a likelihood of irreparable harms remains, standing alone, sufficient to defeat [a preliminary injunction] motion." *Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018). To constitute irreparable injury, the harm must be "certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm." *League of Women Voters v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) (citation and alteration omitted). Further, where Plaintiff's standing is based on an alleged informational injury due to asserted violations of the FRA, the "irreparable harm" showing likewise must consist of informational harm to *Plaintiff*; Plaintiff cannot rely on alleged harms faced by third parties. *See, e.g.*, *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326 (D.D.C. 2018) (noting that "injuries to third parties are not a basis to find irreparable harm"). Plaintiff has the burden to put forth sufficient evidence to satisfy this high standard. "The movant cannot simply make 'broad conclusory statements' about the existence of harm. Rather, [the movant] must 'submit[ ] . . . competent evidence into the record . . . that would permit the Court

12

to assess whether [the movant], in fact, faces irreparable harm . . . .'" *Aviles-Wynkoop v. Neal*, 978 F. Supp. 2d 15, 21 (D.D.C. 2013) (quoting *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008)).

Plaintiff fails to meet its burden to show irreparable harm here. First, Plaintiff's claimed harm is far too vague and speculative to support the drastic remedy of a preliminary injunction. *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (citing the "well known and indisputable principle[]" that an "unsubstantiated and speculative" harm cannot constitute "irreparable harm" sufficient to justify injunctive relief). Plaintiff bases its claim of irreparable harm on the notion that it may, sometime in the future, submit FOIA requests to USDS, and, absent a preliminary injunction requiring USDS, as a general matter, to maintain records in compliance with the FRA, the records potentially responsive to these hypothetical future FOIA requests may not be preserved. *See* P.Br. [ECF 11-1] at 16 (citing "likely destruction and failure to capture all agency records by DOGE and its several components" as the alleged harm at issue). Significantly, unlike the plaintiffs in the three already-pending cases mentioned above, Plaintiff here does not claim to have submitted any FOIA request to USDS. Compl. ¶ 6 (listing entities to which Plaintiff has submitted FOIA requests). Nor does it identify a particular category of record that it might request in the future or explain why that category is likely to be destroyed absent a preliminary injunction.

Second, Plaintiff concedes that, even though Defendants disagree that USDS is an "agency" subject to the FRA and FOIA, USDS does consider itself a PRA entity beholden to the PRA's requirements. Indeed, the USDS Administrator has stated that USDS adheres to the PRA, Gleason Decl. ¶¶ 25-26, and on March 27, 2025, USDS publicly filed the most recent iteration of its PRA recordkeeping policy in another case. *See* Exhibit to Def. Opp. to P. Mot for Preservation

13

Order, ECF 13-2, *Am. Oversight v. U.S. Dep't of Gov't Efficiency*, No. 25-409 (D.D.C. filed Mar. 27, 2025) ("USDS Records Policy") (attached hereto as Exhibit A).

Plaintiff emphasizes the fact that records preserved pursuant to the PRA are not subject to FOIA while a President remains in office. *See* P.Br. at 6 (citing article opining that "[i]t may be years before [USDS] records are public"); *id.* at 9-10 (recognizing that records preserved pursuant to the PRA may be accessible through FOIA as soon as "five years after a President leaves office" and that all such records "eventually become publicly available"). But a dispute over the timing of access does not create any preservation emergency. The situation here stands in stark contrast to other cases where emergency relief requiring records preservation was granted only after the plaintiffs demonstrated good reason to believe records were on the verge of being destroyed. *See, e.g.*, *Am. First Legal Found. v. Becerra*, No. 24-cv-1092 (RC), 2024 WL 3741402, at *15-16 (D.D.C. Aug. 9, 2024) (ordering preservation of former employees' email when record suggested agency followed a policy of destroying such emails); *Competitive Enter. Inst. v. Off. of Science & Tech. Policy,* No. 14-cv-765, 2016 WL 10676292, at *3 (D.D.C. Dec. 12, 2016) (ordering preservation of political appointee emails responsive to plaintiff's FOIA request because the appointee was about to leave office and the continuing applicability of records retention obligations was uncertain).

