**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| PROJECT ON GOVERNMENT OVERSIGHT, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 25-527 (JEB) |
| | ) | |
| DONALD J. TRUMP, et al., | ) | |
| Defendants. | ) | |
| | ) | |

**REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR**
**A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

INTRODUCTION ............................................................................................................... 1

SUPPLEMENTAL FACTS ................................................................................................. 3

ARGUMENT ...................................................................................................................... 4

    I.     Plaintiff Has Standing To Bring This Lawsuit ....................................................... 4

    II.    Plaintiff Will Suffer Irreparable Harm Absent The Requested Injunction ......... 9

    III.   Plaintiff's Claims Are Cognizable Under The FRA And The PRA ................. 15

    IV.   Because DOGE Exercises Substantial Independent Authority It Is An Agency Subject To The FRA……………………………………………………………17

    V.    The Balance Of Hardships Favors The Requested Injunction…………………..20

    VI.   CONCLUSION .................................................................................................. 21

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Am. First Legal Found v. Becerra*, 2024 U.S. Dist. LEXIS 151534 (D.D.C. Aug. 9, 2024) ……………………………………………………………….. 15

*Am. Oversight v. U.S. Dep't of Gov't Efficiency*, No. 25-cv-409 (D.D.C. Apr. 2, 2025)…………………………………………………………... 11, 13

*Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991) …………………………………….. 15

*Armstrong v. Exec. Office of the President*, 1 F.3d 1274 (D.C. Cir. 1993) ………… 17

*Armstrong v. Exec. Office of the President*, 90 F.3d 553 (D.C. Cir. 1996) …………... 20

*Competitive Enter. Inst. v. Off. of Science & Tech. Policy*, No. 14-cv-765, 2016 WL 106776292 (D.D.C. Dec. 12, 2016) ……………………………………….…... 12

*CREW v. Cheney*, 593 F. Supp. 2d 194 (D.D.C. 2009) ………………………………….. 8

*CREW v. Dep't of Homeland Sec.,* 2024 U.S. Dist. LEXIS 47949, (D.D.C. Mar. 19, 2024) ..8

*CREW v. Dep't of Homeland Sec.,* 527 F. Supp. 2d 101 (D.D.C. 2007) …………………… 7

*CREW v. Exec. Office of the President*, 587 F. Supp. 2d 48 (D.D.C. 2008) ……………….. 8

*CREW v. Pompeo*, 2020 U.S. Dist. LEXIS 59038 (D.D.C. Apr. 3, 2020) …………..……16

*CREW v. Pruitt*, 319 F. Supp. 3d 252 (D.D.C. 2018) ……………………………………… 16

*CREW v. U.S. DOGE Serv.*, No. 25-cv-511 (CRC), 2025 U.S. Dist. LEXIS 42869 (D.D.C. Mar. 20, 2025) ……………………………………………………………… 13

*CREW v. USDS*, No. 25-cv-511, Opinion and Order, March 19, 2025 …………….…... 18, 19

*FEC v. Akins*, 524 U.S. 11 (1989) ……………………………………………………….. 9

*Judicial Watch, Inc. v. DOJ*, No. 18-cv-154 (RBW), 2018 WL 11457399, (D.D.C. Nov. 13, 2018) …………………………………………………….…...… 13

*Norton v. SUWA*, 542 U.S. 55 (2004) …………………………………………………… 14

*United States v. Philip Morris USA, Inc.,* 566 F.3d 1095 (D.C. Cir. 2009) ……….…….. 14

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PROJECT ON GOVERNMENT OVERSIGHT, INC. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 25-527 (JEB) |
| ) | |
| DONALD J. TRUMP, et al., ) | |
| Defendants. ) | |

## **INTRODUCTION**

Defendants' opposition to the requested preliminary injunction rests on mischaracterizations of Plaintiff's claims and a refusal to acknowledge the consequences of their own actions. Most significantly, Defendants admit they have neither complied with nor implemented the requirements of the Federal Records Act ("FRA"). Nevertheless, Defendants insist Plaintiff lacks standing to challenge their actions under the FRA and the Administrative Procedure Act ("APA") because Plaintiff has not filed a Freedom of Information Act ("FOIA") request with DOGE.[1] The futility of such an action, however, could not be more apparent. As DOGE readily admits it has no system in place to receive and process FOIA requests. Indeed, for that precise reason DOGE refused to accept and process a FOIA request POGO filed recently with DOGE.[2]  But even without a pending FOIA request, POGO would still have standing based on its demonstrated and continuing interest in DOGE, as reflected in articles written and

---

[1] DOGE refers collectively to Defendants the U.S. Department of Government Efficiency ("DOGE"), the U.S. DOGE Service ("USDS"), and the U.S. DOGE Service Temporary Organization ("USDSTO").

[2] On April 8, 2025, Plaintiff Project On Government Oversight, Inc. ("POGO") filed a FOIA request with the USDS and OMB seeking communications between specified individuals containing specified terms. *See* Exhibit A.

published by POGO journalists and the congressional testimony of a POGO employee about DOGE. Having established its imminent and non-speculative interest in the records of DOGE, Plaintiff has demonstrated the informational harm it suffers because DOGE refuses to comply with the FRA's creation and preservation requirements, which afford Plaintiff access to DOGE documents pursuant to the FOIA.

