## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| **PROJECT ON GOVERNMENT** )<br>**OVERSIGHT, INC.** )<br>1100 13th Street, N.W. )<br>Suite 800 )<br>Washington, DC. 20005, )<br> )<br>      Plaintiff, )<br> )<br>      v. )<br> )<br>**DONALD J. TRUMP**, )<br>in his official capacity as President )<br>of the United States )<br>1600 Pennsylvania Avenue, N.W. )<br>Washington, D.C. 20500, )<br> )<br>**U.S. DEPARTMENT OF** )<br>**GOVERNMENT EFFICIENCY** )<br>736 Jackson Place, N.W. )<br>Washington, D.C. 20503 )<br> )<br>**U.S. DOGE SERVICE**, )<br>736 Jackson Place, N.W. )<br>Washington, D.C. 20503 )<br> )<br>**U.S. DOGE SERVICE TEMPORARY** )<br>**ORGANIZATION**, )<br>736 Jackson Place, N.W. )<br>Washington, D.C. 20503 )<br> )<br>**AMY GLEASON,** )<br>In her official capacity as Acting )<br>Administrator of US DOGE Service and )<br>US DOGE Service Temporary Organization, )<br>736 Jackson Place, N.W. )<br>Washington, D.C. 20503 )| Civil Action No. 25-0527 (JEB) |

                                        )
                Defendants.             )
_____)

## FIRST AMENDED COMPLAINT

1.      This is a civil action for declaratory, injunctive, and mandamus relief brought

under the Administrative Procedure Act, 5 U.S.C. §§ 701, *et seq.* ("APA"); the Presidential

Records Act, 44 U.S.C. §§2201, *et seq.* ("PRA"); the Federal Records Act, 44 U.S.C §3101, *et*

*seq.* ("FRA"); the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202; and the All Writs Act,

28 U.S.C. § 1651; challenging as contrary to law Defendants' recordkeeping policies and

practices that treat federal agency records of Defendants U.S. Department of Government

Efficiency ("DOGE"), U.S. DOGE Service ("USDS"), and U.S. DOGE Service Temporary

Organization ("USDSTO") as presidential records under the PRA and beyond the scope of the

Freedom of Information Act ("FOIA").

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (action

arising under the laws of the United States), 28 U.S.C. § 1361 (mandamus), 5 U.S.C. §§ 702 and

706 (APA), and 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgment Act).

3.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (e).

## PARTIES

4.      Plaintiff POGO is a nonpartisan independent organization based in Washington,

D.C. and organized under section 501(c)(3) of the Internal Revenue Code. Founded in 1981,

POGO champions reforms to achieve a more effective, ethical, and accountable federal

government that safeguards constitutional principles. POGO's investigators and journalists take

leads and information from insiders and verify the information through investigations using

FOIA, interviews, and other fact-finding strategies. POGO's investigative work has been recognized by Members of Congress, executive branch officials, and professional journalism organizations. For instance, in 2015, POGO won the Robert D.G. Lewis Watchdog Award, the Society of Professional Journalists Washington, D.C. Professional Chapter's highest journalistic award, for reporting on the Department of Justice's opaque system for handling allegations of attorney misconduct within its ranks. In 2018, POGO won an award from the Society for Advancing Business Editing & Writing for its investigative series scrutinizing the government's oversight of offshore drilling. POGO extensively used records obtained under FOIA for both investigations. In 2023, POGO won a DC Dateline Award for excellence in journalism from the Society of Professional Journalists for work investigating conflicts of interest in the financial auditing industry. In 2024, POGO won a silver medal for investigative journalism podcasting at the New York Festivals Radio Awards, and was nominated for an Ambie Award for excellence in podcasting. This year, POGO won third place at the National Headliner Awards for digital civic/political affairs podcast. That podcast prominently featured records obtained by POGO through FOIA, including records that a court ruled had been wrongly withheld from POGO.

5.    As a frequent FOIA requester POGO has a strong operational interest in government compliance with the recordkeeping obligations that the FRA imposes on all federal agencies and agency heads. The failure of agencies and agency heads to create and maintain their records impedes POGO's ability to obtain those records through the FOIA, thereby impeding POGO's ability to fulfill its mission, and impairs the informational rights that the FOIA confers on POGO.

