**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| PROJECT ON GOVERNMENT OVERSIGHT, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 25-527 (JEB) |
| | ) | |
| DONALD J. TRUMP, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RENEWED MOTION FOR A PRELIMINARY INJUNCTION**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ................................................................................................1

FACTUAL BACKGROUND ...............................................................................3

STATUTORY BACKGROUND.......................................................................... 8

    The Federal Records Act........................................................................... 8

    The Presidential Records Act.....................................................................9

    The Freedom of Information Act............................................................. 11

LEGAL STANDARS.......................................................................................... 11

ARGUMENT.....................................................................................................12

    I.     PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITs........................12

         A.  POGO Has Standing To Maintain This Action...................................12

         B.  Plaintiff Has Raised Claims Cognizable Under The FRA And PRA............19

         C.  DOGE Is An Agency Subject To The FRA.......................................21

         D.  USDS's March 25, 2025 Recordkeeping Guidance Fails To Substitute For An FRA-Compliant Recordkeeeping Policy................................27

    II.    POGO WILL SUFFER IRREPARABLE INJURY ABSSENT A PRELIMINARY INJUNCTION............................................................29

         A.  Plaintiff Will Suffer Irreparable Injury Absent The Requested Preservation Order.............................................................29

         B.  An Injunction Applying To All Of DOGE'S Records Is Necessary To Prevent Irreparable Injury......................................................35

    III.   DEFENDANTS WILL NOT BE HARMED BY THE REQUESTED RELIEF............................................................................37

    IV.   THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR THE REQUESTED RELIEF ….................................................................38

         CONCLUSION..................................................................................38

## <u>**TABLE OF AUTHORITIES**</u>

### <u>**Cases**</u>

*Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014) …………………………………… 12

*Am. Fed'n Of Lab. & Congr. Of Indus. Orgs. v. U.S. Dep't of Labor*, No. 25-0339
(D.D.C. Feb. 14, 2025) …………………………………………………………… 24

*Am. Fed'n of State, Cty. & Mun. Emps. v. Social Sec. Admin.*, No. 25-cv-596-ELH (D. Md.
Mar. 20, 2025) ………………………………………………………………… 25

*Am. First Legal Found v. Becerra*, 2024 U.S. Dist. LEXIS 151534
(D.D.C. Aug. 9, 2024)…………………………………………………………….. 20,36

*Am. Oversight v. US DOGE*, Civil Action No. 25-409 (BAH) (D.D.C.) ……………… 29,32,34

*Armstrong v. Bush*, 924 F.2d 282 (D.C. Cir. 1991) …….……………………… 9, 20,36

*Armstrong v. EOP*, 1 F.3d 1274 (D.C. Cir. 1993) …..……………………………… 10, 19

*Armstrong v. EOP*, 90 F.3d 553 (D.C. Cir. 1996) …………………………………….. 21

*Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716 (D.C. Cir. 2022) …………….. 12

*Competitive Enter. Inst. v. Off. of Science & Tech. Policy*, No. 14-cv-765,
2016 WL 106776292 (D.D.C. Dec. 12, 2016) ……………………………………… 34

*CREW v. Cheney*, 593 F. Supp. 2d 194 (D.D.C. 2009) …………………………17,18,35

*CREW v. Dep't of Homeland Sec.*, 2024 U.S. Dist. LEXIS 47949 (D.D.C.
Mar. 19, 2024) …………………………………………………………………… 18

*CREW v. Exec. Office of the President*, 587 F. Supp. 2d 48 (D.D.C. 2008) …………….. 18

*CREW v. Off. of Admin.*, 566 F.3d 219 (D.C. Cir. 2009) …………………………… 21

*CREW v. Pompeo,* 2020 U.S. Dist. LEXIS 59038 (D.D.C. Apr. 3, 20020) …………….... 20

*CREW v. Pruitt*, 319 F. Supp. 3d 252 (D.D.C. 2018) …………………………………… 20

*CREW v. U.S. DOGE Serv.*, No. 25-cv-511 (CRC), 2025 U.S. Dist. LEXIS 42869
(D.D.C. Mar. 20, 2025) …….………………………………………………. passim

*Dep't of the Air Force v. Rose*, 425 U.S. 352 (1976) ………………………....... 11

*Doe v. Musk*, No. 25-0462-TDC, 2025 U.S. Dist. LEXIS 49603 (D. Md.) ………………25

*FEC v. Akins*, 524 U.S. 11, 21 (1989) ……………………………………………………… 19

*Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136 (1980) ………… 11

*Lujan v. Defenders of Wildlife*, 504 U.S._555 (1992) ……………………………………….. 12

*Meyer v. Bush*, 981 F.2d 1288 (D.C. Cir. 1993) ……………………………………….. 21

*Nken v. Holder*, 556 U.S. 418 (2009) ……………………………………………………...38

*Open Cmtys. All. v. Carson*, 286 F. Supp 3d 148 (D.D.C. 2017) ………………………….38

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021) ………………………………………. 19

*U.S. Dep't of State v. Ray*, 502 U.S. 164 (1991) ……………………………………... 11

## Statutes and Regulations

5 U.S.C. § 552(b) …………………………………………………………………………… 11

5 U.S.C. § 552(e) …………………………………………………………………………… 21

44 U.S.C. §§ 2101-18, 2902-09, 3101-07, and 3301-24 ………………………………….. 8

44 U.S.C. § 2201(2) …… …………………………………………………………… 10,28,29

44 U.S.C. § 2202 ……………………………………………………………………… 10

44 U.S.C. § 2203(a) …………………………………………………………………… 10

44 U.S.C. § 2204 ……………………………………………………………………...11

44 U.S.C. § 2209(a)(1)-(2) ………………………………………………………… 10,27

44 U.S.C. §2911(a) …………………………………………...………….……… 9,10

44 U.S.C. §§ 3101, 3102, and 3105 …………………………………………………… 8

44 U.S.C. § 3106(a) …………………………………………………………………… 9

44 U.S.C. §§ 3303a(a) and (d) ……………………………………………………… 8

44 U.S.C. § 3314 …………………………………………………………………...… 8

36 C.F.R. § 102-193.10(a) …………………………………………………………… 8

36 C.F.R. § 1230.14 ………………………………………………………………...… 9

# **INTRODUCTION**

From their inception the U.S. Department of Government Efficiency ("DOGE"), U.S. DOGE Service ("USDS"), and U.S. DOGE Service Temporary Organization ("USDSTO") (collectively "DOGE") have defied laws and norms and challenged the authority of the judiciary to oversee their actions. Reaching into the corners of nearly every government agency, DOGE has impacted hundreds of thousands of career government employees and contractors, threatened the very existence of agencies like the U.S. Agency for International Development (USAID) and the Consumer Financial Protection Bureau, and stealthily extracted from government agencies highly sensitive data ranging from individual tax return information to Social Security numbers. In the face of this mounting evidence that DOGE wields enormous authority, DOGE insists it is not an agency subject to the records regime of the Federal Records Act ("FRA") and the transparency requirements of the Freedom of Information Act ("FOIA"). With this lawsuit Plaintiff, Project On Government Oversight, Inc. ("POGO"), asks this Court to conclude that, as other courts recently have concluded, DOGE is an agency and therefore judicially accountable for any failure to maintain and preserve *all* DOGE records as the FRA requires pursuant to a National Archives and Records Administration ("NARA")-approved recordkeeping policy formulated and implemented by DOGE's leadership.

DOGE's refusal to acknowledge its legal obligations under the FRA has potentially profound implications for Plaintiff and the public at large. Given the substantial independent authority DOGE yields and numerous and ever-increasing challenges to the legality of its actions, the records of how and why it yields that power are of enormous interest and import now and in the future. To ensure the preservation of those records Plaintiff sought assurances from Defendants that all DOGE records will be collected, retained, and preserved as the FRA requires

during the pendency of Plaintiff's lawsuit. Defendants, however, refused to provide those assurances. Instead, Department of Justice ("DOJ") counsel stated merely that "USDS has taken all steps to preserve all USDS records consistent with its obligations under the PRA [Presidential Records Act]." *See* ECF No. 11-2 at 5. This tepid response, implicitly denying DOGE's obligations under the FRA and unsupported by any evidence or explanation, raises a very real threat of irreparable harm absent this Court's immediate intervention and exposes Defendants' desire to remain free from any judicial scrutiny. Indeed, DOGE's past actions in contravention of their recordkeeping responsibilities amplify this threat.

Enhancing the risk of irreparable harm, DOGE is operating with "unusual secrecy," *CREW v. U.S. DOGE Serv.*, No. 25-cv-511 (CRC), 2025 U.S. Dist. LEXIS 42869, *54 (D.D.C. Mar. 20, 2025) ("*CREW v. DOGE*"), with employees that "may not fully appreciate their obligations to preserve federal records," *id.*, and "may not be steeped in its document retention policies." *Id.* at 55. The secrecy with which DOGE operates, the ongoing reports of use by DOGE employees of Signal, an encrypted messaging apps with auto-delete functions, and the apparent willingness of this administration to ignore its legal obligations and court orders underline the need here for an injunction requiring Defendants to preserve all DOGE records consistent with the FRA.