Unlike those cases, Plaintiff's filing contains no evidence that USDS records are not being preserved or are on the verge of destruction. Plaintiff's concern appears to be focused primarily on USDS employees' possible use of messaging apps such as Signal. P.Br. at 17-19. Plaintiff points to a newspaper article as suggesting there is "ongoing" use of Signal by USDS employees. *See* P.Br. at 19 (citing Scott Patterson et al., *Inside DOGE's Clash With the Federal Workforce*, Wall St. J. (Feb. 27, 2025)). But Plaintiff's suggestion does not suffice to show irreparable harm. First,

the article's bald hearsay assertion that "[m]any on both sides communicate primarily on the encrypted Signal app," which is not attributed to any identified source, and in context appears to focus on *agency* employees' use of Signal (perhaps for personal communications among themselves or with the authors of the article), is entitled to no weight for purposes of Plaintiff's motion. *Democracy Forward Found. v. Pompeo*, 474 F. Supp. 3d 138, 150 (D.D.C. 2020) (rejecting hearsay in newspaper articles as inadmissible when offered by plaintiff asserting FRA violation); *see also Metro. Council of NAACP Branches v. FCC*, 46 F.3d 1154, 1165 (D.C. Cir. 1995) ("We seriously question whether a New York Times article is admissible evidence of the truthfulness of its contents.").

Second, even if not inadmissible hearsay, Plaintiff's allegation would still not qualify as evidence of imminent destruction. USDS's Records Policy instructs employees to preserve all work-related records and communications regardless of format, including communications exchanged on private messaging platforms such as Signal. *See* Exhibit A. Employees are instructed to "[d]isabl[e] auto-delete features on any such messaging services" to "help with retention and compliance." *Id*. Employees are also advised to use government-issued devices for work-related communications and forward any work-related messages that they receive on personal email or other personal messaging accounts to their government accounts. *Id.* The situation here thus more closely resembles that in *Judicial Watch, Inc. v. DOJ*, No. 18-cv-154 (RBW), 2018 WL 11457399 (D.D.C. Nov. 13, 2018), where the Court denied a preservation order because, even though it was undisputed that "personal email accounts" had been used, there was no evidence that "loss or removal of records occurred because emails were copied/forwarded to the appropriate government accounts." *Id.* at *2.

In the absence of any evidence that records are likely to be destroyed, there is no

justification for issuing a "follow the law" injunction such as Plaintiff proposes here. *See Norton v. SUWA*, 542 U.S. 55, 66 (2004) ("general orders compelling compliance with broad statutory mandates" are inappropriate); *L.A. v. Lyons,* 461 U.S. 95, 109 (1983) (injunction to "follow the law" in the absence of some allegedly imminent violation of the law is inappropriate); *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1137–38 (D.C. Cir. 2009) (distinguishing case before it from an impermissible "generalized injunction to obey the law" because "a proclivity for unlawful conduct has been shown"); *Caudle v. D.C.,* 825 F. Supp. 2d 73, 81 (D.D.C. 2011) ("an impermissible 'obey the law' injunction is one that is not meaningfully more specific than the law in question"). Yet that is precisely what Plaintiff asks for here. *See* P.Br. at 19 ("The immediate relief Plaintiff seeks will require nothing more of Defendants than what the law already mandates: the collection, maintenance, and preservation of federal records pursuant to recordkeeping guidance that complies with the FRA and implementing guidance from NARA.").