DOGE's challenges to the merits of Plaintiff's claims also fail as they rely on mischaracterizations of those claims and a refusal to address the growing body of evidence that DOGE exercises substantial independent authority. Further, far from the broad programmatic attack that Defendants allege, Plaintiff's claims flow from the failure of DOGE to perform discrete, non-discretionary actions imposed by the FRA, including the implementation of a recordkeeping policy. As to DOGE's agency status under the FRA (and consequently the FOIA), Defendants discount the substantial evidence of DOGE's power and authority as inadmissible hearsay. Yet they offer nothing to refute that evidence, relying instead on a series of executive orders that—even if relevant—ignore how DOGE in fact functions.

With its actions DOGE has demonstrated an almost unparalleled penchant for secrecy, seeking to shield its actions from judicial review and public accountability. Its titular head Elon Musk is "operating with a level of autonomy that almost no one can control." Jonathan Swan, Theodore Schleifer, Maggie Haberman, Kate Conger, Ryan Mac & Madeleine Ngo, "Inside Musk's Aggressive Incursion Into the Federal Government," *New York Times*, Feb. 4, 2025, https://www.nytimes.com/2025/02/03/us/politics/musk-federal-government.html. DOGE has launched stealth attacks on agencies, draining their databases for undescribed purposes. Hundreds of thousands of federal employees and government contractors across 27 federal agencies have lost their jobs because of DOGE's actions. *See* Sara Dorn, "Trump's Great

Rehiring: Over 26,000 Fired By DOGE Likely To Return – So Far," *Forbes*, Apr. 4, 2025, https://www.forbes.com/sites/saradorn/2025/04/04/trumps-great-rehiring-over-26000-fired-by-doge-likely-to-return-so-far/. Perniciously, DOGE has sought to hide its actions by taking control of agency communication systems and communicating with ephemeral message apps designed to ensure no record of the communication is preserved. And most fundamentally here, it has flaunted its self-proclaimed authority to avoid any judicial scrutiny for whether and how it implements the FRA's document creation and preservation requirements. In these circumstances, the requested preliminary injunction is critical to ensure all of DOGE's records are preserved before DOGE places them forever beyond the reach of the Plaintiff, this Court, and the public.

## SUPPLEMENTAL FACTS

On April 8, 2025, POGO submitted a FOIA request to USDS and OMB (Exhibit A). The request sought all email communications, text messages, and messages sent on messaging platforms from January 20, 2025, to the present to or from 34 individuals identified by name and email address and containing one or more of 17 listed search terms. POGO also requested expedited processing, explaining the significant public and press interest in DOGE "stem[ming] significantly from how Elon Musk's businesses are impacted by federal government operations, and Musk and DOGE's efforts inside the federal government." *Id.* POGO further elaborated:

> Musk and DOGE have, according to numerous press accounts, fed federal data into artificial intelligence (AI) systems for analysis and to look for ways to replace federal workers with AI. Yet Musk is the owner of xAI (which recently acquired another Musk company, X, formerly Twitter), which is an artificial intelligence company. Musk also appeared at a White House event promoting vehicles by his company, Tesla. [] Musk's SpaceX widely does business with the federal government, including the Defense Department and NASA, and – during his time as a special government employee – Musk publicly advocated that the Federal Aviation Administration turn over a $2.4 billion contract from Verizon to SpaceX.

*Id.*

By email dated April 14, 2025, DOGE advised POGO that because, in its view, DOGE is subject to the Presidential Records Act ("PRA"), it was "declin[ing]" POGO's request. *See* Exhibit B.

## ARGUMENT

### I.    Plaintiff Has Standing To Bring This Lawsuit.

DOGE's argument that Plaintiff lacks standing rests entirely on Plaintiff's failure to file a FOIA request with DOGE. According to DOGE, the pendency of a FOIA request constitutes an essential element "to raise any FRA-related claim" because absent a request Plaintiff cannot "establish an injury in fact[.]" Ds' Mem. in Opp. at 12. Defendants' arguments, however, overlook POGO's demonstrated and continuing interest in how DOGE operates and the legality of its actions—issues that depend crucially on access to DOGE's records.

First, five critical assessments of DOGE that POGO journalists have published demonstrate POGO's deep and ongoing interest in DOGE and its need for access to DOGE's records. On February 6, 2025, POGO published an article about the vetting and ethics concerns Musk's DOGE teams raise. Nick Schwellenbach, "Elon Musk's DOGE Teams Raise Vetting, Ethics Concerns," *POGO.org*, Feb. 6, 2025, https://www.pogo.org/investigations/elon-musks-doge-teams-raise-vetting-ethics-concerns. The article pointed out, among other things, that an employee of X and SpaceX serves on the DOGE team—and details the employee posted on X but since deleted. *Id.* As the article explains, these kind of conflicts of interest not only raise concerns about Musk's access to sensitive information "that could advantage his companies and disadvantage rivals," but also implicate "Musk's significant business operations in China[.]" *Id.* Further, the article notes that while Musk-affiliated employees "have fanned out across the federal government," [t]he names of staff on DOGE teams across the government have not been proactively released." *Id.*