6.    POGO's pending FOIA requests include requests made to the Office of Personnel Management, Office of Management and Budget, General Services Administration, Federal

Bureau of Investigation, Central Intelligence Agency, Office of the Director of National Intelligence, National Reconnaissance Office, Department of Homeland Security, Department of Commerce, Department of Treasury, Department of Defense, Department of Justice, and National Aeronautics and Space Administration for records concerning all noncareer and limited-term senior executives, special government employees, and Schedule C employees (including Temporary Transition Schedule C employees) who began on or after January 20, 2025. DOGE employees can be special government employees, according to the Executive Order creating DOGE, and some are documented as political appointees, such as a DOGE team member at the Department of Treasury who was in a temporary transitional Schedule C position.

7.      POGO also filed a FOIA request with the US DOGE Service and OMB on April 8, 2025, that seeks electronic communications sent or received by 34 specified individuals, including 31 with doge.eop.gov email accounts containing 17 specified terms. USDS has refused to process this request, depriving POGO of access to records to which it is entitled under the FOIA and which it needs to fulfill its mission.

8.      On May 7, 2025, POGO filed another FOIA request with DOGE that seeks electronic communications sent or received by 34 specified individuals, including 31 with doge.eop.gov email accounts containing 10 specified terms distinct from that of POGO's earlier FOIA with DOGE.

9.      POGO filed another FOIA with the U.S. Office of Personnel Management on May 7, 2025 that seeks electronic communications sent or received by 19 specified OPM employees who have been linked to DOGE containing 21 specified terms. Eight of these 19 OPM employees also have doge.eop.gov email accounts (and are among those POGO identified in its April 8, 2025 FOIA to DOGE).

10.    POGO intends to file additional FOIA requests with DOGE in the future seeking records that will shed light on areas of great public interest and concern. Those areas include conflicts of interest with respect to certain programs or contracts, the independent authority exercised by DOGE team members, bypassing legal and procedural safeguards intended to protect the public, and communications with entities outside the federal government.

11.    Journalists with POGO have published five articles providing critical assessments of DOGE and its activities. These include: (1) an article POGO published on February 6, 2025, about the vetting and ethics concerns Musk's DOGE teams raise, Nick Schwellenbach, "Elon Musk's DOGE Teams Raise Vetting, Ethics Concerns," *POGO.org*, Feb. 6, 2025, https://www.pogo.org/investigations/elon-musks-doge-teams-raise-vetting-ethics-concerns; (2) an article POGO published on February 18, 2025, *See* Nick Schwellenbach, "DOD Contractor Hires Trump-Aligned Lobbyists to Tackle DOGE," *POGO.org*, Feb. 18, 2025, https://www.pogo.org/investigations/dod-contractor-hires-trump-aligned-lobbyists-to-tackle-doge; (3) a March 7, 2025 article, Nick Schwellenbach, "Musk's Deep Financial Ties to Top Feds Revealed," *POGO.org*, Mar. 7, 2025, https://www.pogo.org/investigations/musks-deep-financial-ties-to-top-feds-revealed; (4) an April 2, 2025 article, Faith Williams, "What is wrong with DOGE: Its Structure, for One," *POGO.org*, Apr. 2, 2025, https://www.pogo.org/analysis/whats-wrong-with-doge-its-structure-for-one; and (5) an April 22, 2025 analysis highlighting conflicts of interest related to Musk and DOGE officials, Faith Williams, "What's Wrong With DOGE? Its Glaring Conflicts of Interest," *POGO.org*, Apr. 22, 2025, https://www.pogo.org/analysis/whats-wrong-with-doge-its-glaring-conflicts-of-interest.

12.    POGO is currently preparing to publish another article that addresses DOGE and that utilizes FOIA records obtained from the U.S. Office of Personnel Management in response to an earlier FOIA filed by POGO on February 3, 2025.

13.    POGO's Director of Government Affairs Dylan Hedtler-Gaudette testified at the first DOGE-related hearing before the House Committee on Oversight and Government Reform Subcommittee on Delivering on Government Efficiency on February 12, 2025, https://www.pogo.org/testimonies/pogo-calls-for-focus-on-real-reforms-to-improve-federal-spending-accountability-and-transparency. Mr. Hedtler-Gaudette's written testimony included an assessment of DOGE's efficacy in providing a check against waste, fraud, and abuse as well as of Musk's "massive conflicts of interest [his] financial ties present[.]" *Id.* at 9.