To prevent this irreparable harm, POGO seeks a preliminary injunction requiring Defendants to collect, retain, and preserve their records, including all electronic records, pursuant to a recordkeeping policy that complies with the FRA and guidance from NARA. Such a preservation order—which, in essence, is no more than a litigation hold—would prevent any irrevocable removal, loss, or destruction of DOGE records during the pendency of this case, while merely requiring Defendants to do what the FRA already mandates.

## FACTUAL BACKGROUND

Even prior to assuming office, Defendant Donald J. Trump announced he was forming a Department of Government Efficiency "to dismantle Government Bureaucracy, slash excess regulations, cut wasteful expenditures, and restructure Federal Agencies." *CREW v. DOGE*, 2025 U.S. Dist. LEXIS 42869, \*3 (cleaned up). He initially tapped Elon Musk and Vivek Ramaswamy to head DOGE. President Trump formalized that announcement on his first day in office with Executive Order 14158, entitled "Establishing and Implementing the President's 'Department of Government Efficiency,'" https://www.whitehouse.gov/presidential-actions/2025/02/implementing-the-presidents-department-of-government-efficiency-cost-efficiency-initiative/. Hours after he issued EO 14158, Ramaswamy bowed out leaving DOGE headed solely by Musk. Am. Compl. ¶ 42.

Section one of EO 14158 states that its purpose is to "establish[] the Department of Government Efficiency *to implement* the President's DOGE Agenda . . ." (emphasis added) Section three renames the United States Digital Service as the United States DOGE Service ("USDS") "reorganized . . . with the Executive Office of the President ("EOP")." *CREW v. DOGE*, U.S. Dist. LEXIS 42869, \*5. Section 3(b) of EO 14158 further establishes a USDS Administrator reporting to the White House Chief of Staff and establishes the U.S. DOGE Service Temporary Organization, ("USDSTO") headed by the USDS Administrator and charged with "advancing the President's 18-month DOGE agenda."

EO 14158 also directs each agency, in consultation with USDSTO, to establish a DOGE team "within their respective Agencies" consisting of at least four employees, who may include Special Government Employees. Agency heads are directed to coordinate the work of their DOGE Team Lead with USDS. The Order directs the USDSTO Administrator to "commence a

Software Modernization initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems," working with agency heads. EO 14158, sections 3(c) and 4(a).

These provisions mirror what Musk and Ramaswamy had promised in a November 20, 2024 opinion piece in the *Wall Street Journal*. Specifically, "they declared their intent to 'advise DOGE at every step to pursue three major kinds of reform: regulatory rescissions, administrative reductions, and cost savings.'" *CREW v. DOGE*, U.S. Dist. LEXIS 42869, *3 (citation omitted). The two further "revealed that, from its inception, a major objective of the new department would be 'mass head-count reductions across the federal bureaucracy.'" *Id.* at *4 (citation omitted).

President Trump issued other Executive Orders and memoranda charging Defendants with implementing specific aspects of his DOGE agenda. For example, on January 20, 2025, President Trump issued a Memorandum entitled "Hiring Freeze" that charges USDS, working with OMB and OPM, to develop a plan to reduce the size of the federal workforce. https://www.whitehouse.gov/presidential-actions/2025/01/hiring-freeze/. Similarly, EO 14218 involves USDS in spending decisions about the border. *See* https://www.federalregister. gov/documents/2025/02/25/2025-03137/ending-taxpayer-subsidization-of-open-borders. And EO 14248, issued on March 25, 2025, directs DHS in coordination with the USDS Administrator to review state voter register lists. *See* https://www.presidency.ucsb.edu/documents/presidential-documents-archive-guidebook.

On February 11, 2025, Trump issued Executive Order 14210 that lays out DOGE's role in "eliminating waste, bloat, and insularity" and its mandate to work with agency heads to create and implement hiring plans, including anointing DOGE with the power to decide which

vacancies should be filled. EO 14210, sections 1 and 3(b)(i), https://www.whitehouse.
gov/presidential-actions/2025/02/implementing-the-presidents-department-of-government-
efficiency-cost-efficiency-initiative/. For new hires, EO 14210 directs agencies to consult with
the DOGE Team Lead. Section 3(b)(ii). It further directs agencies "not to fill any vacancies for
career appointments that the DOGE Team Lead assesses should not be filled, unless the Agency
Head determines the positions should be filled." Section 3(b)(ii)*; CREW v. DOGE*, U.S. Dist.
LEXIS 42869, *8 (cleaned up). Section 3(f) of EO 14210 obligates the Administrator to "submit
a report to the President regarding implementation of this order, including a recommendation as
to whether any of its provisions should be extended, modified, or terminated."

On February 3, 2025, the White House confirmed publicly that Musk was officially
joining the federal government as a special government employee and that he would submit a
financial disclosure report that would not be made public. Theodore Schleifer & Eric Lipton,
"Elon Musk's Financial Disclosure Will Not Be Made Public," *New York Times*, Feb. 11, 2025,
https://www.nytimes.com/2025/02/11/us/politics/elon-musk-finances.html?smid=nytcore-ios-
share&referringSource=article.Share. According to public reporting, Musk received both a
government email address and an office. *See, e.g.*, Francesca Chambers, "Trump makes DOGE
head Elon Musk a 'special government employee' amid accusations of a takeover, *USA Today*,
Feb. 3, 2025, https://www.usatoday.com/story/news/politics/2025/02/03/doge-elon-musk-
special-employee-federal-government/78185365007/. But the Administration has refused to
acknowledge his precise role, at times denying he is in charge of DOGE despite President
Trump's assertions to the contrary. *See* Andrea Shalal & Nandita Bose, "Trump appears to
contradict White House, says Musk in charge of DOGE," *Reuters*, Feb. 20, 2025, https://www.

reuters.com/world/us/trump-appearws-contradict-white-house-says-elon-musk-charge-doge-2025-02-20/.

This secrecy carries over to the work of DOGE and the identities of its employees. As Judge Cooper noted in *CREW v. DOGE*,

> USDS's operations thus far have been marked by unusual secrecy . . . For instance, USDS reportedly installed an outside server at OPM to store government staffers' personal information, including their names and email accounts . . . USDS employees have also reportedly declined to identify themselves to career officials on request . . . Indeed, Musk has said that posters who released the names of USDS employees online "committed a crime."

U.S. Dist. LEXIS 42869, *13-14 (cleaned up).

On February 21, 2025, POGO filed suit against Donald Trump, DOGE, USDS, USDSTO, and the then-unnamed USDSTO Administrator. (ECF No 1). The complaint alleges that Defendants, as an agency, are subject to the recordkeeping requirements of the FRA and their records are publicly accessible through the FOIA. The complaint further challenges the failure of the USDSTO Administrator to create and implement a recordkeeping policy that treats the records of DOGE, USDS, and USDSTO as agency records under the FRA.

By letter dated February 25, 2025, to the White House Counsel (ECF No. 11-2 at 2), POGO asked for assurances within one week that all DOGE and DOGE Service records will be collected, maintained, and preserved as of January 20, 2025, as the FRA requires. Receiving no response, counsel for POGO contacted Department of Justice ("DOJ") counsel by email on March 11, 2025, reiterating POGO's request for assurances that it made to the White House. *See* ECF No. 11-2 at 4-5. By email dated March 14, 2025, DOJ counsel provided the following one-sentence response: "I can now confirm that USDS has taken all steps to preserve all USDS records consistent with its obligations under the PRA." *See* ECF No. 11-2 at 5. This statement echoes media reports stating that White House officials and DOGE advisors claim that the PRA

applies. Brent D. Griffiths, "Elon Musk said DOGE would provide 'maximum transparency.' It may be years before its records are public," *Business Insider*, Feb. 7, 2025, https://www.business insider.com/musk-doge-records-public-information-foia-presidential-records-act-2025-2; Sean Michael Newhouse, "Multiple groups file lawsuits to get DOGE records," *Government Executive*, Feb. 27, 2025, https://www.govexec.com/oversight/2025/02/multiple-groups-file-lawsuits-get-doge-records/403343/.

On March 24, 2025, Plaintiff moved for a preliminary injunction that would require Defendants to preserve all their records pending the outcome of this litigation. *See* ECF No. 11. With their opposition to that motion Defendants included a one-page document entitled "United States DOGE Service Records Retention Policy," dated March 25, 2025. See ECF No. 12-1. The document purports to implement the requirements of the PRA and claims USDS is subject to the PRA as a component of the Executive Office of the President. Defendants have offered no evidence of whether, when, and how the policy was disseminated to DOGE employees.

On April 8, 2025, POGO filed a FOIA request with the US DOGE Service and the Office of Management and Budget ("OMB") seeking electronic communications sent or received by 36 specified individuals, including 34 with doge.eop.gov email accounts, and containing 17 specified terms. *See* ECF No. 14-1 at 2-6. By email dated April 14, 2025, USDS advised POGO that USDS was subject to the PRA and not the FOIA and therefore refused to process POGO's request. *See* ECF No. 14-1 at 8.