## IV.    Plaintiff Is Unlikely To Succeed on the Merits

Plaintiff is also unlikely to succeed on the merits of its claims in this case. Strikingly, Plaintiff's PI Motion simply ignores well-established limitations on judicial review in FRA/PRA cases and relies entirely on the Court's preliminary analysis in the *CREW* FOIA case, which led it to issue a preservation order limited to the records potentially response to the FOIA requests at issue in that case. But here, as discussed, no FOIA request is at issue because Plaintiff does not allege that it has submitted a FOIA request to USDS. Moreover, none of the causes of action asserted in Plaintiff's Complaint fall within the permissible scope of claims under the FRA or the PRA. Rather than challenging a discrete policy, Plaintiff tries to mount a broad programmatic challenge, which is impermissible even against an agency subject to the FRA—and USDS is in any event no such entity.

A. **Plaintiff Is Barred from Bringing a Broad Programmatic Attack on USDS's Recordkeeping Practices**

First, Plaintiff raises no permissible FRA or PRA claim. The D.C. Circuit held in *Armstrong I* that the PRA "precludes judicial review of the President's recordkeeping practices and decisions." *Armstrong I*, 924 F.2d at 291. Meanwhile, the FRA "does not contain an express or implied private right of action." *Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 954 (D.C. Cir. 2016) (citing *Kissinger*, 445 U.S. at 148-50). Accordingly, a plaintiff seeking to assert a violation of the FRA must rely on the causes of action set forth in the APA, 5 U.S.C. § 706. And the APA requires that any challenge identify a final "discrete agency action" rather than a "'broad programmatic attack' on an agency's compliance with a statutory scheme." *CREW v. DHS*, 387 F. Supp. 3d 33, 49 (D.D.C. 2019), *amended*, 2019 WL 11307644 (D.D.C. July 22, 2019).

The upshot of these limitations is that the only permissible challenge in this context would be one that challenges a specific recordkeeping guideline or directive as somehow inadequate under the PRA or FRA. For example, in *Armstrong II*, the court recognized a limited exception to the PRA's bar on judicial review: Where a plaintiff had submitted a FOIA request and then brought suit claiming White House guidelines improperly classified certain material as Presidential records when in fact (according to the plaintiff) they qualified as "agency records subject to the FRA," a court could "review guidelines outlining what is, and what is not, a 'presidential record,'" as opposed to a federal record. *See Armstrong II*, 1 F.3d at 1280, 1290, 1294. In *Armstrong I*, the court similarly allowed an APA claim that an agency's "recordkeeping guidelines and directives do not adequately describe the material that must be retained as 'records' under the FRA." *Armstrong I*, 924 F.2d at 292.[5]

---

[5] The court in *Armstrong I* also recognized a second category of permissible FRA-related claims, holding that, although plaintiffs may not challenge an agency's alleged illegal destruction of records, they may seek "judicial review of the agency head's or Archivist's refusal to seek the

Here, Plaintiff raises four separate claims, none of which is sufficiently limited to comport with the restrictions of *Armstrong I*, *Armstrong II*, or the APA. Rather than challenging a discrete written guideline, Plaintiff purports to challenge unidentified "policies and practices," Compl. ¶¶ 55, 63, or the alleged wholesale failure to "create and implement a recordkeeping policy" under the FRA, *id.* ¶¶ 68, 75. Essentially, these claims ask the Court to order Defendants to design and implement an entire FRA recordkeeping scheme for USDS records. Such broad, programmatic relief, which calls on the Court to undertake an ongoing oversight role in order to implement wholesale improvement of government practices, is prohibited under the APA and far outside the scope of the limited review that *Armstrong I* and *II* permit. *See, e.g.*, *Animal Legal Def. Fund, Inc. v. Vilsack*, 111 F.4th 1219, 1232 (D.C. Cir. 2024) (Katsas, J., concurring) (APA requires plaintiffs "to focus their claims on 'discrete' as opposed to 'programmatic' agency actions"); *Jones v. U.S. Secret Serv.,* 701 F. Supp. 3d 4, 17 (D.D.C. 2023) (dismissing claim alleging "ongoing 'failure to properly train' officers" because APA did not allow programmatic challenge seeking "wholesale improvement" by court decree of an alleged "ongoing unlawful practice"). Because Plaintiff's claims are altogether impermissible, Plaintiff is unlikely to succeed on the merits