POGO published a second DOGE-related article on February 18, 2025. *See* Nick

Schwellenbach, "DOD Contractor Hires Trump-Aligned Lobbyists to Tackle DOGE,"

*POGO.org*, Feb. 18, 2025, https://www.pogo.org/investigations/dod-contractor-hires-trump-

aligned-lobbyists-to-tackle-doge. This article explores the new opportunities for lobbyists that

DOGE poses, and how DOGE's efforts to shrink the federal workforce intersect with

cybersecurity contracts. Lobbyists will play a critical role in "figure[ing] out the DOGE

environment," including the defense of "federal contracts from possible DOGE intervention" or

"mak[ing] the case for expanding them." *Id.*

On March 7, 2025, POGO published a third DOGE-related article. *See* Nick

Schwellenbach, "Musk's Deep Financial Ties to Top Feds Revealed," *POGO.org*, Mar. 7, 2025,

https://www.pogo.org/investigations/musks-deep-financial-ties-to-top-feds-revealed. This article

explains the deeper than previously known ties that senior Office of Personnel Management

(OPM) political appointees have to Elon Musk's businesses. The article discusses the access

DOGE and Musk have to data at OPM and other agencies that intersects with Musk's business

interests such as xAI. One of those officials "is the point of contact for OPM's government-wide

email system"—the very system "believed to have been used 'to issue [the Trump

administration's] deferred resignation offers and the emails demanding all federal employees

respond with five bullet points of accomplishments or face termination.'" *Id.*

On April 2, 2025, POGO published another analysis of DOGE. Faith Williams, "What is

wrong with DOGE: Its Structure, for One," *POGO.org*, Apr. 2, 2025,

https://www.pogo.org/analysis/whats-wrong-with-doge-its-structure-for-one. This article

discusses how "DOGE's reach and power have steadily expanded, even as its organization and

its mission have remained hazy." *Id.* The article notes that when it wants to, DOGE operates like

an agency. Specifically, DOGE has been involved "in firing thousands of federal employees, canceling contracts, and physically shuttering federal office buildings." *Id.* As the article explains, "[t]he difficulty defining DOGE is not an accident, but rather seemingly opacity-by-design that helps block its personnel and actions from judicial review, congressional oversight, and public accountability." *Id.* The article further explains the difficulty in pinning down DOGE leadership and staffing noting, among other things, the discrepancies in how the administration has described Musk's role at DOGE. *Id.*

Finally, on April 22, 2025, POGO published an analysis highlighting conflicts of interest related to Musk and DOGE officials. Faith Williams, "What's Wrong With DOGE? Its Glarig Conflicts of Interest," *POGO.org*, Apr. 22, 2025, https://www.pogo.org/analysis/whats-wrong-with-doge-its-glaring-conflicts-of-interest. The article further explains how Musk's role at DOGE allows his companies to avoid oversight from federal agencies.

Second, POGO's Director of Government Affairs Dylan Hedtler-Gaudette testified at the first DOGE-related hearing before the House Committee on Oversight and Government Reform Subcommittee on Delivering on Government Efficiency on February 12, 2025, https://www.pogo.org/testimonies/pogo-calls-for-focus-on-real-reforms-to-improve-federal-spending-accountability-and-transparency, further evidencing POGO's deep and continuing interest in DOGE's functions, leadership, and actions. Mr. Hedtler-Gaudette's written testimony included an assessment of DOGE's efficacy in providing a check against waste, fraud, and abuse as well as of Musk's "massive conflicts of interest [his] financial ties present[.]" *Id.* at 9.[3]

---

[3] Mr. Hedtler-Gaudette's testimony clearly struck a nerve as he was mocked and ridiculed afterwards "by conservatives on social media and right-wing cable news," Justin, Baragona, "MAGA cruelly mocks DOGE committee hearing witness because he's blind," *Independent*,

Third, POGO has a visible media presence on DOGE and DOGE-related issues. POGO's President and Executive Director Danielle Brian and others at POGO routinely offer expert commentary on DOGE activities. For example, Ms. Brian commented on how DOGE's impacts on contractors have mainly affected "the equivalent of the mom-and-pop shops," Emily Badger, Aatish Bhatia, Josh Katz, Margot Sanger-Katz & Ethan Singer, "The Big Government Contracts DOGE Hasn't Touched," *New York Times*, Mar. 4, 2025, https://www.nytimes.com/interactive/ 2025/03/04/upshot/doge-musk-contracts-cuts.html. One POGO post on X.com highlighted a *New York Times* article on how DOGE made it harder to check its claims, with POGO remarking "DOGE has started providing fewer details on the cuts it's making to the federal government. These kinds of attempts to hide information from the public are why we're suing DOGE to demand that it complies with federal record laws," https://x.com/POGOwatchdog/status/ 1900295302826860649.

Taken as a whole, this evidence demonstrates POGO's concrete, substantive, and ongoing need for records of DOGE that would be severely harmed absent the requested injunction requiring DOGE to create, maintain and preserve its records under the FRA.