14.    POGO has a visible media presence on DOGE and DOGE-related issues that has resulted in at least forty media mentions. POGO's President and Executive Director Danielle Brian and others at POGO routinely offer expert commentary on DOGE activities. For example, Ms. Brian commented on how DOGE's impacts on contractors have mainly affected "the equivalent of the mom-and-pop shops," Emily Badger, Aatish Bhatia, Josh Katz, Margot Sanger-Katz & Ethan Singer, "The Big Government Contracts DOGE Hasn't Touched," *New York Times*, Mar. 4, 2025, https://www.nytimes.com/interactive/2025/03/04/upshot/doge-musk-contracts-cuts.html. One POGO post on X.com highlighted a *New York Times* article on how DOGE made it harder to check its claims, with POGO remarking "DOGE has started providing fewer details on the cuts it's making to the federal government. These kinds of attempts to hide information from the public are why we're suing DOGE to demand that it complies with federal record laws," https://x.com/POGOwatchdog/status/1900295302826860649.

15.     Defendant Donald J. Trump is President of the United States and is sued in his official capacity only. President Trump is subject to the requirements of the PRA, including the obligation to treat only presidential records as subject to the requirements of the PRA.

16.     Defendant U.S. Department of Government Efficiency is a federal agency within the meaning of the APA, 5 U.S.C. § 551(f)(1), headquartered in Washington, D.C. and subject to the requirements of the FRA and the FOIA.

17.     Defendant U.S. DOGE Service is a federal agency within the meaning of the APA, 5 U.S.C. § 551(f)(1), headquartered in Washington, D.C. and subject to the requirements of the FRA and the FOIA.

18.     Defendant U.S. DOGE Service Temporary Organization ("USDSTO") is a federal agency within the meaning of the APA, 5 U.S.C. § 551(f)(1), headquartered in Washington, D.C. and subject to the requirements of the FRA and the FOIA. USDSTO sits within the USDS and is headed by Defendant Amy Gleason.

19.     Defendant Amy Gleason is the Acting Administrator of USDS and USDSTO and is sued in her official capacity only. As Administrator, Ms. Gleason is subject to specified duties and obligations imposed by Presidential Executive Orders from President Trump to implement the President's DOGE agenda. As the head of an agency, Administrator Gleason is also subject to the requirements of the FRA, including, *inter alia*, the requirement to have and implement a recordkeeping policy for the agency's records and to initiate enforcement actions to prevent the unlawful removal or loss of agency records.

## STATAUTORY BACKGROUND

### The Presidential Records Act

20.     In response to presidential misconduct revealed by the Watergate scandal,

Congress enacted the PRA in 1978 to establish public ownership of presidential and vice

presidential records, to impose record-keeping requirements on the President and Vice President,

and to authorize the NARA to preserve and make publicly available presidential records. *See*

Carl Bretscher, The President and Judicial Review Under the Records Act, 60 Geo. Wash. L.

Rev., 1477, 1483 (1992) (PRA passed "to prevent a repeat of Watergate's legal drama

surrounding ownership of presidential records").

21.     Toward that end, the PRA specifies that "[t]he United States shall reserve and

retain complete ownership, possession, and control of Presidential records[.]" 44 U.S.C. § 2202.

22.     The PRA directs the President to "take all such steps as may be necessary to

assure that the activities, deliberations, decisions, and policies that reflect the performance of his

constitutional, statutory, or other official or ceremonial duties are adequately documented and

that such records are maintained as Presidential records[.]" 44 U.S.C. § 2203(a).

23.     The PRA defines "Presidential records" broadly to include documentary

materials "created or received by the President, the President's immediate staff, or a unit or

individual of the Executive Office of the President whose function is to advise or assist the

President" in conducting activities related to the President's constitutional, statutory, or

ceremonial duties.  44 U.S.C. § 2201(2). The PRA excludes from the definition of presidential

records "personal records," defined as those "of a purely private or nonpublic character"

unrelated to the President's constitutional, statutory, or ceremonial duties. 44 U.S.C. § 2201(3)

24.     Under the PRA, a President may designate a period of up to 12 years after the

completion of his or her presidency during which his or her presidential records are not publicly

accessible, including under the FOIA. 44 U.S.C. §§ 2204(a) and (b). After the expiration of any

limits imposed by the PRA on public access to a former President's records, those records

are administered under the FOIA. 44 U.S.C. § 2204(c)(1).

25.     Through the PRA Congress explicitly removed from the definition of presidential

records "any documentary materials that are . . . official records of an agency" under the APA's

definition of "agency." 44 U.S.C. § 2201(2)(A)(i). *See also Armstrong v. EOP*, 1 F.3d 1274, 1292

(D.C. Cir. 1993).