On May 2, 2025, after a hearing on Plaintiff's motion for a preliminary injunction, this Court denied Plaintiff's motion without prejudice. Plaintiff agreed it would file an amended complaint and renewed motion for a preliminary injunction.

## STATUTORY BACKGROUND

*The Federal Records Act*

The FRA is a collection of statutes that governs the creation, management, and disposal of federal or agency records. 44 U.S.C. §§ 2101-18, 2902-09, 3101-07, and 3301-24. Congress enacted the FRA to ensure "[a]ccurate and complete documentation of the policies and transactions of the Federal Government." 36 C.F.R. § 102-193.10(a). Toward that end, the FRA requires federal agencies to establish: (1) a program to make and preserve agency records; (2) effective controls over the creation, maintenance, and use of records; and (3) safeguards against the removal or loss of records. 44 U.S.C. §§ 3101, 3102, and 3105.

The FRA specifically mandates that "[t]he head of each Federal agency *shall make and preserve* records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency[.]" 44 U.S.C. § 3101 (emphasis added). The FRA defines the term "records" to include "all books, papers . . . or other documentary materials, regardless of physical form or characteristics . . . made or received by an agency of the United States Government under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency . . . as evidence of the organization, functions, policies, decisions, procedures, operations or other activities of the Government or because of the informational value of data in them." 44 U.S.C. § 3301.

The FRA provides the exclusive procedure by which all federal records may be disposed of or destroyed. *See* 44 U.S.C. § 3314. Under its provisions, federal records may be disposed of or destroyed only with the authorization of the Archivist either through General Records Schedules or NARA-approved agency-specific disposition schedules. 44 U.S.C. §§ 3303a(a) and (d).

The FRA generally requires that federal records, including those generated in personal electronic messaging accounts, be preserved in a government recordkeeping system. Consistent with this obligation the FRA prohibits agency officials from "create[ing] or send[ing] a record using a non-official electronic messaging account unless such officer or employee—(1) copies an official electronic messaging account of the officer or employee in the original creation or transmission of the records; or (2) forwards a complete copy of the record to an official electronic messaging account of the officer or employee not later than 20 days after the original creation or transmission of the record." 44 U.S.C. §2911(a).

To prevent the unlawful destruction or removal of records the FRA creates a "system of administrative enforcement." *Armstrong v. Bush*, 924 F.2d 282, 284 (D.C. Cir. 1991). This system imposes obligations on both agency heads and the Archivist of the United States. With respect to agency heads the FRA provides that if they become aware of "any actual, impending, or threatened unlawful removal, defacing, alteration, corruption, deletion, erasure, or other destruction of records in the custody of the agency" they must "notify the Archivist" and "with the assistance of the Archivist . . . initiate action through the Attorney General for the recovery" of such records. 44 U.S.C. § 3106(a); *see also* 36 C.F.R. § 1230.14 (implementing NARA regulation detailing how agencies "must report promptly any unlawful or accidental removal, defacing, alteration, or destruction of records in the custody of that agency to NARA").

*The Presidential Records Act*

In response to presidential misconduct revealed by the Watergate scandal, Congress enacted the PRA in 1978 to establish public ownership of presidential and vice-presidential records, to impose record-keeping requirements on the President and Vice President, and to authorize the NARA to preserve and make publicly available presidential records. *See* Carl

Bretscher, <u>The President and Judicial Review Under the Records Act</u>, 60 Geo. Wash. L.

Rev., 1477, 1483 (1992) (PRA passed "to prevent a repeat of Watergate's legal drama

surrounding ownership of presidential records"). Toward that end, the PRA specifies that "[t]he

United States shall reserve and retain complete ownership, possession, and control of

Presidential records[.]" 44 U.S.C. § 2202.

The PRA directs the President to "take all such steps as may be necessary to assure that

the activities, deliberations, decisions, and policies that reflect the performance of his

constitutional, statutory, or other official or ceremonial duties are adequately documented and

that such records are maintained as Presidential records[.]" 44 U.S.C. § 2203(a). Critically here,

through the PRA Congress explicitly removed from the definition of presidential records "any

documentary materials that are . . . official records of an agency" under the APA's definition of

"agency." 44 U.S.C. § 2201(2)(A)(i). *See also Armstrong v. EOP*, 1 F.3d 1274, 1292 (D.C. Cir.

1993).

In 2014, Congress amended both the PRA and the FRA through the Presidential and

Federal Records Act Amendments of 2015, Pub. L. 11113-187, 128 Stat. 2003 (2014). The

Amendments sought to "modernize[] records management by focusing more directly on

electronic records." NARA Press Release, "National Archives Welcomes Presidential and

Federal Records Act Amendments of 2015," Dec. 1, 2014, https://www.archives.gov/press/

press-releases/2015/nr15-23.html. For both federal and presidential records the Amendments

explicitly restrict the use of non-official electronic messaging accounts to create or send records

unless a complete version is preserved in an official electronic messaging account. *See* 44

U.S.C. § 2911 (federal records), 44 U.S.C. § 2209(a)(1)-(2) (presidential records). To

implement the 2014 Amendments, NARA issued guidance confirming that a "complete"

version of an electronic record—including electronic messages generated in non-official accounts—should include the record's associated metadata, attachments, and functionality. *See, e.g.*, NARA Bulletin 2015-02, July 29, 2015, https://www.archives.gov/recordsmgmt/bulletins/2015/2015-02.html; NARA Bulletin 2015-04, Sept. 15, 2015, https://www.archives.gov/records-mgmt/bulletins/2015/2015-04.html.

Beginning five years after a President leaves office, the public can access presidential records from NARA through the procedures the FOIA establishes. 44 U.S.C. § 2204(c). Although some materials can be withheld or redacted for an extended period of time, they too eventually become publicly available. 44 U.S.C. § 2204(a).

*The Freedom of Information Act*

The FOIA, enacted in 1966, established a statutory right of public access upon request to documents held by Executive Branch agencies. The FOIA carries a "strong presumption in favor of disclosure," *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991), and its "limited exceptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976).

Under the FOIA, virtually every record of a federal agency must be made publicly available upon request unless it is specifically exempted pursuant to one or more of  the FOIA's nine exemptions. 5 U.S.C. § 552(b). Those government entities that fall outside of the APA's definition of "agency" are not subject to the FOIA. *See, e.g.*, *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980).

## **LEGAL STANDARD**

To qualify for a preliminary injunction the movant "must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in

the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (cleaned up). While the movant must demonstrate that all four factors weigh in favor of granting preliminary injunctive relief, courts in this Circuit historically have used a "sliding scale" approach that recognizes courts may award relief when "a strong showing on one factor could make up for a weaker showing on another." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (cleaned up) (noting, however, the sliding-scale approach "is arguably in tension with intervening Supreme Court decisions" but that the D.C. Circuit "[i]n the past ha[s] noted this tension but reserved the question of whether the sliding-scale approach remains valid.").

Here, regardless of which standard applies, Plaintiff is entitled to a preliminary injunction requiring Defendants to maintain and preserve all agency records pursuant to recordkeeping guidance that conforms with the FRA and NARA guidance.

## ARGUMENT

### I.    POGO IS LIKELY TO SUCCEED ON THE MERITS.

#### A.    POGO Has Standing To Maintain This Action.

As a threshold matter, POGO has standing to maintain this action. Consistent with the requirements of Article III, POGO has a legally protected interest in Defendants' compliance with their recordkeeping obligations under the FRA that is "concrete and particularized, and . . . actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Numerous and discrete actions by POGO illustrate POGO's interest in the records of DOGE and support POGO's standing to sue.