**B.    Plaintiff Fails To Establish that USDS Is an "Agency"**

Second, Plaintiff is also unlikely to succeed on its central argument, even if permissibly raised. As discussed, none of Plaintiff's claims specifically challenge a written USDS policy— including the attached USDS Records Policy. Indeed, Plaintiff's Complaint was filed before USDS filed a copy of the USDS Records Policy in another case. It would be inappropriate for the Court to essentially re-write Plaintiff's claims by construing them to challenge that Policy. *Blue v.*

---

initiation of an enforcement action by the Attorney General" under 44 U.S.C. § 3106. *Armstrong I*, 924 F.2d at 295; *cf. CREW v. Pruitt*, 319 F. Supp. 3d 252, 258 (D.D.C. 2018). Plaintiff has not asserted any such claim.

*Fremont Inv. & Loan*, 584 F. Supp. 2d 10, 13 (D.D.C. 2008) ("The Court shall not allow Plaintiffs, who are represented by counsel, to re-write their Amended Complaint through an Opposition to a Motion to Dismiss . . . ."); *SPLC v. DHS*, No. 18-cv-0760, 2023 WL 2564119, at \*4 n.6 (D.D.C. Mar. 15, 2023) ("Plaintiff may not belatedly amend its complaint in its pleadings—nor may the Court rewrite the complaint to draw *argumentative* inferences in Plaintiff's favor.").

However, even if the Court construes Plaintiff's claims as challenging the USDS Records Policy on the ground that it identifies USDS records as subject to the PRA, Plaintiff is unlikely to succeed on the merits of that claim. Again, the category of "agencies" subject to the FRA is coextensive with FOIA's definition of "agency" in 5 U.S.C. § 552(a). *Armstrong v. EOP* ("*Armstrong III*"), 90 F.3d 553, 556 (D.C. Cir. 1996). The Supreme Court has recognized that Congress did not intend FOIA to apply to "'the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President.'" *Kissinger*, 445 U.S. at 156 (quoting H.R. Conf. Rep. No. 1380, 93d Cong., 2d Sess. 15 (1974)). The Court thus held that notes made by Henry Kissinger in his role as the President's National Security Adviser were not subject to FOIA. *Id.* at 157-58. When analyzing *Kissinger*, the D.C. Circuit observed that the Supreme Court's interpretation of FOIA relied on a House Conference Report, issued in connection with the 1974 FOIA amendments, that indicated Congress's intent to codify an earlier D.C. Circuit decision, *Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971). *Meyer v. Bush*, 981 F.2d 1288, 1291-92 (D.C. Cir. 1993). In *Soucie*, the D.C. Circuit held that the then-named Office of Science and Technology—an entity "outside the White House Office, but within the Executive Office of the President," *Soucie*, 448 F.2d at 1074—qualified as an "agency" under FOIA because it exercised "substantial independent authority" beyond advising and assisting the President. *See Meyer*, 981 F.2d at 1291-92 (discussing *Soucie*); *see also Main St. Legal Servs., Inc. v. Nat'l Sec.*

*Council*, 811 F.3d 542, 548 (2d Cir. 2016) (discussing development of *Soucie* analysis).

The D.C. Circuit has subsequently assessed whether an entity within the EOP qualifies as an "agency" under FOIA by analyzing the entity's function, in order to distinguish between entities that advise and assist the President (which are not subject to FOIA), and those that are substantially independent (which are). *CREW v. Off. of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009). In *Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038 (D.C. Cir. 1985), for example, the court found that the Council of Economic Advisers (CEA) is not an "agency" for FOIA purposes because, although the CEA (unlike USDS) has duties prescribed by statute, each of its enumerated statutory duties is directed at providing advice and assistance to the President,[6] and neither the governing statute nor any executive order gives CEA any regulatory power. *Id.* at 1043; *cf. Meyer*, 981 F.2d at 1292 (discussing *Rushforth*).