The cases on which Defendants rely provide no persuasive authority to the contrary under these circumstances. For example, in *CREW v. Dep't of Homeland Sec.,* cited in Ds' Mem. in Opp. at 11, the court concluded the plaintiff lacked standing because the court was unable to "discern when, if ever, CREW will seek access to [] records in the DHS's possession." 527 F. Supp. 2d 101, 106 (D.D.C. 2007). Here, by contrast, POGO's demonstrated and ongoing interest,

---

Feb. 13, 2025, https://www.the-independent.com/news/world/americas/us-politics/doge-hearing-blind-witness-online-response-b2697878.html, including Elon Musk on X.com.

reflected in part in its pending FOIA request with DOGE, provides clear evidence that its efforts to access DOGE records are particularized and imminent and more than a mere plausibility.

Indeed, POGO stands in similar shoes as one of the plaintiffs in *CREW v. Cheney*, 593 F. Supp. 2d 194, 226-27 (D.D.C. 2009), whose assertions about his past extensive use of presidential records—the records at issue in that case—and his "unambiguous" intent to review records on a specified topic in the future were sufficient to establish his standing to challenge the threatened removal of vice presidential records. As the court reasoned, "[t]here is . . . no question that the destruction of PRA records would cause [plaintiff] injury when he seeks to use them in the future." *Id.* at 227. Likewise, here, POGO's extensive use of the FOIA for its journalistic endeavors to uncover government waste, fraud, and abuse; its demonstrated focus on these issues as they relate to DOGE; its unambiguous intent to file additional FOIA requests for DOGE records in the future should DOGE implement a FOIA regime, *see* Declaration of Brandon Brockmyer ¶ 10 (Exhibit C) (attesting to POGO's intent "to file additional FOIA requests with DOGE in the future, seeking records that will shed light on areas of great public interest and concern including conflicts of interest with respect to certain programs or contracts, the independent authority exercised by DOGE team members, and communications with entities outside the federal government"); and its "strong operational interest in Defendant's compliance with their recordkeeping obligations under the FOIA," *CREW v. Dep't of Homeland Sec.*, 2024 U.S. Dist. LEXIS 47949, *13 (D.D.C. Mar. 19, 2024) (cleaned up), support its standing to sue to prevent an injury that is "sufficiently concrete and imminent." *Id. See also CREW v. Exec. Office of the President*, 587 F. Supp. 2d 48 (D.D.C. 2008) (cited in Ds' Mem. in Opp. at 10-11) (Plaintiff had standing under the FRA where its researchers "function as journalists" who obtain records under the FOIA to disseminate information to the public). 587 F. Supp. 2d at 60. These

facts establish that Plaintiff has suffered an informational injury that supports its standing to sue. *See FEC v. Akins*, 524 U.S. 11, 21 (1989) ("inability to obtain information . . . constitutes injury in fact for standing purposes").

Moreover, while Plaintiff admittedly did not have an outstanding FOIA request when it filed the complaint (although it does now), even had it submitted a request to DOGE prior to suing, POGO would be in the same posture as now. That is because DOGE has absolutely no FOIA regime in place, eschewing the applicability of the FRA and the FOIA. In arguing against a preliminary injunction in *CREW v. DOGE*, DOGE Administrator Amy Gleason admitted:

> If USDS is required to comply with the court's order, it will have to set up a new FOIA operation from scratch within USDS. Because USDS is an Executive Office of the President component that reports to the White House Chief of Staff and advises the President, *it has adopted no FOIA regulations, hired no document processors or reviewers, and has no dedicated budget for these activities*.

Gleason Decl. ¶ 28 (Ex. A to Pl.'s Mem. for PI, ECF No. 11-2) (emphasis added). *See also* Exhibit B. With no FOIA regulations in place, no money to support a FOIA regime, and no personnel to process FOIA requests DOGE is and was utterly unequipped to handle any FOIA request. Given its refusal to adopt a FOIA regime, DOGE cannot reasonably fault POGO for failing to file a FOIA request with the agency, something that would have been an exercise in completely futility. These facts make this case unique and different from all the cases on which Defendants rely to argue POGO lacks standing. That difference yields a critically different result.

## II.    Plaintiff Will Suffer Irreparable Harm Absent The Requested Injunction.

Defendants' refusal to comply with the FRA's recordkeeping obligations poses a grave risk that DOGE records will not be preserved, depriving Plaintiff, the public, and Congress of the ability to hold DOGE accountable for its actions. Defendants' argument that Plaintiff has

not established irreparable harm rests principally on its flawed argument that POGO lacks

standing to sue. *See* Ds' Mem. in Opp. at 12-13. As discussed *supra*, that is false.

Moreover, the facts supporting Plaintiff's standing are a far cry from the hypothetical

claims courts have rejected. Plaintiff has demonstrated a deep interest in specific issues related

to DOGE, including conflicts of interest and vetting issues. POGO has attested to its intent to

file requests with DOGE in the future (assuming DOGE adopts a FOIA regime), Brockmyer

Decl. ¶ 10, and recently filed a FOIA request with DOGE and OMB seeking records that would

expand on POGO's knowledge about the links between Musk's personal and commercial

interests and his role in implementing the DOGE agenda (*see* Exhibit A). The FOIA request is

written with great particularity and illustrates the concrete interest POGO has in DOGE's

records.