**The Federal Records Act**

26.     The FRA is a collection of statutes that govern the creation, management, and

disposal of federal or agency records. 44 U.S.C. §§ 2101-18, 2902-09, 3101-07, and 3301-24.

Congress enacted the FRA to ensure "[a]ccurate and complete documentation of the policies and

transactions of the Federal Government." 36 C.F.R. § 102-193.10(a).

27.     Toward that end, the FRA requires federal agencies to establish: (1) a program to

make and preserve agency records; (2) effective controls over the creation, maintenance, and use

of records; and (3) safeguards against the removal or loss of records. 44 U.S.C. §§ 3101, 3102,

and 3105.

28.     The FRA specifically mandates that "[t]he head of each Federal agency *shall

make and preserve* records containing adequate and proper documentation of the

organization, functions, policies, decisions, procedures, and essential transactions of the

agency[.]" 44 U.S.C. § 3101 (emphasis added). The FRA defines the term "records" to

include "all books, papers . . . or other documentary materials, regardless of physical form

or characteristics . . . made or received by an agency of the United States Government under

Federal law or in connection with the transaction of public business and preserved or

appropriate for preservation by that agency . . . as evidence of the organization, functions,

policies, decisions, procedures, operations or other activities of the Government or because

of the informational value of data in them." 44 U.S.C. § 3301.

29.     The FRA provides the exclusive procedure by which all federal records may be disposed of or destroyed. *See* 44 U.S.C. § 3314. Under its provisions, federal records may be disposed of or destroyed only with the authorization of the Archivist either through General Records Schedules or NARA-approved agency-specific disposition schedules. 44 U.S.C. §§ 3303a(a) and (d).

30.     The FRA generally requires that federal records, including those generated in personal electronic messaging accounts, be preserved in a government recordkeeping system. Consistent with this obligation, the FRA prohibits agency officials from "create[ing] or send[ing] a record using a non-official electronic messaging account unless such officer or employee—(1) copies an official electronic messaging account of the officer or employee in the original creation or transmission of the records; or (2) forwards a complete copy of the record to an official electronic messaging account of the officer or employee not later than 20 days after the original creation or transmission of the record." 44 U.S.C. § 2911(a).

31.     To prevent the unlawful destruction or removal of records, the FRA creates a "system of administrative enforcement." *Armstrong v. Bush*, 924 F.2d 282, 284 (D.C. Cir. 1991). This system imposes obligations on both agency heads and the Archivist.

32.     With respect to agency heads the FRA provides that if they become aware of "any actual, impending, or threatened unlawful removal, defacing, alteration, corruption, deletion, erasure, or other destruction of records in the custody of the agency" they must "notify the Archivist" and "with the assistance of the Archivist . . . initiate action through the Attorney General for the recovery" of such records. 44 U.S.C. § 3106(a); *see also* 36 C.F.R. § 1230.14 (implementing NARA regulation detailing how agencies "must report promptly any unlawful or accidental removal, defacing, alteration, or destruction of records in the custody of that agency to NARA").

## The Freedom of Information Act

33.     The FOIA, enacted in 1966, established a statutory right of public access upon request to documents held by Executive Branch agencies. The FOIA carries a "strong presumption in favor of disclosure," *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991), and its "limited exceptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976).

34.     Under the FOIA, virtually every record of a federal agency must be made publicly available upon request unless it is specifically exempted pursuant to one or more of the FOIA's nine exemptions. 5 U.S.C. § 552(b). Those government entities that fall outside of the APA's definition of "agency" are not subject to the FOIA. *See, e.g.*, *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980).

## FACTS GIVING RISE TO PLAINTIFF'S CLAIMS FOR RELIEF

35.     On January 20, 2025, Donald J. Trump was inaugurated as the 47th President of the United States.

36.     After assuming office on January 20, 2025, President Trump issued Executive Order 14158 entitled "Establishing and Implementing the President's 'Department of Government Efficiency.'" ("DOGE EO") Section one of the DOGE EO states that its purpose is to "establish[] the Department of Government Efficiency to implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity."

37.     Section three of the DOGE EO also renames the United States Digital Service as the United States DOGE Service ("USDS") within the EOP.

38.     The DOGE EO further establishes a USDS Administrator reporting to the White House Chief of Staff.

39.     The DOGE EO also establishes the U.S. DOGE Service Temporary Organization, headed by the USDS Administrator and charged with "advancing the President's 18-month DOGE agenda," DOGE EO, Section 3 (b), and implementing a "Software Modernization Initiative." *Id.* § 4.