First, six critical assessments of DOGE that POGO journalists have published demonstrate POGO's deep and ongoing interest in DOGE and its need for access to DOGE's records. On February 6, 2025, POGO published an article about the vetting and ethics concerns

Musk's DOGE teams raise. Nick Schwellenbach, "Elon Musk's DOGE Teams Raise Vetting, Ethics Concerns," *POGO.org*, Feb. 6, 2025, https://www.pogo.org/investigations/elon-musks-doge-teams-raise-vetting-ethics-concerns. The article pointed out, among other things, that an employee of X and SpaceX serves on the DOGE team—and details the employee posted on X but since deleted. *Id.* As the article explains, these kind of conflicts of interest not only raise concerns about Musk's access to sensitive information "that could advantage his companies and disadvantage rivals," but also implicate "Musk's significant business operations in China[.]" *Id.* Further, the article notes that while Musk-affiliated employees "have fanned out across the federal government," [t]he names of staff on DOGE teams across the government have not been proactively released." *Id.*

POGO published a second DOGE-related article on February 18, 2025. *See* Nick Schwellenbach, "DOD Contractor Hires Trump-Aligned Lobbyists to Tackle DOGE," *POGO.org*, Feb. 18, 2025, https://www.pogo.org/investigations/dod-contractor-hires-trump-aligned-lobbyists-to-tackle-doge. This article explores the new opportunities for lobbyists that DOGE poses, and how DOGE's efforts to shrink the federal workforce intersect with cybersecurity contracts. Lobbyists will play a critical role in "figure[ing] out the DOGE environment," including the defense of "federal contracts from possible DOGE intervention" or "mak[ing] the case for expanding them." *Id.*

On March 7, 2025, POGO published a third DOGE-related article. *See* Nick Schwellenbach, "Musk's Deep Financial Ties to Top Feds Revealed," *POGO.org*, Mar. 7, 2025, https://www.pogo.org/investigations/musks-deep-financial-ties-to-top-feds-revealed. This article explains the deeper than previously known ties that senior Office of Personnel Management (OPM) political appointees have to Elon Musk's businesses. The article discusses the access

13

DOGE and Musk have to data at OPM and other agencies that intersects with Musk's business interests such as xAI. One of those officials "is the point of contact for OPM's government-wide email system"—the very system "believed to have been used 'to issue [the Trump administration's] deferred resignation offers and the emails demanding all federal employees respond with five bullet points of accomplishments or face termination.'" *Id.*

On April 2, 2025, POGO published another analysis of DOGE. Faith Williams, "What's Wrong with DOGE? Its Structure, for One," *POGO.org*, Apr. 2, 2025, https://www.pogo.org/analysis/whats-wrong-with-doge-its-structure-for-one. This article discusses how "DOGE's reach and power have steadily expanded, even as its organization and its mission have remained hazy." *Id.* The article notes that when it wants to, DOGE operates like an agency. Specifically, DOGE has been involved "in firing thousands of federal employees, canceling contracts, and physically shuttering federal office buildings." *Id.* As the article explains, "[t]he difficulty defining DOGE is not an accident, but rather seemingly opacity-by-design that helps block its personnel and actions from judicial review, congressional oversight, and public accountability." *Id.* The article further explains the difficulty in pinning down DOGE leadership and staffing noting, among other things, the discrepancies in how the administration has described Musk's role at DOGE. *Id.*

On April 22, 2025, POGO published an analysis highlighting conflicts of interest related to Musk and DOGE officials. Faith Williams, "What's Wrong With DOGE? Its Glaring Conflicts of Interest," *POGO.org*, Apr. 22, 2025, https://www.pogo.org/analysis/whats-wrong-with-doge-its-glaring-conflicts-of-interest. The article further explains how Musk's role at DOGE allows his companies to avoid oversight from federal agencies. POGO is also planning

another DOGE-related article based on documents it received from OMB under the FOIA. Am. Compl. ¶ 12.

Finally, on May 13, 2025, POGO published an analysis discussing DOGE's disregard for the rule of law in cases involving data, personnel, agencies, and record-keeping. Faith Williams, "What's Wrong With DOGE? Its Disregard for the Law," *POGO.org*, May 13, 2025, https://www.pogo.org/analysis/whats-wrong-with-doge-its-disregard-for-the-law .

Second, POGO's Director of Government Affairs Dylan Hedtler-Gaudette testified at the first DOGE-related hearing before the House Committee on Oversight and Government Reform Subcommittee on Delivering on Government Efficiency on February 12, 2025, https://www.pogo.org/testimonies/pogo-calls-for-focus-on-real-reforms-to-improve-federal-spending-accountability-and-transparency, further evidencing POGO's deep and continuing interest in DOGE's functions, leadership, and actions, and its recognized expertise. Mr. Hedtler-Gaudette's written testimony included an assessment of DOGE's efficacy in providing a check against waste, fraud, and abuse as well of Musk's "massive conflicts of interest [his] financial ties present[.]" *Id.* at 9.[1]

Third, POGO has a visible media presence on DOGE and DOGE-related issues that has resulted in at least 40 media mentions. *See* Declaration of Brandon Brockmyer ("Brockmyer Decl." ¶ 14 (ECF No. 14-1 at 12). POGO's President and Executive Director Danielle Brian and others at POGO routinely offer expert commentary on DOGE activities. For example, Ms. Brian

---

[1] Mr. Hedtler-Gaudette's testimony clearly struck a nerve as he was mocked and ridiculed afterwards "by conservatives on social media and right-wing cable news," Justin, Baragona, "MAGA cruelly mocks DOGE committee hearing witness because he's blind," *Independent*, Feb. 13, 2025, https://www.the-independent.com/news/world/americas/us-politics/doge-hearing-blind-witness-online-response-b2697878.html, including Elon Musk on X.com.

commented on how DOGE's impacts on contractors have mainly affected "the equivalent of the mom-and-pop shops," Emily Badger, Aatish Bhatia, Josh Katz, Margot Sanger-Katz & Ethan Singer, "The Big Government Contracts DOGE Hasn't Touched," *New York Times*, Mar. 4, 2025, https://www.nytimes.com/interactive/2025/03/04/upshot/doge-musk-contracts-cuts.html. One POGO post on X.com highlighted a *New York Times* article on how DOGE made it harder to check its claims, with POGO remarking "DOGE has started providing fewer details on the cuts it's making to the federal government. These kinds of attempts to hide information from the public are why we're suing DOGE to demand that it complies with federal record laws," https://x.com/POGOwatchdog/status/1900295302826860649.

Fourth, POGO has filed FOIA requests for DOGE-related documents with the Office of Personnel Management, OMB, General Services Administration, Federal Bureau of Investigation, Central Intelligence Agency, Office of the Director of National Intelligence, National Reconnaissance Office, Department of Homeland Security, Department of Commerce, Department of Treasury, Department of Defense, Department of Justice, and National Aeronautics and Space Administration for records concerning all noncareer and limited-term senior executives, special government employees, and Schedule C employees (including Temporary Transition Schedule C employees) who began on or after January 20, 2025. Am. Compl. ¶ 6. DOGE employees can be special government employees, according to the Executive Order creating DOGE, and some are documented as political appointees, such as a DOGE team member at the Department of Treasury who was in a temporary transitional Schedule C position. *Id.*

Fifth, POGO filed a FOIA request with the US DOGE Service and OMB on April 8, 2025, seeking electronic communications sent or received by 36 specified individuals, including

34 with doge.eop.gov email accounts, and containing 17 specified terms. *Id.* ¶ 7. USDS refused to process this request claiming it is subject to the PRA and not the FOIA. *Id.* POGO has now sued USDS under the FOIA for refusing to process this request. *See POGO v. USDS*, Civil No. 25-1295 (BAH). In the interim, POGO has been deprived of access to records to which it is entitled under the FOIA and which it needs to fulfill its mission. Of note, in determining Plaintiff's standing this Court can consider the impact of filing this request, even though it was made after POGO filed its original complaint here. *See, e.g.*, *Scahill v. District of Columbia*, 909 F.3d 1177, 1184 (D.C. Cir. 2018) ("a plaintiff may cure a standing defect under Article III through an amended pleading alleging facts that arose after filing the original complaint").

Sixth, POGO intends to file additional FOIA requests with DOGE in the future for records that will shed light on areas of great public interest and concern. Those areas include conflicts of interest with respect to certain programs or contracts, the independent authority exercised by DOGE team members, and communications with entities outside the federal government. *See* Brockmyer Decl. ¶ 10.

Taken as a whole, this evidence demonstrates POGO's concrete, substantive, and ongoing need for records of DOGE that would be severely harmed absent the requested injunction requiring DOGE to preserve all its records. That interest extends to a broad swath of documents covering a wide range of DOGE and DOGE-related issues now and in the future. In this respect Plaintiff stands in the same shoes as other plaintiffs deemed to have standing based on comparable facts.

For example, in *CREW v. Cheney*, 593 F. Supp. 2d 194, 226-27 (D.D.C. 2009), the court found standing based on the assertions from one of the plaintiffs concerning his past extensive use of presidential records—the records at issue in that case—and his "unambiguous" intent to

review records on a specified topic in the future were sufficient to establish his standing to

challenge the threatened removal of vice presidential records. As the court reasoned, "[t]here is .

. . no question that the destruction of PRA records would cause [plaintiff] injury when he seeks

to use them in the future." *Id.* at 227. Likewise, here, POGO's extensive use of the FOIA for its

journalistic endeavors to uncover government waste, fraud, and abuse; its demonstrated focus on

these issues as they relate to DOGE; its unambiguous intent to file additional FOIA requests for

DOGE records in the future should DOGE implement a FOIA regime, *see* Brockmyer Decl. ¶ 10

(Exhibit C); and its "strong operational interest in Defendant's compliance with their

recordkeeping obligations under the FOIA," *CREW v. Dep't of Homeland Sec.*, 2024 U.S. Dist.