Similarly, in *Armstrong III*, the D.C. Circuit found that the National Security Council (NSC) is not a FOIA agency because neither the President nor Congress has delegated any function to the NSC other than that of advising and assisting the President. 90 F.3d at 553. Although NSC is authorized, among other things, to review and provide guidance and direction for the conduct of intelligence activities, and to provide overall policy direction for the information security program, *see id.* at 561, there was no showing that the "NSC exercises meaningful non-advisory authority." *Id.* at 565. As the court found, "to the extent that the NSC assists the President in coordinating the activities of the various agencies with national security responsibilities, it exercises no authority

---

[6] The CEA's governing statute, 15 U.S.C. § 1023, authorizes the CEA to (1) assist and advise the President in the preparation of the Economic Report; (2) gather, compile and submit to the President timely and authoritative information concerning economic developments and economic trends; (3) appraise the various programs and activities of the Federal Government and make recommendations to the President; (4) develop and recommend to the President national economic policies to foster and promote free competitive enterprise; and (5) make and furnish whatever material a President may request on matters of Federal economic policy.

of its own." *Id.* at 561.

Likewise, in *Meyer*, the D.C. Circuit held that the President's ad hoc Task Force on Regulatory Relief was exempt from FOIA, even though the Executive Director of the Task Force (who was the OMB Director) had the authority, among other things, to review regulatory impact analyses (RIAs) and to issue guidelines both for filing the RIAs and for identifying major rules. *Meyer*, 981 F.2d at 1290. In fact, the Executive Order creating the Task Force also gave the OMB Director—subject to the Task Force's guidance—the authority (1) to designate regulations as major rules; (2) to require agencies to seek additional information in connection with a regulation; (3) to require interagency consultation designed to reduce conflicting regulations; (4) to develop procedures for estimating the annual social costs and benefits of regulations; and (5) to prepare recommendations to the President for changes in agency statutes. *See* EO 12291, § 6.

Nevertheless, the D.C. Circuit found that the Task Force lacked "substantial independent authority to direct executive branch officials." *Meyer*, 981 F.2d at 1297 (internal quotation omitted). As the court noted, the Executive Order creating the Task Force specified the President's intent "only to improve the internal management of the Federal Government." *Id.* at 1290 (quoting EO 12291, § 9). And that Executive Order "did not confer any power to prevent an agency from carrying out its legal duty," as it "cautioned that the agencies must follow its provisions only 'to the extent permitted by law.'" *Id.* (quoting EO 12291, § 2).

In *CREW v. Off. of Admin.*, the D.C. Circuit boiled down the various functional tests used to determine whether an entity within the Executive Office of the President was an agency into one question—whether the entity at issue "wield[s] substantial authority independently of the President." *CREW*, 566 F.3d at 222. Applying this test to the Office of Administration, which resides within the EOP, the court in *CREW* concluded, based on its review of the Office's charter

21

documents and website, that the Office "lacks substantial independent authority and is therefore not an agency under FOIA." *See id.* More recent decisions applying this test have found, for example, that the Presidential Advisory Commission on Election Integrity was not an "agency" for purposes of the Paperwork Reduction Act, *United to Protect Democracy v. Presidential Advisory Comm'n on Election Integrity*, 288 F. Supp. 3d 99, 115 (D.D.C. 2017); and that the Office of American Innovation was not a FOIA agency "because it is within the White House Office and because it does not exercise substantial authority independent of the President." *Democracy Forward Found.*, 356 F. Supp. 3d at 64.