DOGE also argues that POGO will suffer no harm because "USDS adheres to the

PRA." Ds' Mem. in Opp. at 13. To bolster that point DOGE has offered as an exhibit the PRA

recordkeeping policy Defendants claim is currently in place (Ex. D to Ds' Mem. in Opp.). That

policy, however, is dated March 25, 2025, and Defendants have provided no information about

any prior policy or practice in place before that date. All this suggests DOGE very belatedly

issued a records policy to backfill a clear gap in its records management.

Moreover, conspicuously absent from the record is any evidence that DOGE

employees are knowledgeable about and complying with this or any other recordkeeping policy.

The only evidence DOGE has proffered is the one-page PRA recordkeeping policy in effect for

mere weeks and a citation to Ms. Gleason's declaration, signed before DOGE's PRA

recordkeeping policy was even in effect and submitted in another case. Ms. Gleason offers only

two tepid assurances. First, she avers that "[i]n accordance with the PRA's requirements, USDS

materials will be transmitted to the National Archives and Records Administration at the appropriate time." Gleason Decl. ¶ 25. Second, Ms. Gleason avers that "USDS has informed its employees (including those in the U.S. DOGE Service Temporary Organization) that they must adhere to records-preservation requirements." *Id.* ¶ 26. But given that she executed her declaration on March 14, 2025, prior to DOGE's adoption of a PRA recordkeeping policy, her vague reference to DOGE employees being informed in some unidentified way that they must adhere to some unidentified records preservation requirements hardly provides the kind of assurance that would negate the need for a document preservation order here.

That need is further underscored by the differences between "what qualifies as a record and the respective retention obligations" under the FOIA and PRA. *Am. Oversight v. U.S. Dep't of Gov't Efficiency*, No. 25-cv-409 (D.D.C. Apr. 2, 2025), Minute Order. Those differences coupled with DOGE's refusal to acknowledge its preservation obligations under the FRA led Judge Beryl A. Howell to issue a preservation order, *id.,* a course this Court should follow for identical reasos. Defendants dismiss this language as lacking an explanation for "why any such difference would be significant based on the FOIA requests at issue." Ds' Mem. Op. at 23 n.7. Here, however, Plaintiff seeks a preservation order that would encompass all of DOGE's records, not merely those responsive to a specific FOIA request. In this context, the differences in scope between the PRA and FRA matter. Tellingly, Defendants offer no argument that the FRA and PRA impose identical obligations, instead stressing that they are 'two separate records regimes[.]" Ds' Mem. in Opp. at 3.

Simply stated, the mere existence of a recordkeeping policy standing alone—particularly one formulated under the PRA, not the FRA, which controls here— fails to establish that DOGE employees are in fact complying with that policy. Nor does it counter the

evidence Plaintiff has offered that DOGE records are at risk of destruction because of the actions of DOGE employees. As outlined in Plaintiff's memorandum in support of its motion for a preliminary injunction at pages 17-19, the secrecy in which DOGE operates and its reported use of messaging apps that are designed to erase messages after a specified time provide strong evidence that DOGE's records are at risk. And that risk continues. *See, e.g.*, Alexandra Ulmer, Marisa Taylor, Jeffrey Dastin & Alexandra Alper, "Exclusive: Musk's DOGE using AI to snoop on U.S. federal workers, sources say," *Reuters*, Apr. 8, 2025, https://www.reuters.com/technology/artificial-intelligence/musks-doge-using-ai-snoop-us-federal-workers-sources-say-2025-04-080/ (noting DOGE team's use of Signal to communicate). Nearly from its inception DOGE employees were counseled to avoid using a messaging app that could capture messages for accessibility under the FOIA. *See* Jason Koebler & Joseph Cox, "DOGE Employees Ordered to Stop Using Slack While Agency Transitions to a Records System Not Subject to FOIA, *404media*, Feb. 5, 2025, https://www.404media.co/doge-employees-ordered-to-stop-using-slack-while-agency-transitions-to-a-records-system-not-subject-to-foia/. Further, the fact that DOGE employees include political appointees whose government tenure is uncertain heightens the risk that DOGE records will not be properly preserved. *See Competitive Enter. Inst. v. Off. of Science & Tech. Policy*, No. 14-cv-765, 2016 WL 106776292, at *3 (D.D.C. Dec. 12, 2016). At bottom, the absence of countervailing evidence speaks volumes about the palpable risk of records being destroyed, whether by design or accident, absent the requested preliminary injunction.

Defendants further suggest a preservation order is unwarranted absent "good reason to believe records [are] on the verge of being destroyed." Ds' Mem. in Opp. at 14. To the contrary, courts have readily entered preservation orders without evidence of imminent destruction. For

example, in *CREW v. U.S. DOGE Serv.*, No. 25-cv-511 (CRC), 2025 U.S. Dist. LEXIS 42869, *54 (D.D.C. Mar. 20, 2025), Judge Cooper reasoned that because DOGE has operated in "unusual secrecy," *id.* *54, refusing to publicly acknowledge Musk's precise role at DOGE, and labelling the publication of names of USDS employees "a crime." *id.*, there was a "possibility that representative of the Defendant entities may not fully appreciate their obligations to preserve federal records." *Id.* *54-55. Further, newly hired DOGE employees "to put it charitably, may not be steeped in [DOGE's] document retention policies." *Id.* *55. Judge Cooper accordingly issued a preservation order to prevent the possible destruction of DOGE records.