40.     The DOGE EO also directs each agency, in consultation with USDSTO, to establish a DOGE team "within their respective Agencies" consisting of at least four employees, who may include Special Government Employees. Agency heads are directed to coordinate the work of their DOGE Team Lead with USDS.

41.     The DOGE EO directs the USDSTO Administrator to "commence a Software Modernization initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems," working with agency heads. DOGE EO Section 4.

42.     President Trump initially tapped Elon Musk and Vivek Ramaswamy to head DOGE. Hours after President Trump issued the DOGE EO, Ramaswamy bowed out, leaving DOGE headed solely by Musk.

43.     On February 3, 2025, the White House confirmed publicly that Musk was officially joining the federal government as a special government employee and that he would submit a financial disclosure report that would not be made public. Theodore Schleifer & Eric Lipton, "Elon Musk's Financial Disclosure Will Not Be Made Public," *New York Times*, Feb. 11, 2025, https://www.nytimes.com/2025/02/11/us/politics/elon-musk-finances.html.According to public reporting, Musk received both a government email address and an office. *See, e.g.*, Francesca Chambers, "Trump makes DOGE head Elon Musk a 'special government employee'

amid accusations of a takeover, *USA Today*, Feb. 3, 2025, https://www.usatoday.com/story/news/politics/2025/02/03/doge-elon-musk-special-employee-federal-government/78185365007/.

44.     On February 11, 2025, Trump issued Executive Order 14210 that lays out DOGE's role in "eliminating waste, bloat, and insularity" and its mandate to work with agency heads to create and implement hiring plans, including anointing DOGE with the power to decide which vacancies should be filled. The USDSTO Administrator is obligated to "submit a report to the President regarding implementation of this order, including a recommendation as to whether any of its provisions should be extended, modified, or terminated."

45.     According to recent reporting, DOGE's operating budget has ballooned to nearly $40 million. Avi Asher-Schapiro, Andy Kroll & Christopher Bing, "DOGE's Millions: As Musk and Trump Gut Government, Their Ax-Cutting Agency Gets Cash Infusion, ProPublica, Feb. 20, 2025, https://www.propublica.org/article/doge-trump-musk-funding-foia-congress-transparency.

46.     DOGE has established a website with a .gov URL (https://doge.gov/) that includes the header "An official website of the United States government" and an X account (@DOGE), both of which are used to promote its work, findings, and actions, such as cancelling contracts and grants.

47.     Employees of DOGE have been assigned government email accounts to be used in conducting official DOGE business.

48.     On February 25, 2025, after weeks of refusing to answer the question of who the DOGE Administrator is, the White House identified Amy Gleason as the Acting Administrator. Joe Hernandez, "Amy Gleason is the acting administrator of DOGE, the White House says. Who is she?," *NPR*, February 26, 2025, https://www.npr.org/2025/02/26/nx-s1-5310634/amy-gleason-doge-administrator.

49.     Even without the title of Administrator, Elon Musk has functionally assumed

leadership of USDS and USDSTO since their inception. In that capacity, he has been

implementing his vision for what has been called "a dramatically smaller and weaker

government." Jeff Stein, Elizabeth Dwoskin, Hannah Natanson & Jonathan O'Connell, "In

chaotic blitz, Musk's core goals come into focus," *Washington Post*, Feb. 9, 2025,

https://www.washingtonpost.com/business/2025/02/08/doge-musk-goals/. Musk has been

described as "exercising a level of control so sweeping that it is stunning former top White

House officials[.]" Bobby Allyn & Shannon Bond, "Elon Musk is barreling into government

with DOGE, raises unusual legal questions," *NPR*, Feb. 3, 2025,

https://www.npr.org/2025/02/03/nx-s1-5285539/doge-musk-usaid-trump.

50.     Exercising power conferred on him by the President, Musk and the agencies he

functionally leads, USDS and USDSTO, are implementing a "broad[] agenda to gut the civilian

workforce, assert power over the vast federal bureaucracy and shrink it to levels unseen in at

least 20 years." Stein, et al., *Washington Post*, Feb. 9, 2025.

51.     According to public reporting, DOGE through USDS is "exercising significant

authority by directing agencies to implement various policies, superintending personnel

decisions purporting to close federal agencies, acquiring access to sensitive databases, and

threatening agency officials who fail to comply." "Challenging DOGE," *Governing for Impact*,

Feb. 2025, https://governingforimpact.org/wp-content/uploads/2025/02/Challenging-DOGE-

Primer-final.pdf.