LEXIS 47949, *13 (D.D.C. Mar. 19, 2024) (cleaned up), support its standing to sue to prevent an

injury that is "sufficiently concrete and imminent." *Id. See also CREW v. Exec. Office of the

President*, 587 F. Supp. 2d 48 (D.D.C. 2008) (Plaintiff had standing under the FRA where its

researchers "function as journalists" who obtain records under the FOIA to disseminate

information to the public). 587 F. Supp. 2d at 60. By contrast, while the court in *CREW v. Dep't

of Homeland Sec.* concluded the plaintiff lacked standing, it reached this conclusion because the

court was unable to "discern when, if ever, CREW will seek access to [] records in the DHS's

possession." 527 F. Supp. 2d 101, 106 (D.D.C. 2007). Here, however, POGO's demonstrated

and ongoing interest, reflected in part in its pending FOIA request with DOGE and the attestation

by POGO's Director of Investigations and Research of what POGO will request from DOGE in

the future under the FOIA, provides clear evidence that its efforts to access DOGE records are

particularized and imminent and more than a mere plausibility.

Further, the denial of POGO's access to the records of DOGE and the corresponding

need to sue DOGE to obtain that access also constitute an injury in fact for purposes of standing.

Plaintiff has suffered an informational injury that supports its standing to sue. *See FEC v. Akins*, 524 U.S. 11, 21 (1989) ("inability to obtain information . . . constitutes injury in fact for standing purposes"). Nor is that injury abstract and lacking in concreteness. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 4 (2021) ("No concrete harm, no standing"). In refusing to honor its legal obligations under the FRA and FOIA, DOGE has placed all its records beyond the public's reach including, most critically, the records POGO seeks now and intends to seek in the future.

### B.   Plaintiff Has Raised Claims Cognizable Under The FRA And PRA.

The Complaint as now amended challenges, among other things, the recordkeeping guidance USDS issued on March 25, 2025, pursuant to the PRA. *See* Am. Compl. ¶ 74. This claim falls within the exception to the PRA's bar on judicial review that the D.C. Circuit recognized in *Armstrong v. Exec. Office of the President*, 1 F.3d at 1293, for "guidelines that purport to implement the PRA." As the D.C. Circuit reasoned, without judicial review, guidelines that did not comply with the PRA's definition of presidential records would shield from review records improperly managed as presidential records. Such a result conflicts with the PRA's express exclusion of agency records from the definition of presidential records and would remove those records from the reach of the FOIA. *Id.* at 1292. The court considered the "clear limitation on just which materials the President could legitimately assert control over" and Congress' intent "to preserve the pre- existing body of FOIA law governing the disclosure of government agency records." *Id.* Accordingly, guidelines that treat agency records as presidential materials are subject to judicial review.

Here, that means the formal recordkeeping policy DOGE has just adopted and Defendants' prior expressed intent to control DOGE records by treating them as presidential records are subject to this Court's review. As part of that review, the Court

19

must give full force to the PRA's definition of presidential records and its exclusion of agency records, because "the FOIA trumps the definition of 'agency' records in the PRA." *Id.* Thus, Plaintiff raises a clearly permissible challenge under the PRA that is subject to this Court's review.

Plaintiff also challenges Defendants' failure to have any recordkeeping guidance under the FRA in place, instead treating all their records as presidential. As courts have recognized, where, as here, an agency ignores entirely its statutory obligations the court has a role to play—any other conclusion would leave DOGE free to flout its mandatory recordkeeping obligations free from any consequences whatsoever. Although courts may lack the authority to "address individual acts of noncompliance," they "can review an APA claim challenging an agency's informal policy of practice of violating certain directives of the FRA, including the Act's records-creation and -destruction mandates[.]" *CREW v. Pompeo,* 2020 U.S. Dist. LEXIS 59038, at \*12 (D.D.C. Apr. 3, 20020) (cleaned up). *See also CREW v. Pruitt*, 319 F. Supp. 3d 252, 260 (D.D.C. 2018) (recognizing court's authority to review a claim that an agency's "recordkeeping policy does not conform to the FRA[.]"). *See also Am. First Legal Found v. Becerra*, 2024 U.S. Dist. LEXIS 151534, \*34 (D.D.C. Aug. 9, 2024) (*Armstrong v. Bush*, 924 F.2d 282, 293-94 (D.C. Cir. 1991) supports judicial review of an APA-based challenge under the FRA "that an agency failed to employ adequate recordkeeping guidelines and directives"). That is the precise claim Plaintiff raises here.

Finally, judicial review here would not require the court to issue overly broad relief or require the Court to take on an oversight role. Plaintiff simply asks the Court to compel Defendants "to comply with their statutory duties to treat the records of DOGE, USDS and USDSTO as agency records subject to the FRA and the FOIA." Am. Compl. ¶ 80. This is achieved through the discrete action of adopting and implementing a recordkeeping policy under the FRA, no less and no more.

### C.  DOGE Is An Agency Subject To The FRA.

The gravamen of POGO's complaint is that collectively DOGE, USDS, and USDSTO are an agency and therefore must comply with the recordkeeping requirements of the FRA pursuant to FRA-compliant recordkeeping guidance issued by the Administrator. Controlling precedent and all the evidence available to date establish conclusively DOGE's agency status.

The D.C. Circuit recognized in *Armstrong v. EOP*, 90 F.3d 553, 555 (D.C. Cir. 1996), that "the coverage of the FRA is coextensive with the definition of 'agency' in the FOIA[.]" The FOIA in turn defines "agency" expansively to include "any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency." 5 U.S.C. § 552(e).

Courts have formulated a three-factor test to determine whether an entity alleged to be an agency within the meaning of the FOIA (and the FRA) is "substantially independent" of the President and therefore has agency status or instead functions "solely to advise and assist the President" and therefore lacks agency status. *Meyer v. Bush*, 981 F.2d 1288, 1293 (D.C. Cir. 1993). That three-part test considers: "how close operationally the group is to the President, what the nature of its delegation from the President is, and whether it has a self-contained structure." *Id.* A conclusion that "an EOP unit is subject to FOIA" as a federal agency must be based on "a finding that the entity in question 'wielded substantial authority independently of the President.'" *CREW v. Off. of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009).

Applying the three-factor test to DOGE based on the facts known to date demonstrates POGO will likely succeed in establishing DOGE is an agency wielding substantial independent authority. Judge Cooper reached this very conclusion in an opinion he recently issued in *CREW*

*v. DOGE*. First, Judge Cooper pointed to the executive orders governing DOGE. Executive

Order 14158, in establishing DOGE, "appears to give USDS the authority to implement the

DOGE Agenda, not just to advise the President in doing so." U.S. Dist. LEXIS 42869, *34

(cleaned up). The text of Executive Order 14158 confirms the correctness of this conclusion by

defining its purpose as "establish[ing] the Department of Government Efficiency to *implement*

*the President's DOGE Agenda*." (emphasis added). Further President Trump's subsequent

executive order concerning DOGE:

> directs that agencies 'shall not fill any vacancies for career appointments that the
> DOGE Team Lead assesses should not be filled, unless the Agency Head
> determines the positions should be filled' . . . [and] grants the USDS Team Lead
> the power to keep vacant career positions open unless an agency overrides that
> decision.

U.S. Dist. LEXIS 42869, *36. This second executive order "appears to contemplate that this

authority will be exercised independent of the President." *Id.*

Second, Judge Cooper relied on the public statements of Elon Musk and President

Trump, which "indicate that USDS is in fact exercising substantial independent authority." U.S.

Dist. LEXIS 42869, *34. As he noted, at DOGE's "inception, President Trump trumpeted that

USDS would have the power to 'to [sic] dismantle Government Bureaucracy, slash excess

regulations, cut wasteful expenditures, and restructure Federal Agencies.'" *Id.* (citation omitted).

As for Musk, he also "indicated that USDS would take aggressive action to pursue its agenda,"

and that Musk and Ramaswamy "also suggested that USDS would have the power to identify

regulations due for the chopping block." *Id.* at *37. In a more recent statement, "Musk noted . . .

that he plans to use USDS to reduce the federal budget by $2 trillion," something that Judge

Cooper noted "would require more than mere advice." *Id.* These and other statements Judge

Cooper outlined "suggest that the President and USDS leadership view the department as wielding decision-making authority to make cuts across the federal government." *Id.*

Third, Judge Cooper catalogued "USDS's actions to date [that] demonstrate its substantial authority over vast swathes of the federal government." U.S. Dist. LEXIS 42869, *38. Those actions include: (1) decimating USAID, including placing nearly all its employees on administrative leave (what Musk termed "feeding USAID into the wood chipper"), *id.* at *37; (2) eliminating 104 DEI-related contracts with the federal government; and (3) terminating 89 contracts with the Department of Education. *Id.* at *38. As Judge Cooper noted, "[d]oing any of those three things would appear to require substantial independent authority; to do all three surely does." *Id.* at *39. In denying the government's motion for reconsideration Judge Cooper summarized the evidence of DOGE's agency status as follows: DOGE "has reportedly led the charge on personnel cuts across federal agencies; eliminated government contracts, and sent teams of employees to federal agencies to gain access to sensitive and classified data." *CREW v. USDS*, No. 25-cv-511, Opinion and Order, March 19, 2025 (ECF No. 23).