By contrast, the D.C. Circuit has held EOP components to be agencies only when they wield significant authority independent of the President. In *Soucie*, as discussed, the D.C. Circuit held that OSTP was a FOIA agency because it had independent authority "to evaluate federal scientific research programs, initiate and fund research projects, and award scholarships." *CREW v. Office of Admin*, 566 F.3d at 223 (discussing *Soucie*, 448 F.2d at 1073-75). The court held that OMB was a FOIA agency because it has a statutory duty to provide budget information to Congress, along with "numerous other statutory duties." *Sierra Club v. Andrus*, 581 F.2d 895, 902 (D.C. Cir. 1978), *rev'd on other grounds*, 442 U.S. 347 (1979); *see also id.* at 902 n.25 (noting OMB's authority to "assemble, correlate, revise, reduce, or increase the requests for appropriations of the several departments or establishments"). And the court held that the Council on Environmental Quality (CEQ) is a FOIA agency because it has independent authority to coordinate federal environmental regulatory programs, issue guidelines for preparing environmental impact statements, and promulgate regulations—legally binding on the agencies—for implementing the procedural provisions of the National Environmental Policy Act. *See Pac. Legal Found. v. CEQ*, 636 F.2d 1259, 1262-63 (D.C. Cir. 1980).

USDS lacks the "substantial independent authority" that would render it an "agency" for purposes of FOIA or the FRA. The full extent of USDS's authority to date is set forth in the EOs and Presidential Memorandum listed above. Under those documents, USDS's role is to initiate a software modernization initiative, requiring agency heads to provide USDS access to their electronic systems, EO 14158; provide advice and recommendations to agencies regarding their hiring plans, EO 14170; provide recommendations to align federal spending with the purposes of EO 14218; coordinate with DHS to enable its review of various electronic systems, EO 14248; and consult with the OMB and OPM Directors regarding a plan to reduce the size of the Federal workforce, Presidential Memorandum. On their face, these functions are purely advisory. In regard to certain initiatives, it is the embedded DOGE Teams—which are part of other agencies, not part of USDS—that play a role regarding new hiring decisions, EO 14210; review of regulations, EO 14219; and assisting in building a centralized payment system, EO 14222.

The Court in the *CREW* FOIA case reached a contrary conclusion—at least, as the Court emphasized, "on th[e] preliminary record" before it when issuing a preservation order. *CREW v. USDS*, 2025 WL 752367, at *10.[7] But that decision, by its own admission, relied heavily on hearsay media reports—which as discussed above are inadmissible. *See id.* at *12. It also emphasized the phrasing of EO 14158 when describing the purpose of "the President's

---

[7] In contrast to *CREW*, the Court's Minute Order in the *American Oversight* FOIA case, explaining its decision to issue a preservation order, did not address the merits of this issue, instead relying on the importance of making sure USDS employees were aware of their preservation obligations in light of the plaintiff's interest in the specific records responsive to its FOIA requests. Minute Order of Apr. 2, 2025, *Am. Oversight*, No. 1:25-cv-409 (D.D.C. Apr. 2, 2025). The Court did assert that "what qualifies as a record and the respective retention obligations differ between the PRA and the FOIA." *Id.* (citing *Armstrong III*, 90 F.3d 553 (D.C. Cir. 1996); *U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136 (1989)). But the Court did not explain why any such difference would be significant based on the FOIA requests at issue, so as to warrant a preservation order in that case. Here, Plaintiff has no pending FOIA request, and has identified no reason to think any such differences might be significant.

'Department of Government Efficiency'" as to "implement the President's DOGE agenda." *Id.* at *11. Of course, the abstract notion of "implement[ing] a policy "agenda" cannot be dispositive regarding whether an entity wields substantial independent authority, and as described, the tasks that the EOs assign to USDS are limited and advisory in nature.