Similarly, in *Competitive Enter. Inst. v. Off. of Science & Tech. Policy*, No. 14-cv-765, 2016 WL 106776292 (D.D.C. Dec. 12, 2016), cited in Ds' Mem. in Opp. at 14, the court entered a preservation order notwithstanding the recordholder's attestation that he would preserve the records at issue pending the court's merits decision. The Court noted it "has no reason to doubt the sincerity of [the recordholder's] declaration that he will not delete any of his emails[.]" 2016 WL 106776292, *3. Nevertheless, the court entered the requested preservation order, reasoning "a declaration does not have the force of an order." *Id. See also Am. Oversight v. U.S. Dep't of Gov't Efficiency*, No. 25-cv-409 (D.D.C. Apr. 2, 2025), Minute Order ("while the Court presumes that executive officials . . . act in good faith, absent a court order punishable by contempt requiring the maintenance and preservation of potentially responsive records, plaintiff would have no recourse were the records at issue not maintained and preserved pursuant only to a litigation hold letter") (cleaned up).

In arguing to the contrary, Defendants rely on *Judicial Watch, Inc. v. DOJ*, No. 18-cv-154 (RBW), 2018 WL 11457399, (D.D.C. Nov. 13, 2018). *See* Ds' Mem. in Opp. at 15. In that

case, however, the court refused to enter a preservation order based on two factors not present here. First, the National Archives and Records Administration had already conducted an investigation of the deleted emails at issue and concluded no records were lost or removed, thereby eliminating the need for a preservation order. Second, the court pointed to the sworn declarations of the two individuals whose emails were at issue, in which they testified they were complying with their preservation obligations. No such evidence exists here.

Finally, Defendants challenge the nature of Plaintiff's claims as insufficient to warrant an injunction because Plaintiff simply wants Defendants to "follow the law." Ds' Mem. in Opp. at 15-16. To the contrary, with the requested relief Plaintiff seeks to compel Defendants under the APA to perform the discrete, nondiscretionary actions that the FRA imposes on them, including the adoption and implementation of a recordkeeping policy under the FRA (not the PRA) and the creation, maintenance and preservation of records pursuant to that policy. This is a far cry from the relief at issue in *Norton v. SUWA*, 542 U.S. 55, 66 (2004) (cited in Ds' Mem. in Opp. at 16), where the plaintiff was seeking relief that asked the court to oversee "general deficiencies in compliance." *Id.* Unlike *Norton*, Plaintiff here has not asked this Court to dictate the contents of DOGE's recordkeeping policy or to take specified actions to compel agency compliance with that policy—actions more akin to those the *Norton* court found could not justify an injunction. Instead, Plaintiff merely seeks to compel DOGE to adopt and implement a recordkeeping policy under the FRA. As such, the requested relief "sufficiently specif[ies] the activities enjoined as to provide Defendants with fair notice of the prohibited conduct," rather than "abstractly enjoin[ing] Defendants from violating" the FRA. *United States v. Philip Morris USA, Inc.,* 566 F.3d 1095, 1137 (D.C. Cir. 2009) (cited in Ds' Opp. Mem. at 16).

### III.    Plaintiff's Claims Are Cognizable Under The FRA And PRA.

On the merits, Defendants argue Plaintiff cannot succeed because Plaintiff's claims are not cognizable under either the FRA or the PRA. Ds' Mem. in Opp. at 17-18. Reduced to its essence, Defendants' argument means an agency like DOGE can disavow all its statutorily imposed obligations with no consequences. No caselaw supports the extreme position Defendants implicitly advance here.

Specifically, Defendants argue that Plaintiff's claims are barred because Plaintiff has not presented a challenge to "a specific recordkeeping guideline or directive as somehow inadequate under the . . . FRA," Ds' Mem. in Opp. at 17. While generally true (*see infra*), this is because Defendants have opted out entirely of an FRA recordkeeping system, disclaiming its applicability in the first place, and therefore have no specific guideline or directive in place under the FRA. As courts have recognized, where, as here, an agency ignores entirely its statutory obligations the court has a role to play—any other conclusion would leave DOGE free to flout its mandatory recordkeeping obligations free from any consequences whatsoever.

For example, in *Am. First Legal Found v. Becerra*, 2024 U.S. Dist. LEXIS 151534 (D.D.C. Aug. 9, 2024), the court considered a challenge under the FRA to the practice of the CDC to delete the emails of its former employees. The court relied in part, on precedent in *Armstrong v. Bush*, 924 F.2d 282, 293-94 (D.C. Cir. 1991), that courts may hear an APA-based challenge under the FRA claiming "that an agency failed to employ adequate recordkeeping guidelines and directives[.]" 2024 U.S. Dist. LEXIS 151534, *34 (cleaned up). This precedent supported judicial review of a challenge to an agency's compliance "with whatever on-public recordkeeping policy the agency chose to adopt in its stead." *Id.* at *36. Here, too, this precedent recognizes this Court's ability to review Plaintiff's challenge to the DOGE-wide

policy to treat its records as presidential and therefore in violation of the FRA.