52.     That authority is reflected in the efforts by Musk and USDS and USDSTO to

dismantle USAID, *see, e.g.*, Chambers, *USA Today*, Feb. 3, 2025, and their cancelling of DEIA-

related contracts at 25 federal agencies and entities. X, Jan. 29, 2025, https://x.com/DOGE/
status/188476249785014685̲7̲.

53.     Musk and the agencies he functionally leads have employed similar tactics to
seize control of the Consumer Financial Protection Bureau with the goal of eliminating the
agency altogether. DOGE staff have advised GSA that they plan to automate most of that
agency's jobs.

54.     Similarly, it has been reported that at the Education Department, DOGE staff,
using AI, are analyzing data with the goal of cancelling every contract not legally required or
essential to the agency's operations. Stein, et al., *Washington Post*, Feb. 9, 2025. And a DOGE
employee has been editing the Education Department's website. *Id.*

55.     According to recent reporting, over 280,000 federal employees and contractors
across 27 agencies have been laid off or will be laid off by DOGE. Sara Dorn, "Trump's Great
Rehiring: Over 26,000 Fired By DOGE Likely To Return – So Far," *Forbes*, Apr. 4, 2025,
https://www.forbes.com/sites/saradorn/2025/04/04/trumps-great-rehiring-over-26000-fired-by-
doge-likely-to-return-so-far/.

56.     As summarized by Judge Cooper in a recent order denying DOGE's motion for
reconsideration, DOGE "has reportedly led the charge on personnel cuts across federal agencies;
eliminated government contracts, and sent teams of employees to federal agencies to gain access
to sensitive and classified data." *CREW v. USDS*, No. 25-cv-511, Opinion and Order, March 19,
2025 (ECF No. 23).

57.     At the same time, Musk and DOGE have run roughshod over record keeping
requirements designed, in part, to bring greater transparency and accountability to the
government. For example, according to a recently filed lawsuit against the Office of Personnel

Management, *Jane Does 1-2 v. OPM*, Civil No. 25-00234 (D.D.C. Jan. 27, 2025), a Musk

employee working with DOGE set up a new server at OPM that bypassed federal law and was

intended for sending government-wide emails. Billy Mitchell, "OPM calls to dismiss email

server lawsuit, issues missing privacy assessment," *Fedscoop*, Feb. 5, 2025, https://fedscoop.

com/opm-server-lawsuit-motion-to-dismiss-elon-musk-doge/.

58.    Those emails include one sent on January 28, 2025, entitled "Fork in the Road," a

title that is identical to an email Musk sent to Twitter employees when he took over Twitter. The

OPM Fork-in-the-Road email sets forth a deferred resignation program available to all federal

employees. Those who resign under this program retain all pay and benefits through September

30, 2025, and are exempted from the in-person work requirements set out in that same email. *See*

Office of Personnel Management, Fork in the Road, Deferred Resignation Email to Federal

Employees, Jan. 28, 2025, https://www.opm.gov/fork.

59.    On February 5, 2025, it was reported that OPM had ordered DOGE employees to

stop using Slack "while government lawyers attempt to transition the agency to one that is not

subject to the Freedom of Information Act[.]" Jason Koebler & Joseph Cox, "DOGE Employees

Ordered to Stop Using Slack While Agency Transitions to a Records System Not Subject to

FOIA," *404media*, Feb. 5, 2025, https://www.404media.co/doge-employees-ordered-to-stop-

using-slack-while-agency-transitions-to-a-records-system-not-subject-to-foia/. Another email

advised DOGE employees that DOGE was splitting from OMB. *Id.*

60.    DOGE and its agency components have also wrapped themselves in secrecy,

eschewing the applicability of the FOIA. In a further step toward secrecy, DOGE has entered

into a memorandum of understanding with at least one agency, the Consumer Financial

Protection Bureau ("CFPB"), that requires the CFPB to notify DOGE Service of FOIA requests

related to the work of DOGE team employees at the CFPB as well as oversight inquiries from

Congress, Inspectors General or GAO. Jason Leopold, "Elon Musk's DOGE Wants to Be

Notified About Any Requests for Oversight," *Bloomberg*, Feb. 14, 2025,

https://www.bloomberg.com/news/newsletters/2025-02-14/elon-musk-s-doge-wants-to-be-

notified-about-foias.