Additional actions by DOGE that demonstrate its substantial independent authority include gaining "access to sensitive data and payment systems across federal agencies, and potentially to classified information, even over the objection of officials within those agencies." *CREW v. DOGE*, U.S. Dist. LEXIS 42869, *38. They also include the "Fork in the Road deferred resignation offer sent to all federal employees"—a letter mirroring one Musk sent to Twitter employees upon his acquisition of Twitter. *Id.*

Notably, since Judge Cooper issued his memorandum opinion in *CREW v. DOGE*, new details have emerged regarding other actions DOGE has taken that evidence its substantial independent authority. For example, on March 12, 2025, it was reported that "EPA is giving

more authority to the Elon-Musk-backed Department of Government Efficiency," specifically "that DOGE must now sign off on any agency expenditure of more than $50,000 . . . as well as actions with no associated costs that could later create them." Eric Katz, "EPA begins eliminating offices as DOGE tightens grip on nearly all agency spending," *Government Executive*, Mar. 12, 2025, https://www.govexec.com/management/2025/03/epa-begins-eliminating-offices-doge-tightens-grip-nearly-all-agency-spending/403684/?oref=ge-home-top-story.

Further, the enormous impact of DOGE's actions is becoming more apparent. For example, a "small outpost" of the National Nuclear Security Administration "has lost a huge cadre of scientists, engineers, safety experts, project officers, accountants and lawyers" as a result of the DOGE-offered buyouts and DOGE-mandated cuts. Sharon LaFraniere, Minho Kim & Julie Tate, "DOGE Cuts Reach Key Nuclear Scientists, Bomb Engineers and Safety Experts," *New York Times*, Mar. 17, 2017, https://www.nytimes.com/2025/03/17/us/politics/federal-job-cuts-nuclear-bomb-engineers-scientists.html. DOGE's actions "are threatening the muscle and bone of operations that involve national security or other missions at the very heart of the federal government's responsibilities." *Id.* And according to recent reporting, over 280,000 federal employees and contractors across 27 agencies have been laid off by DOGE. Sara Dorn, "Trump's Great Rehiring: Over 26,000 Fired By DOGE Likely To Return – So Far," *Forbes*, Apr. 4, 2025, https://www.forbes.com/sites/saradorn/2025/04/04/trumps-great-rehiring-over-26000-fired-by-doge-likely-to-return-so-far/.

Relying on comparable facts Judge Bates in *Am. Fed'n Of Lab. & Congr. Of Indus. Orgs. v. U.S. Dep't of Labor*, No. 25-0339 (D.D.C. Feb. 14, 2025), ECF No. 34concluded that for purposes of the Economy Act DOGE is an agency. Among other things, "USDS is coordinating

teams across multiple agencies with the goal of reworking and reconfiguring agency data, technology, and spending." These activities "[are] not the stuff of mere advice and assistance." *Id.* at 7. In reaching this conclusion the Court compared the definition of agency in the Economy Act to similar definitions of agency in the FOIA and Administrative Procedure. *See also Am. Fed'n of State, Cty. & Mun. Emps. v. Social Sec. Admin.*, No. 25-cv-596-ELH (D. Md. Mar. 20, 2025), slip op. at 109-11 (agreeing with Judges Bates and Cooper that DOGE is an agency).

Similarly, in *Doe v. Musk*, No. 25-0462-TDC, 2025 U.S. Dist. LEXIS 49603 (D. Md.), the court considered whether DOGE's actions to shut down USAID violated the Constitution, including the Appointments Clause. The court catalogued the numerous actions DOGE had taken "without any apparent advanced approval by agency leadership" at the Department of Education, NIH, the Department of Agriculture, the Department of Energy, the National Nuclear Security Administration, USAID, and FEMA. *Id.* at *9-10. The court noted that similarly to USAID Musk was involved in shutting down CFPB's headquarters. *Id.* at *45. The absence of any "formal legal authority" conferred on Musk to take these actions did not overcome the 'actual authority" that Musk had exerted over USAID. *Id.* at *49. Although this case did not hinge on DOGE's status as an agency, its recognition of the extensive power DOGE unilaterally wields supports DOGE's agency status here.

Judge Cooper also determined that DOGE satisfies the third factor for agency status—the extent to which an agency has a self-contained structure. Specifically, "USDS has a defined staff: the USDS Administrator, a temporary organization operating within USDS, and DOGE teams that are embedded outside USDS within each executive branch agency." 2025 U.S. Dist. LEXIS 42869, *40. Moreover, "USDS also retains the authority to consult with agency heads regarding

the selection of the outside USDS teams, thereby exerting influence over employees across federal agencies." *Id.*

Neither here nor in any other case have Defendants proffered any evidence to undermine these conclusions beyond labelling the news reports as inadmissible hearsay. As Judge Cooper pointed out, however, DOGE's decision to "deliberately . . . forego" a "host of arguments" as to why it is not an agency was a "litigation choice[.]" *Id.* Apparently DOGE has made that same litigation choice here, leading to the conclusion it has nothing substantive to rebut the evidence of its substantial independent authority. Moreover, refuting this mountain of evidence seems highly unlikely, particularly given the Court's observation in *Am. Fed'n Of Lab. & Congr. Of Indus. Orgs.* that DOGE's work "is not the stuff of mere advice and assistance."

Further, in labelling the numerous and growing press reports of DOGE's substantive actions as mere hearsay, Defendants essentially ask this Court to turn a blind eye to the reality of what is playing out throughout the federal government. According to Defendants, this Court should ignore that DOGE is leading the charge to eliminate entire agencies, that DOGE has directed the layoffs of hundreds of thousands of federal employees and government contractors across 27 agencies, *see* Dorn, *Forbes*, Apr. 4, 2025; that DOGE is directing the collection of a vast swath of sensitive data across the government for unexplained and undisclosed reasons; and that DOGE has emerged as the most powerful entity in President Donald Trump's administration all because these actions have been reported in the press. But the fact that only the press has been able to pierce the veil of secrecy surrounding DOGE heightens, not detracts from, the utility of its reporting. At a minimum, the reality of how DOGE operates raises a factual question of its agency status that can be resolved only through discovery. *See CREW v.*

*USDS*, No. 25-cv-511, Opinion and Order, March 19, 2025, at 12.

### D.  USDS's March 25, 2025 Recordkeeping Guidance Fails To Substitute For An FRA-Complaint Recordkeeping Policy.

Defendants may argue that their belatedly issued PRA recordkeeping guidance

provides an adequate substitute for an FRA-complaint policy. Such an argument cannot

succeed. Even taken at face value the March 25, 2025 policy purporting to implement the PRA,

omits key requirements of the PRA and excludes certain categories of documents from

preservation requirements in contradiction of the PRA's definition of a presidential record.

First, DOGE's guidance excludes from the preservation requirement:

> Purely personal records that have no relation to, or effect on, government work
> . . . . certain materials without historical value, such as notes, drafts, or similar
> documents that are not circulated or that are not created or saved for purposes
> of documenting the activities or deliberations of the Administration . . .

The PRA, however, contains no such exclusions; the statute's definition of presidential records

is broader while its definition of "personal records" is narrower.

The PRA excludes the following from the definition of presidential records:

> any documentary materials that are (i) official records of an agency (as defined
> in section 552(e) of title 5, United States Code; (ii) personal records; (iii) stocks
> of publications and stationery; or (iv) extra copies of documents produced only
> for convenience of reference, when such copies are clearly so identified.

44 U.S.C. § 2201(2). Further, the PRA defines "personal records" as

> all documentary materials, or any reasonably segregable portion thereof, of
> a purely private or nonpublic character which do not relate to or have an
> effect upon the carrying out of the constitutional, statutory, or other official
> or ceremonial duties of the President.

44 U.S.C. § 2201(3). The statute further describes three types of documents falling within its

definition of "personal records," specifically: (1) diaries and journals not prepared, used, or

circulated to transact government business; (2) documents related to "private political

associations" with no connection to the President's duties; and (3) materials that relate

"exclusively to the President's own election" as well as the election of other individuals. *Id.* at

(A)-(C).

The USDS Records Policy's exclusions do not match those of the PRA. Unlike the

policy, the PRA contains no exclusion for "certain materials without historical value." Nor does

the PRA include within its definition of personal records those that "have no relation to, or

effect on, government work[.]" These critical differences create a gap between what the PRA

requires be preserved and the smaller body of documents that the USDS Records Policy require

be preserved. This gap risks the loss of critical records.

Second, while the PRA directs employees who receive work-related messages on non-

official accounts to forward complete copies to an "official electronic messaging account," 44

U.S.C. § 2209(a), the USDS Records Policy merely directs that such messages be sent to "work

device[s]." Without more, including information on whether DOGE has in place an automated

means of archiving messages, this directive is patently insufficient. The policy fails to even

define what constitutes a "work device," much less whether such a device is linked to an

automated means of archiving.