Moreover, EO 14158 makes clear that its stated purpose is to be carried out by the totality of the "DOGE Structure," which includes not only USDS and USDSTO, but also the DOGE Teams that are in agencies and comprised of agency personnel. EO 14158, § 3(a)-(c). To the extent any part of the DOGE Structure plays an implementation role, the EOs indicate that it is the agency DOGE Teams, advising and consulting with agency heads regarding implementation actions within agencies, as discussed above. The opinion in the *CREW* FOIA case failed to appreciate this distinction. *E.g.*, *CREW*, 2025 WL 752368, at *11 (describing EO that "grants the USDS Team Lead the power to keep vacant career positions open unless an agency overrides their decision"); *id.* at *12 (including "DOGE teams" as part of USDS's "defined staff" rather than part of an agency's staff). Any authorities or activities of DOGE Teams are irrelevant to the question of whether USDS itself is an "agency." Of course, the fact that DOGE Teams are already part of the agencies where they are embedded means that their records are already governed by the agencies' FRA requirements and are subject to FOIA to the same extent any other records within those agencies might be. Thus, if the Court reaches this issue, Plaintiff is unlikely to succeed on the merits here as well.

## C.    The Court Lacks Jurisdiction To Enjoin the President

To the extent Plaintiff's claims seek declaratory or injunctive relief against the President himself, they are also unlikely to succeed because no such relief may be awarded. Courts should not issue injunctive or declaratory relief against the President concerning his performance of

official duties, due to the extraordinary separation of powers concerns that such an order would raise. *See Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) ("[I]n general this court has no jurisdiction of a bill to enjoin the President in the performance of his official duties." (citation and quotation marks omitted)); *Newdow v. Roberts*, 603 F.3d 1002, 1012 (D.C. Cir. 2010) ("A court— whether via injunctive or declaratory relief—does not sit in judgment of a President's executive decisions."); *see also id.* at 1013 ("With regard to the President, courts do not have jurisdiction to enjoin him."); *Severino v. Biden*, 71 F.4th 1038, 1042–43 & n.1 (D.C. Cir. 2023) (recognizing the court likely could not order any injunctive relief against the President but declining to dismiss claim because redress was available from other defendants). Apart from all the other defects of Plaintiff's request for preliminary emergency relief, any such relief should not be ordered against the President himself.

## V.    The Balance of Hardships and Public Interest Do Not Favor Emergency Injunctive Relief

The remaining factors required for preliminary injunctive relief—balancing of the harm to the opposing party and the public interest—also weigh against emergency relief here. These factors merge when the Government is the opposing party. *Nken*, 556 U.S. at 435. Here, the harm to the government and the public is that USDS would be required to overlay its existing USDS Records Policy (not to mention the existing preservation orders issued by the courts in the *CREW* and *American Oversight* FOIA cases, addressing the subsets of records potentially responsive to those plaintiffs' FOIA requests) with yet another Court order requiring preservation of the same records. Even an inadvertent loss of a single record could potentially expose USDS to sanctions, potentially even from three different courts, if the record were potentially responsive to FOIA requests in both *CREW* and *American Oversight*. Such a prospect amounts to burdensome judicial overkill. On the other hand, as explained above, Plaintiff has no legitimate claim to harm since it has not submitted

a single FOIA request to USDS, and in light of USDS's in-place Records Policy that instructs employees to preserve all work-related records and communications. The Court should deny the requested preliminary injunction in this case.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiff's Motion for a Preliminary Injunction.

Dated:  April 7, 2025                    Respectfully submitted,

                                         YAAKOV M. ROTH
                                         Acting Assistant Attorney General

                                         MARCIA BERMAN
                                         Assistant Director, Federal Programs Branch

                                         */s/ Kathryn L. Wyer*
                                         KATHRYN L. WYER
                                         Federal Programs Branch
                                         U.S. Department of Justice, Civil Division
                                         1100 L Street, N.W., Room 12014
                                         Washington, DC  20005
                                         Tel. (202) 616-8475
                                         kathryn.wyer@usdoj.gov
                                         *Attorneys for Defendants*