Nor does the lack of formality in DOGE's recordkeeping policies and practices render them non-reviewable. To the contrary, courts may review "policies and practices" that "may be informal, rather than articulated in regulations or an official statement of policy." *CREW v. Pompeo*, 2020 U.S. Dist. LEXIS 59038, *11 (D.D.C. Apr. 3, 2020) (cleaned up). As this Court recognized, courts lack the authority to "address individual acts of noncompliance," but "can review an APA claim challenging an agency's informal policy of practice of violating certain directives of the FRA, including the Act's records-creation and -destruction mandates[.]" *Id.* at *12 (cleaned up). *See also CREW v. Pruitt*, 319 F. Supp. 3d 252, 260 (D.D.C. 2018) (recognizing court's authority to review a claim that an agency's "recordkeeping policy does not conform to the FRA[.]"). As this authority makes clear, Defendants have it backwards. Courts possess the authority to review broad claims that agency policies fail to conform with the FRA's requirements, even informal, unpublished policies like those challenged here, but lack authority to review "individual acts of noncompliance." *CREW v. Pompeo*, 2020 U.S. Dist. LEXIS 59038, *12.

Further, judicial review here would not require the court to issue "broad, programmatic relief" that would require undertaking "an ongoing oversight role[.]" *Id.* at 18. Instead, Plaintiff has asked the Court to "compel[] Defendants to comply with their statutory duties to treat the records of DOGE, USDS and USDSTO as agency records subject to the FRA and the FOIA." Compl. ¶ 64. This is achieved through the discrete action of adopting and implementing a recordkeeping policy under the FRA, no less and no more.

Plaintiff has also challenged the specific policies and practices of Defendants to treat DOGE's records as subject to the Presidential Records Act ("PRA"). *See* Compl. ¶ 55. This claim falls within the exception to the PRA's bar on judicial review that the D.C.

Circuit recognized in *Armstrong v. Exec. Office of the President*, 1 F.3d 1274, 1293 (D.C. Cir. 1993), for "guidelines that purport to implement the PRA." As the D.C. Circuit reasoned, without judicial review, guidelines that did not comply with the PRA's definition of presidential records would shield from review records improperly managed as presidential records. Such a result conflicts with the PRA's express exclusion of agency records from the definition of presidential records and would remove those records from the reach of the FOIA. *Id.* at 1292. The court considered the "clear limitation on just which materials the President could legitimately assert control over" and Congress' intent "to preserve the pre-existing body of FOIA law governing the disclosure of government agency records." *Id.* Accordingly, guidelines that treat agency records as presidential materials are subject to judicial review.

Here, that means the formal recordkeeping policy DOGE has just adopted and Defendants' prior expressed intent to control DOGE records by treating them as presidential records are subject to this Court's review. As part of that review, the Court must give full force to the PRA's definition of presidential records and its exclusion of agency records, because "the FOIA trumps the definition of 'agency' records in the PRA." *Id.* Thus, Plaintiff raises a clearly permissible challenge under the PRA that is subject to this Court's review.

## IV. Because DOGE Exercises Substantial Independent Authority It Is An Agency Subject To The FRA.

To date, multiple courts have concluded that DOGE is an agency because it exercises substantial independent authority, the touchstone for determining agency status of those entities housed within the Executive Office of the President, among others. In reaching this conclusion those courts have pointed to the myriad independent actions DOGE has taken as catalogued in numerous press reports and its governing executive order charging DOGE with implementing

the President's DOGE agenda. As summarized by Judge Cooper in a recent order denying DOGE's motion for reconsideration, DOGE "has reportedly led the charge on personnel cuts across federal agencies; eliminated government contracts, and sent teams of employees to federal agencies to gain access to sensitive and classified data." *CREW v. USDS*, No. 25-cv-511, Opinion and Order, March 19, 2025 (ECF No. 23). Neither here nor in any other case have Defendants proffered any evidence to undermine these conclusions beyond labelling the news reports as inadmissible hearsay and pointing to a number of other executive orders that mention DOGE. As Judge Cooper pointed out, however, DOGE's decision to "deliberately . . . forego" a "host of arguments" as to why it is not an agency was a "litigation choice[.]" *Id.* Apparently DOGE has made that same litigation choice here, leading to the conclusion it has nothing substantive to rebut the evidence of its substantial independent authority.