61.     To implement their mission, DOGE staff have gained access to a vast swath of

sensitive government data and records. For example, DOGE now has access to and the ability to

"delete, modify, or export the personal information of millions of federal workers and federal job

applicants." Stein, et al., *Washington Post*, Feb. 9, 2025. DOGE is also seeking access to

personal taxpayer data from the IRS that "includes detailed financial information about every

taxpayer, business and nonprofit in the country[.]" Jacob Bogage & Jeff Stein, "Musk's DOGE

seeks access to personal taxpayer data, raising alarm at IRS," *Washington Post*, Feb. 16, 2025,

https://www.washingtonpost.com/business/2025/02/16/doge-irs-access-taxpayer-data/.

62.     While accessing that data, DOGE employees have taken great pains to ensure no

records exist of their efforts to exfiltrate data. For example, according to a whistleblower, while

accessing data on the National Labor Relations Board's ("NLRB") internal systems in early

March 2025, DOGE employees directed Labor Department employees not to log their activities

on the system. The DOGE employees turned off monitoring tools and manually deleted records

of their access to the system. Jenna McLaughlin, "A whistleblower's disclosure details how

DOGE may have taken sensitive Labor data, *NPR*, Apr. 15, 2025, https://www.npr.org/2025/04

/15/nx-sl-5355896/doge-nlrb-elon-musk-spacex-security.

63.     Despite this evidence that Defendants exercise substantial independent authority

and are therefore an agency as defined by the Administrative Procedure Act Defendants have

refused to accept and process FOIA requests. In response to POGO's request to USDS of April 8, 2025, USDS responded that because it is subject to the PRA and not the FOIA it declined to process POGO's request.

64.     Defendants have also failed to adopt and implement a recordkeeping policy as the FRA requires. Instead, on March 25, 2025, USDS issued a one-page document, "United States DOGE Service Records Retention Policy," explaining Defendants' records retention obligations under the PRA.

65.     While purporting to implement the PRA, the March 25, 2025 policy omits key requirements of the PRA and excludes certain categories of documents from the memo's reach in contradiction of the PRA's definition of a presidential record.

66.     On February 25, 2025, POGO's Executive Director and outside counsel sent a letter to White House Counsel David Warrington, asking that he provided assurances that all DOGE and USDS records will be collected, retained, and preserved as of January 20, 2205, as the FRA requires.

67.     When the White House failed to respond to POGO's request, POGO reached out to counsel for Defendants by email dated March 11, 2025, reiterating its preservation request and noting Juge Cooper's imposition of a preservation order on March 10 in *CREW v. USDS*. By email dated March 15, 2025, counsel responded only that "USDS has taken all steps to preserve all USDS records consistent with its obligations under the PRA," but said nothing about its obligations under the FRA.

### PLAINTIFF'S CLAIMS FOR RELIEF

### CLAIM ONE
**(For a Declaratory Judgment that Recordkeeping Guidelines Issued and/or Implemented by Defendants Violate the PRA and the FRA)**

68.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if set forth fully herein.

69.     As entities with a self-contained structure that exercise substantial independent authority, DOGE, USDS and USDSTO are agencies within the meaning of the APA, 5 U.S.C. 551(f)(1).

70.     As agencies, DOGE, USDS and USDSTO and Administrator Gleason are subject to the recordkeeping requirements of the FRA and their records are publicly accessible through the FOIA.

71.     The policies and practices of President Trump, DOGE, USDS, USDSTO and Administrator Gleason to treat the records of DOGE and its agency components as subject to the PRA and consequently excluded from the FRA and FOIA are therefore arbitrary, capricious and contrary to law.

72.     Plaintiff POGO, an organization with a longstanding interest in the records of government agencies, including DOGE, and that uses the FOIA to access those records, has been harmed and will continue to be harmed by the policy and practice of Defendants to deprive POGO of access to the agency records of DOGE, USDS and USDSTO.

73.     Plaintiff is therefore entitled to relief in the form of a declaratory judgment that Defendants are in violation of their non-discretionary statutory responsibilities under the FRA to treat the records of DOGE, USDS and USDSTO as agency records subject to the FRA and publicly accessible through the FOIA.

74.     Plaintiff is also entitled to a declaratory judgment that Defendants' policy and practice of treating DOGE and USDS records as non-agency records subject to the PRA,

including the March 25, 2025 "United States DOGE Service Records Retention Policy," are arbitrary, capricious, and contrary to law.

## CLAIM TWO
**(For Injunctive Relief and a Writ of Mandamus Compelling Defendants to Comply With Their Non-Discretionary Duties Under The FRA)**

75. Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if set forth fully herein.