Third, the PRA prohibits the use of non-official electronic message accounts unless

copies are sent or the messages are forwarded to an official electronic message account. 44

U.S.C. § 2209(a). The USDS Records Policy uses much less precise and mandatory language,

stating specifically: "If you happen to receive work-related messages on your personal device . .

. make sure to capture and transmit those messages to your work device." Again, the difference

in language raises the possibility of fewer records being preserved under the USDS Records

Policy.

Fourth, the policy addresses how to deal with the receipt of work-related messages on personal devices but omits a key requirement of the PRA—how to deal with work-related messages *sent* on personal devices. *See* 44 U.S.C. § 2209(a) (requiring copies of both messages sent and messages received to be preserved on official electronic message accounts).

These gaps and differences between what the PRA requires and what the USDS Records Policy requires raise a substantial risk that not all records will be preserved, undermining Defendants' reliance on this policy as an adequate substitute for an FRA-compliant recordkeeping policy.

At bottom, Defendants' issuance of a recordkeeping policy pursuant to the PRA—even putting aside the policy's failure to comply with that statute—is no substitute for an FRA-compliant policy. Indeed, as Judge Howell recognized in *Am. Oversight v. US DOGE*, Civil Action No. 25-409 (BAH) (D.D.C.), Minute Order, Apr 2, 2025, DOGE's reliance on its compliance with the PRA "only confirms plaintiff's concern about the need for a preservation order since what qualifies as a record and the respective retention obligations differ between the PRA and the FOIA."

For all these reasons, Plaintiff has a likelihood of success on the merits.

## II.    POGO WILL SUFFER IRREPARABLE INJURY ABSENT A PRELIMINARY INJUNCTION.

### A.  Plaintiff Will Suffer Irreparable Injury Absent The Requested Preservation Order.

As a direct consequence of its agency status, DOGE is governed by the FRA. Yet DOGE has resisted that conclusion, insisting instead it is subject to the PRA. To be sure, both statutes impose recordkeeping obligations on those entities subject to them. But under the PRA constitutional considerations shield the President from virtually any judicial review while in

office, leaving the President free to defy the statute's mandates. Indeed, during his first term in office President Trump faced litigation over his document destruction practices, *see, e.g.*, Rebekah Entralgo, "Trump Sued For Allegedly Violating Presidential Records Act, *NPR*, June 22, 2017, https://www.npr.org/sections/thetwo-way/2017/06/22/533977417/trump-sued-for-allegedly-violating-presidential-records-act, and a criminal indictment for leaving office with classified presidential records. These suggest the records from his second term in office face a similar threat of destruction, including records from the very controversial DOGE, depriving Plaintiff and the public of the ability to hold DOGE accountable for its actions. For POGO this threat extends to records specifically requested in its pending FOIA request with USDS as well as to records responsive to future requests POGO intends to file with DOGE. Further, POGO has a documented interest in a wide range of DOGE-related issues beyond what is has specifically requested in its FOIA requests, as evidenced in the numerous articles written and anticipated by POGO's journalists.

The risk of document destruction is far from an abstract concern. According to a recently filed lawsuit, a Musk employee working with DOGE set up a new server at OPM that bypassed federal law and was intended for sending government-wide emails. *See* Am. Compl. ¶ 57. Similarly, in February it was reported that OPM had ordered DOGE employees to stop using the encrypted messaging app Slack "while government lawyers attempt to transition the agency to one that is not subject to the Freedom of Information Act[.]" Jason Koebler & Joseph Cox, "DOGE Employees Ordered to Stop Using Slack While Agency Transitions to a Records System Not Subject to FOIA, *404media*, Feb. 5, 2025, https://www.404media.co/doge-employees-ordered-to-stop-using-slack-while-agency-transitions-to-a-records-system-not-subject-to-foia/. Nevertheless, as more recent reporting confirms, DOGE employees continue to use Slack. *See*

*CREW v. DOGE*, 2025 U.S. Dist. LEXIS 42869, *53. Moreover Musk—the functional leader of DOGE—has "used the social media platform X to solicit job applications for USDS and to poll the public about courses of action that USDS is considering." *Id.*

DOGE has operated in "unusual secrecy," *Id.* at *54 (D.D.C. Mar. 20, 2025), refusing to publicly acknowledge Musk's precise role at DOGE, and labelling the publication of names of USDS employees "a crime." *Id.* Judge Cooper concluded that this evidence "gives rise to the possibility that representatives of the Defendant entities may not fully appreciate their obligations to preserve federal records." *Id.* *54-55. Heightening this concern, many USDS "staffers are reported to have joined the federal government only recently and, to put it charitably, may not be steeped in its document retention policies." *Id.* *55. All this was enough for Judge Cooper to hold that a preservation order was warranted, a conclusion this Court should reach as well.

Nor does the existence of the March 25, 2025 PRA policy obviate this harm. As discussed *supra*, Defendants' belatedly issued policy to backfill a clear gap in their records management, provides no substitute for an FRA-compliance policy and risks the destruction of DOGE agency documents.

Moreover, conspicuously absent from the record is any evidence DOGE employees are knowledgeable about or complying with the March 25, 2025 PRA policy or any other recordkeeping policy. In other pending litigation DOGE submitted a declaration from Administrator Amy Gleason, submitted here as ECF No. 11-2 at 7-11. Administrator Gleason states only that USDS and USDSTO "have obligations to maintain records and do so pursuant to the [PRA]." Gleason Decl. ¶ 25. While she claims USDS has informed employees of their need to "adhere to records-preservation requirements," *id.* ¶ 26, she does explain what those

requirements are or what specifically employees have been told. These vague statements fall far

short of evidence that Ms. Gleason and DOGE are satisfying their obligations under either

statute. Moreover, given that she executed her declaration on March 14, 2025, 11 days prior to

DOGE's adoption of a PRA recordkeeping policy, her vague reference to DOGE employees

being informed in some unidentified way that they must adhere to some unidentified records

preservation requirements hardly provides the kind of assurance that would negate the need for a

document preservation order here.

The differences between "what qualifies as a record and the respective retention

obligations" under the FOIA and PRA further underscore that need for a preservation order. *Am.

Oversight v. U.S. Dep't of Gov't Efficiency*, No. 25-cv-409 (D.D.C. Apr. 2, 2025), Minute Order.

Those differences coupled with DOGE's refusal to acknowledge its preservation obligations

under the FRA led Judge Beryl A. Howell to issue a preservation order, *id.,* a course this Court

should follow for identical reasons.

Simply stated, the mere existence of a recordkeeping policy standing alone—particularly

one formulated under the PRA, not the FRA, which controls here— fails to establish that DOGE

employees are in fact complying with that policy. Nor does it counter the evidence Plaintiff has

offered that DOGE records are at risk of destruction because of the actions of DOGE employees.

As outlined *supra*, the secrecy in which DOGE operates and its reported use of messaging apps

that are designed to erase messages after a specified time provide strong evidence that DOGE's

records are at risk. And that risk continues. *See, e.g.*, Alexandra Ulmer, Marisa Taylor, Jeffrey

Dastin & Alexandra Alper, "Exclusive: Musk's DOGE using AI to snoop on U.S. federal

workers, sources say," *Reuters*, Apr. 8, 2025, https://www.reuters.com/technology/artificial-

intelligence/musks-doge-using-ai-snoop-us-federal-workers-sources-say-2025-04-080/ (noting

DOGE team's use of Signal to communicate). Nearly from its inception DOGE employees were counseled to avoid using a messaging app that could capture messages for accessibility under the FOIA. *See* Jason Koebler & Joseph Cox, "DOGE Employees Ordered to Stop Using Slack While Agency Transitions to a Records System Not Subject to FOIA, *404media*, Feb. 5, 2025, https://www.404media.co/doge-employees-ordered-to-stop-using-slack-while-agency-transitions-to-a-records-system-not-subject-to-foia/. And in their exfiltration of data from internal agency systems, DOGE employees have operated with complete secrecy, taking pains to erase any evidence of their data extraction. *See* Jenna McLaughlin, "A whistleblower's disclosure details how DOGE may have taken sensitive Labor data, *NPR*, Apr. 15, 2025, https://www.npr.org/2025/04/15/nx-sl-5355896/doge-nlrb-elon-musk-spacex-security.

Further, the fact that DOGE employees include political appointees and Special Government Employees like Elon Musk, whose government tenure is uncertain at best, heightens the risk that DOGE records will not be properly preserved. *See Competitive Enter. Inst. v. Off. of Science & Tech. Policy*, No. 14-cv-765, 2016 WL 106776292, at *3 (D.D.C. Dec. 12, 2016). At bottom, the absence of countervailing evidence speaks volumes about the palpable risk of records being destroyed, whether by design or accident, absent the requested preliminary injunction.