At the same time, stories mount about the substantial independent authority DOGE continues to wield. For example, a March 3, 2025 press report explains DOGE's role in deactivating thousands of credit cards issued to government agencies and individuals. *See* Kate Knibbs & Aarian Marshall, "Elon Musk's $1 Spending Limit Is Paralyzing Federal Agencies," *Wired*, Mar. 3, 2025, https://www.wired.com/story/doge-elon-musk-spending-cuts-federal-workers/. The results have been near catastrophic, threatening mission-critical projects across the government. While nominally done in the interest of preventing fraud, federal employees note that "[t]here are so many controls in place to make sure fraud doesn't happen[.]" *Id.*

In labelling the numerous and growing press reports of DOGE's substantive actions as mere hearsay, Defendants ask this Court to turn a blind eye to the reality of what is playing out throughout the federal government. According to Defendants, this Court should ignore that DOGE is leading the charge to eliminate entire agencies, that DOGE has directed the layoffs of

hundreds of thousands of federal employees and government contractors across 27 agencies, *see* Dorn, *Forbes*, Apr. 4, 2025; that DOGE is directing the collection of a vast swath of sensitive data across the government for unexplained reasons; and that DOGE has emerged as the most powerful entity in President Donald Trump's administration all because these actions have been reported in the press. But the fact that only the press has been able to pierce the veil of secrecy surrounding DOGE heightens, not detracts from, the utility of its reporting. At a minimum, the reality of how DOGE operates raises a factual question of its agency status that can be resolved only through discovery. *See CREW v. USDS*, No. 25-cv-511, Opinion and Order, March 19, 2025, at 12.

In lieu of evidence demonstrating how DOGE actually functions, Defendants point to a number of executive orders and presidential memoranda charging OMB with consulting, coordinating, and advising together with DOGE and other entities on various issues. Defendants argue these orders and memoranda constitute "[t]he full extent of USDS's authority to date[.]" Ds' Mem. in Opp. at 23. But while these presidential EOs and memoranda outline DOGE's responsibilities, among those of other agencies, none involves advice and assistance to the president. Instead, they focus on OMB—an agency subject to the FRA and FOIA—and its role in working with DOGE, not on DOGE itself. But even on their own terms many illustrate how DOGE has been given a substantive role such as the "initiat[ion] of a software modernization initiative." Ds' Mem. in Opp. at 23.

Further, Defendants overlook the most applicable executive order—Executive Order 14158—which created DOGE and charged it with "*implement[ing]* the President's DOGE agenda[.]" (emphasis added). Defendants dismiss this language as nothing more than an "abstract notion," Ds' Mem. in Opp. at 24, but it is no more abstract than the language of the

other orders on which Defendants rely. Moreover, as the D.C. Circuit has recognized, "the more general the goal" set by a president for an entity within the EOP "the greater the likelihood that the responsible entity is vested with some element of discretion and is not just advising or assisting the President." *Armstrong v. Exec. Office of the President*, 90 F.3d 553, 565 (D.C. Cir. 1996). In charging DOGE with the broad goal of implementing his DOGE agenda President Trump clearly vested DOGE with substantial discretion. That charge as memorialized in EO 14158, when coupled with the actual actions of DOGE, amply supports DOGE's agency status.

Finally on the question of DOGE's agency status Defendants point to the DOGE teams embedded within agencies and suggest it is those teams that are actually implementing the President's DOGE agenda. Ds' Mem. in Opp. at 24. According to Defendants, because the DOGE teams are agency employees their records are governed by the FRA, implying a preservation order is unnecessary. *Id.* Here too, however, Defendants have offered no evidence whatsoever about how those DOGE teams function, the specific tasks they perform, and at whose direction. Absent that critical information this Court has no basis to conclude that an order requiring the preservation of all DOGE records is unnecessary because all DOGE records currently are being preserved as federal records under the FRA.

## V.    The Balance Of Hardships Favors The Requested Injunction.

Finally, Defendants argue that "yet another Court order requiring the preservation of the same records" that currently are subject to other preservation orders would cause them harm that outweighs the public interest and would constitute "judicial overkill." Ds' Mem. Opp. at 25. But defendants ignore a key difference between the *CREW* and *American Oversight* cases and this one: here Plaintiff seeks a preservation order covering *all* DOGE records, not merely those responsive to specific FOIA requests. Thus, far from "judicial overkill," the requested

preservation order would fill in a critical gap.

Defendants further argue they would be harmed by the requested injunction because "an inadvertent loss of a single record could potentially subject USDS to sanctions[.]" Ds' Mem. Op. at 23. This could be said about any preservation order, however. Moreover, Defendants risk sanctions for the purposeful destruction of documents subject to a preservation order but there is nothing to suggest they would be sanctioned for "an inadvertent loss."

In short, Defendants' failure to offer any compelling reason for denying the requested relief highlights why that relief is necessary.[4]

## **CONCLUSION**

For the foregoing reasons and those set forth in Plaintiff's opening brief, the Court should grant Plaintiff's motion for a preliminary injunction.

Respectfully submitted,

/s/Anne L. Weismann
Anne L. Weismann
(D.C. Bar No. 298190)
5335 Wisconsin Avenue, NW, Suite 640
Washington, D.C. 20015
(301) 717-6610
Weismann.anne@gmail.com

Dated: April 23, 2025          *Attorney for Plaintiff*

---

[4] Defendants further argue that the Court lacks jurisdiction to enjoin the President. Ds' Mem. in Opp. at 24-25. The Court need not resolve this issue in the context of the requested preliminary injunction, which would not require the President himself to take any specific action.