76. The FRA is clear and the duties thereunder plainly defined: Defendants are required to treat the records of DOGE and its agency components as agency records subject to the FRA and publicly accessible through the FOIA.

77. The PRA expressly excludes from its scope "any documentary materials that are . . . official records of an agency" under the APA's definition of "agency." 44 U.S.C. § 2201(2)(A)(i).

78. Plaintiff, an organization that relies on records from agencies like DOGE, USDS and USDSTO to disseminate to and inform and educate the public, has a direct interest in ensuring the records of DOGE, USDS and USDSTO are maintained, preserved, and accessible to the public in accordance with the provisions of the FRA and FOIA.

79. By adopting a policy and practice of treating the agency records of DOGE, USDS and USDSTO as subject to the PRA and outside the scope of the FOIA, Defendants are violating their clearly mandated ministerial duties under 44 U.S.C. §§ 3101, 3102, and 3105.

80. Plaintiff is therefore entitled to mandamus and injunctive relief compelling Defendants to comply with their statutory duties to treat the records of DOGE, USDS and USDSTO as agency records subject to the FRA and the FOIA.

## CLAIM THREE
### (For a Declaratory Judgment that Defendant Administrator of USDS's Recordkeeping Policies and Guidelines Violate Mandatory Duties Imposed By the FRA)

81.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if set forth fully herein.

82.    The FRA imposes on the head of each agency the mandatory requirement to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency[.]" 44 U.S.C. § 3101.

83.    In direct defiance of that statutory mandate, Defendant Administrator of USDS and USDSTO has directed that their records be treated as presidential records under the PRA and outside the scope of the FOIA.

84.    In direct defiance of that statutory mandate, Defendant Administrator of USDS and USDSTO has also failed to create and implement a recordkeeping policy under the FRA for their records.

85.    Plaintiff, who has a longstanding interest in the records of government agencies and who uses the FOIA to access those records, has been harmed and will continue to be harmed by the policy and practice of Defendant Administrator to deprive them of access to the agency records of DOGE, USDS and USDSTO by treating those records as subject to the PRA.

86.    Plaintiff is therefore entitled to relief in the form of a declaratory judgment that Defendant Administrator of USDS and USDSTO is in violation of her non-discretionary statutory responsibilities under the FRA to create and implement a recordkeeping policy that treats the records of DOGE, USDS and USDSTO as agency records subject to the FRA and publicly accessible through the FOIA

87.     Plaintiff is also entitled to a declaratory judgment that Defendant Administrator's policy and practice of treating DOGE, USDS and USDSTO records as non-agency records subject to the PRA are arbitrary, capricious, and contrary to law.

## CLAIM FOUR
**(For Injunctive Relief and a Writ of Mandamus Compelling Defendant Administrator of USDS to Comply With the Non-Discretionary Duties Imposed By the FRA)**

88.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs as if set forth fully herein.

89.     The FRA is clear and the duties thereunder plainly defined: Defendant Administrator of USDS, as the head of an agency, must "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency[.]" 44 U.S.C. § 3101.

90.     Plaintiff, an organization that relies on records from agencies like DOGE, USDS and USDSTO to disseminate to and inform and educate the public, has a direct interest in ensuring their records are maintained, preserved, and accessible to the public in accordance with the provisions of the FRA and FOIA.

91.     By failing to create and implement a recordkeeping policy that treats the records of DOGE, USDS and USDSTO as agency records under the FRA, Defendant Administrator is violating her clearly mandated ministerial duties under 44 U.S.C. § 3101.

92.     Plaintiff is therefore entitled to mandamus and injunctive relief compelling Defendant Administrator to comply with her statutory duty to make and preserve the records of DOGE, USDS and USDSTO as agency records subject to the FRA and the FOIA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(1) Declare that Defendants' policy and practice of treating DOGE, USDS and USDSTO records as non-agency records subject to the PRA, including but not limited to the March 25, 2025 records retention policy issued by USDS, are arbitrary, capricious, and contrary to law;

(2) Order all defendants, in the form of injunctive and mandamus relief, to comply with their statutory duties to treat the records of DOGE, USDS and USDSTO as agency records subject to the FRA and the FOIA;

(3) Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

/s/Anne L. Weismann
Anne L. Weismann
(D.C. Bar No. 298190)
5335 Wisconsin Avenue, NW
Suite 640
Washington, DC 20015
Weismann.anne@gmail.com
(301) 717-6610

Dated:  May 9, 2025                    *Attorney for Plaintiff*