Even without evidence that documents face a risk of imminent destruction, courts have readily entered preservation orders. For example, in *CREW v. U.S. DOGE Serv.*, No. 25-cv-511 (CRC), 2025 U.S. Dist. LEXIS 42869, *54 (D.D.C. Mar. 20, 2025), Judge Cooper reasoned that because DOGE has operated in "unusual secrecy," *id.* *54, refusing to publicly acknowledge Musk's precise role at DOGE, and labelling the publication of names of USDS employees "a crime" *id.*, there was a "possibility that representative[s] of the Defendant entities may not fully

appreciate their obligations to preserve federal records." *Id.* \*54-55. Further, newly hired DOGE employees "to put it charitably, may not be steeped in [DOGE's] document retention policies." *Id.* \*55. Judge Cooper accordingly issued a preservation order to prevent the possible destruction of DOGE records.

Similarly, in *Competitive Enter. Inst. v. Off. of Science & Tech. Policy*, No. 14-cv-765, 2016 WL 106776292 (D.D.C. Dec. 12, 2016), the court entered a preservation order notwithstanding the recordholder's attestation that he would preserve the records at issue pending the court's merits decision. The Court noted it "has no reason to doubt the sincerity of [the recordholder's] declaration that he will not delete any of his emails[.]" 2016 WL 106776292, \*3. Nevertheless, the court entered the requested preservation order, reasoning "a declaration does not have the force of an order." *Id. See also Am. Oversight v. U.S. Dep't of Gov't Efficiency*, No. 25-cv-409 (D.D.C. Apr. 2, 2025), Minute Order ("while the Court presumes that executive officials . . . act in good faith, absent a court order punishable by contempt requiring the maintenance and preservation of potentially responsive records, plaintiff would have no recourse were the records at issue not maintained and preserved pursuant only to a litigation hold letter") (cleaned up).

Nor does the one-sentence assurance DOJ counsel provided—that USDS has taken all steps to preserve all USDS records consistent with its obligations under the PRA—assuage these concerns. Left unanswered are what those steps are and the underlying factual basis that would allow a testing of its accuracy. Contradictory facts, including the ongoing use of Signal, *see, e.g.*, Scott Patterson, Josh Dawsey & Brian Schwartz, "Inside DOGE's Clash With the Federal Workforce, *Wall Street Journal*, Feb. 27, 2025, https://www.wsj.com/politics/policy/inside-doge-elon-musk-government-employees-b87fc17a, suggest the answer is no.

In short, the secrecy with which DOGE operates, its past behavior exhibiting a disregard for its recordkeeping obligations, and the failure of its counsel to provide a full-throated assurance that all DOGE records will be preserved in accordance with the FRA during the pendency of this lawsuit illustrate that absent the requested preliminary injunction, Plaintiff will suffer irreparable injury. The possibility, if not likelihood, that we will lose part of this history forever is simply too great a risk to bear.

> ### B.  An Injunction Applying To All Of DOGE's Records Is Necessary To Prevent Irreparable Injury

At a hearing on Plaintiff's initial motion for a preliminary injunction this Court questioned whether a preservation order extending to all DOGE records was justified, especially given the preservation orders issued against DOGE in other cases. The answer is yes because here, unlike those cases, Plaintiff's claims arise under the PRA, FRA, and APA and Plaintiff's standing rests on pending and planned FOIA requests as well as a more generalized and documented interest in DOGE and its activities. A more limited preservation order would not adequately protect those interests.

That is why courts, in issuing preliminary injunctions in the FRA and PRA context, have extended the preservation requirements to all records of an agency or EOP component. For example, in *CREW v. Cheney*, where Plaintiffs challenged Defendants' improper exclusion of all the records of then-Vice President Cheney from the PRA, the court issued a preliminary injunction requiring the preservation "all documentary material" falling within the PRA's definition of Vice-Presidential records. In reaching this conclusion the court relied in part on two declarations from plaintiff historians "describing the use that they intend to make of the records potentially at issue in this litigation when they become available to the public" as well as "the historical significance of those records." *Id*. at 339, 340. Without an injunction encompassing all

records falling with the PRA's coverage, not merely those potentially responsive to plaintiff's future needs, those records "will not be available for future generations." *Id.* at 340.

That same reasoning applies here. Not only has POGO attested to future FOIA requests it intends to file in addition to its pending FOIA request with USDS but POGO has also attested to the vitality of DOGE's records to its "investigative work to hold [DOGE] . . . and all DOGE team members accountable to the public." Brockmyer Decl. ¶ 15. Here, as in the *CREW* case, a preservation order sweeping in all DOGE records is critical to ensure POGO'S future access and to protect the public's right to access records that unquestionably have "historical significance." *CREW v. Cheney*, 577 F Supp. at 340.

Similarly, *Am. First Legal Found. v. Becerra*, 2024 U.S. Dis. LEXIS 141534 (D.D.C. Aug. 9, 2024), involved a challenge under the FRA to the defendant's practice of deleting email of its former employees shortly after their departure from the agency. The plaintiff argued that absent the injunction it would suffer irreparable harm, specifically the deletion of emails, at least some of which the plaintiff had sought in FOIA requests. According to the plaintiff, that loss "will permanently deprive both Plaintiff and the public at large of access to federal records." *Id.* at *41. In evaluating this claim the court reasoned:

> The premise of Plaintiff's argument . . . is that the loss or destruction of federal records is a significant harm to both Plaintiff and the public, and that it is a harm that cannot be cured once the records are lost or destroyed. Plaintiff's premise is sound; records that have been destroyed or deleted are almost certain to have been "lost forever to history."

Id. at *41-42 (citing *Armstrong v. Bush*, 924 F.2d 282, 288 (D.C. Cir. 1991)). Although the evidence before the court did not suggest all the emails at issue were at risk of destruction the court nevertheless issued an injunction extending to all emails in the category of records at issue

based, in part, on its finding that the plaintiff would suffer irreparable injury absent the injunction. *Id.* at*48, 52.

Here, too, Plaintiff seeks records of interest to both Plaintiff and the public given the out-size role DOGE has played since its inception. The destruction of any of those records will cause irreparable harm, thereby justifying the requested preservation order to ensure they will not be "lost forever to history." *Id.* at *42.

Moreover, a preservation order extending to all DOGE records accords with the scope of relief to which Plaintiff is entitled if it prevails on its FRA and PRA claims. If, as Plaintiff contends, DOGE is an agency subject to the FRA then it must create, maintain, and preserve *all* records falling with the FRA's definition of agency records, not merely those sought in POGO's pending FOIA request. Yet if all DOGE records are not preserved in the interim, Plaintiff (and the public) will be deprived of the full relief to which they are entitled upon prevailing in this litigation, namely relief that extends to all DOGE records. Once a record is permanently destroyed, full relief is no longer possible.

Thus, this case differs from *CREW v. DOGE* and *Am. Oversight v. U.S. Dep't of Gov't Efficiency* where the preliminary injunctive relief the courts ordered tracked the ultimate relief the plaintiffs sought in those cases: specific documents requested in the specific FOIA requests being litigated. Here, however, Plaintiff has brought this case under the FRA and PRA and seeks ultimate relief that would apply agency-wide to all DOGE records. Accordingly, any preliminary injunction this Court issues should ensure that such ultimate relief will be available.

## III.    DEFENDANTS WILL NOT BE HARMED BY THE REQUESTED RELIEF.

The immediate relief Plaintiff seeks will require nothing more of Defendants than what the law already mandates: the collection, maintenance, and preservation of federal records

pursuant to recordkeeping guidance that complies with the FRA and implementing guidance

from NARA. Requiring Defendant to comply with the law cannot properly be characterized as a

burden, particularly where an injunction "merely ends an unlawful practice." *Open Cmtys. All. v.*

*Carson*, 286 F. Supp 3d 148, 179 (D.D.C. 2017) (cleaned up).

IV.    **THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR THE REQUESTED RELIEF.**

Finally, the balance of equities and the public interest, which "merge" when "the

[g]overnment is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), weigh heavily in

favor of the requested preliminary injunction.

Beyond the harm to Plaintiff, the public interest strongly favors a preliminary injunction

requiring Defendants to comply with their obligations under the FRA. The enormous power that

DOGE wields has impacted Americans across the country and from nearly every walk of life.

DOGE bears responsibility for actions ranging from thousands of government workers losing

their jobs to the decreased security and staffing of our nuclear arsenal. DOGE has amassed

personal and private information about millions of Americans with no guarantee that information

will be safely stored and not shared for improper purposes. Access to records that delineate and

explain DOGE's actions is critical to hold the agency accountable. Balancing all the interests at

stake leads to the inescapable conclusion that an injunction requiring DOGE to preserve its

records is both necessary and warranted.

<u>**CONCLUSION**</u>

For the foregoing reasons Plaintiff respectfully requests that the Court grant Plaintiff's

renewed request for a preliminary injunction.

Respectfully submitted,

/s/Anne L. Weismann
Anne L. Weismann

(D.C. Bar No. 298190)
5335 Wisconsin Avenue, NW, Suite 640
Washington, D.C. 20015
(301) 717-6610
Weismann.anne@gmail.com

Dated: May 15, 2025                     *Attorney for Plaintiff*