**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

PROJECT ON GOVERNMENT
OVERSIGHT, INC.,

                Plaintiff,

     v.                                         No. 1:25-cv-527 (JEB)

DONALD J. TRUMP et al.,

                Defendants.

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO PLAINTIFF'S RENEWED MOTION
FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................iii

INTRODUCTION ...................................................................1

STATUTORY FRAMEWORK ....................................................3

FACTUAL AND PROCEDURAL BACKGROUND ....................................5

    I.      Relevant Presidential Issuances Regarding USDS ..................................5

    II.    Pending FOIA Litigation ...........................................9

    III.   Procedural History ...............................................10

ARGUMENT .......................................................................12

    I.      Legal Standard ....................................................12

    II.    Plaintiff Fails To Demonstrate That It Will Suffer Irreparable Harm Absent an Emergency Injunction ...........................................12

    III.   Plaintiff Is Unlikely To Succeed on the Merits of Its Claims .................20

          A.     Plaintiff Is Barred from Bringing a Broad Programmatic Attack on USDS's Recordkeeping Practices ................................20

          B.     To the Extent Plaintiff's Claims Are Construed To Seek a Simple Ruling Regarding USDS's Status, They Are Barred Under 5 U.S.C. § 704 and the Mandamus Act Because FOIA Provides an Adequate Remedy ...................................22

          C.     The Other Defects that Plaintiff Asserts in the USDS Records Policy Are Not Part of Any Claim and Are Meritless ................26

          D.     Plaintiff Fails To Establish that USDS Is an "Agency" ...............29

          E.     The Court Lacks Jurisdiction To Enjoin the President ...............34

    IV.   The Balance of Hardships and Public Interest Do Not Favor Emergency Injunctive Relief.......................................................35

    V.    Any Preliminary  Injunction Should Require Security ..........................36

CONCLUSION ....................................................................36

# TABLE OF AUTHORITIES

## Cases

*Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321 (D.D.C. 2018) ....................... 13

*Am. First Legal Found. v. Becerra*,
        No. 24-cv-1092 (RC), 2024 WL 3741402 (D.D.C. Aug. 9, 2024) .................... 19

*Animal Legal Def. Fund, Inc. v. Vilsack*, 111 F.4th 1219 (D.C. Cir. 2024) .................. 22

\**Armstrong v. Bush* ("*Armstrong I*"), 924 F.2d 282 (D.C. Cir. 1991) ....... 4, 20, 21, 22, 23

\**Armstrong v. EOP* ("*Armstrong II*"),
        1 F.3d 1274 (D.C. Cir. 1993) ................................................................. 3, 21, 22

*Armstrong v. EOP* ("*Armstrong III*"), 90 F.3d 553 (D.C. Cir. 1996) ...................... 29, 30

*Aviles-Wynkoop v. Neal*, 978 F. Supp. 2d 15 (D.D.C. 2013) ........................................... 13

*Caudle v. D.C.,* 825 F. Supp. 2d 73 (D.D.C. 2011) ....................................................... 20

*Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716 (D.C. Cir. 2022) ...................... 12

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) .......... 12

*CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738 (D.C. Cir. 1995) ............. 13

*Cobell v. Norton*, 391 F.3d 251 (D.C. Cir. 2004) ......................................................... 12

*Competitive Enter. Inst.* (*CEI*) *v. Off. of Science & Tech. Policy*, 82 F. Supp. 3d 228
        (D.D.C. 2015), *reversed on other grounds*, 827 F.3d 145 (D.C. Cir. 2016) ........ 23

*Competitive Enter. Inst.* (*CEI*) *v. Off. of Science & Tech. Policy,*
        No. 14-cv-765, 2016 WL 10676292 (D.D.C. Dec. 12, 2016) ............................ 18

*Cornish v. Dudas*, 540 F. Supp. 2d 61 (D.D.C. 2008) ................................................... 13

*CREW v. Cheney*, 577 F. Supp. 2d 328 (D.D.C. 2008) ................................................... 19

*CREW v. Cheney*, 593 F. Supp. 2d 194 (D.D.C. 2009) ................................................... 19

*CREW v. DHS*, 387 F. Supp. 3d 33 (D.D.C. 2019),
        *amended*, 2019 WL 11307644 (D.D.C. July 22, 2019) ..................................... 20

*CREW v. EOP*, 587 F. Supp. 2d 48 (D.D.C. 2008) ........................................................ 23

*CREW v. Off. of Admin.*, 593 F. Supp. 2d 156 (D.D.C. 2009) .......................................4, 9

*CREW v. Off. of Admin.*, 566 F.3d 219, 222 (D.C. Cir. 2009) ......................24, 30, 31, 32

*CREW v. Pruitt*, 319 F. Supp. 3d 252 (D.D.C. 2018) ...................................................21

*CREW v. Trump*, 924 F.3d 602 (D.C. Cir. 2019) ...........................................................4

*CREW v. USDS* ("*CREW* FOIA case"),
    No. 1:25-cv-511, 2025 WL 752367 (D.D.C. Mar. 10, 2025) .............9, 17, 18, 34

*Democracy Forward Found. v. Pompeo*, 474 F. Supp. 3d 138 (D.D.C. 2020) ........ 16, 23

*Democracy Forward Found. v. White House Office of Am. Innovation*,
    356 F. Supp. 3d 61 (D.D.C. 2019) ..........................................................5, 25, 32

*DSE, Inc. v. United States*, 169 F.3d 21 (D.C. Cir. 1999) ..............................................36

*Feinman v. FBI*, 713 F. Supp. 2d 70 (D.D.C. 2010) ......................................................23

*Franklin v. Massachusetts*, 505 U.S. 788 (1992) ...................................................... 34, 35

*Indiana v. Biden*, 652 F. Supp. 3d 995 (S.D. Ind. 2023) ...........................................5, 25

*In re Nat'l Nurses United*, 47 F.4th 746 (D.C. Cir. 2022) .............................................23

*In re Navy Chaplaincy*, 738 F.3d 425 (D.C. Cir. 2013) .................................................12

*Jones v. U.S. Secret Serv.*, 701 F. Supp. 3d 4 (D.D.C. 2023) .........................................22

*Judicial Watch, Inc. v. DOJ*,
    No. 18-cv-154 (RBW), 2018 WL 11457399 (D.D.C. Nov. 13, 2018) ...............17

*Judicial Watch, Inc. v. Kerry*, 844 F.3d 952 (D.C. Cir. 2016) .......................................20

*Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136 (1980) ... 5, 20, 29

*L.A. v. Lyons,* 461 U.S. 95 (1983) ................................................................................20

*League of Women Voters v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) ..................................13

*LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*,
    No. 25-cv-542 (RBW), 2025 WL 1454010 (D.D.C. May 21, 2025) ..................23

*Main St. Legal Servs., Inc. v. Nat'l Sec. Council*, 811 F.3d 542 (2d Cir. 2016) ........ 24, 29

*Metro. Council of NAACP Branches v. FCC*, 46 F.3d 1154 (D.C. Cir. 1995) ............... 16

*Meyer v. Bush*, 981 F.2d 1288 (D.C. Cir. 1993) ...........................................24, 29, 30, 31

*Nat'l Treas. Empl. Union v. Trump.*,
    No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) ............................. 36

*Navajo Nation v. Azar*, 292 F. Supp. 3d 508 (D.D.C. 2018) ........................... 13

*Newdow v. Roberts*, 603 F.3d 1002 (D.C. Cir. 2010) .................................... 34

*Nken v. Holder*, 556 U.S. 418 (2009) ..................................................... 12, 35

*Norton v. SUWA*, 542 U.S. 55 (2004) ..................................................... 20

*Pac. Legal Found. v. CEQ*, 636 F.2d 1259 (D.C. Cir. 1980) .................................. 25, 32

*Rushforth v. Council of Econ. Advisers*, 762 F.2d 1038 (D.C. Cir. 1985) ........... 24-25, 30

*Sampson v. Murray*, 415 U.S. 61 (1974) ...................................................... 13

*Severino v. Biden*, 71 F.4th 1038 (D.C. Cir. 2023) ....................................... 35

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2011) ...................................... 12

*Sierra Club v. Andrus*, 581 F.2d 895 (D.C. Cir. 1978),
    *rev'd on other grounds*, 442 U.S. 347 (1979) .................................... 32

*Singh v. Carter*, 185 F. Supp. 3d 11 (D.D.C. 2016) ...................................... 12

*Soucie v. David*, 448 F.2d 1067 (D.C. Cir. 1971) ............................... 25, 29, 32

*Trump v. Thompson*, 20 F.4th 10 (D.C. Cir. 2021) ....................................... 12

*United States v. Philip Morris USA Inc.*, 566 F.3d 1095 (D.C. Cir. 2009) .................... 20

*United to Protect Democracy v. Presidential Advisory Comm'n on Election Integrity*,
    288 F. Supp. 3d 99 (D.D.C. 2017) ................................................ 32

*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................ 12

*Wisc. Gas Co. v. FERC*, 758 F.2d 66 (D.C. Cir. 1985) (per curiam) ............................ 17

## <u>Statutes</u>

Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 .......................................... *passim*

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 ............................... *passim*

5 U.S.C. § 704........................................................................................... 2, 22, 26

5 U.S.C. § 706 ............................................................................................... 20, 22

5 U.S.C. § 3161 ..................................................................................................... 6

15 U.S.C. § 1023 .................................................................................................. 30

Mandamus Act, 28 U.S.C. § 1361 ...................................................................... 23

All Writs Act, 28 U.S.C. § 1651 ......................................................................... 23

Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 ......................................... 23

Federal Records Act ("FRA"),
    44 U.S.C. Chapters 21, 29, 31, and 33...................................................... *passim*

Presidential Records Act of 1978 ("PRA"), 44 U.S.C. §§ 2201–2209 ................... *passim*

44 U.S.C. § 2201 ...................................................................... 4, 5, 15, 26, 27

44 U.S.C. § 2202 ................................................................................................... 4

44 U.S.C. § 2203 ............................................................................................. 4, 15

44 U.S.C. § 2204 ................................................................................................... 5

44 U.S.C. § 2209 ................................................................................................. 27

44 U.S.C. § 2904 ................................................................................................... 3

44 U.S.C. § 2906 ................................................................................................... 3

44 U.S.C. § 3101 ................................................................................................... 3

44 U.S.C. § 3106 ................................................................................................. 21

44 U.S.C. § 3301 ............................................................................................. 3, 15

**Legislative Materials**

H.R. Conf. Rep. No. 1380, 93d Cong., 2d Sess. 15 (1974) ............................................ 29

**Presidential Materials**

Executive Order ("EO") 12291 ...................................................................... 31

EO 14158 .................................................................................6, 7, 33, 34

EO 14170 ............................................................................. 7, 33

EO 14210 ............................................................................. 7, 33

EO 14218 ............................................................................. 7, 8, 33

EO 14219 ............................................................................. 8, 33

EO 14222 ............................................................................. 8, 33

EO 14248 ............................................................................. 8, 38

Presidential Memorandum, *Hiring Freeze* (Jan. 20, 2025), *available at*
      https://www.whitehouse.gov/presidentialactions/2025/01/hiring-freeze/  ...8-9, 33

**Administrative Materials**

36 C.F.R. § 1222.10 ................................................................... 27

36 C.F.R. § 1222.12 ................................................................... 15

36 C.F.R. § 1222.16 ................................................................... 3, 15

36 C.F.R. § 1225.16 ................................................................... 3, 15

Pursuant to the Court's May 19, 2025, Minute Order, Defendants respectfully submit this memorandum in opposition to plaintiff Project on Government Oversight, Inc. ("POGO" or "Plaintiff")'s Renewed Motion for a Preliminary Injunction [ECF 17].

## INTRODUCTION

After its original motion for a preliminary injunction was denied without prejudice, Plaintiff has filed an amended complaint and now—nearly three months after bringing suit—again seeks emergency injunctive relief to compel Defendants to "collect, maintain, and preserve all their records" pursuant to the Federal Records Act (FRA)—a statute that applies neither to the President nor to presidential advisory entities like defendant the U.S. DOGE Service (USDS). *See* Proposed Order [ECF 17-2]. As before, Plaintiff fails to establish its entitlement to a preliminary injunction. For one thing, Plaintiff fails to establish a risk of irreparable harm. In order to justify its requested preliminary injunction that, by its terms, covers "all" USDS records, Plaintiff would have to establish an actual and imminent risk that "all" USDS records are on the verge of destruction absent an injunction. But Plaintiff fails to make this showing for *any* USDS record. Instead, USDS has in place a records retention policy that requires preservation of all work-related documents and communications pursuant to the Presidential Records Act (PRA), a statute that is more protective than the FRA. And USDS is already subject to preservation orders covering a broad swathe of its records in two cases brought under the Freedom of Information Act (FOIA). Even the news articles on which Plaintiff relies contain no assertions—even through inadmissible hearsay—that USDS records are being destroyed. Plaintiff's request for an impermissible "obey-the-law" injunction is thus wholly unsupported and should be rejected out of hand.

Plaintiff is also unlikely to succeed on the merits of its claims. All four of Plaintiff's claims boil down to the assertion that USDS is an "agency" subject to the FRA and FOIA rather than a

presidential advise-and-assist component of the Executive Office of the President (EOP) subject to the PRA. But under the circumstances here, the Administrative Procedure Act (APA) provides no mechanism to raise such claims. On their face, Plaintiff's claims ask the Court to compel and oversee USDS's establishment and implementation of an entire FRA-compliant recordkeeping program. That is not a discrete agency action but is instead broad programmatic relief that is impermissible under the APA. Indeed, even though Plaintiff now alleges (incorrectly) that USDS's Records Policy is inconsistent with the PRA, it evidently does so in a further misguided effort to establish irreparable harm; none of Plaintiff's claims is aimed at those supposed flaws.

Plaintiff's effort thus goes far beyond claims in past and present cases questioning whether an entity within the EOP is governed by the PRA or the FRA—all of which have properly arisen through the more specific causes of action under FOIA and similar statutes. Significantly, Plaintiff has now filed a separate FOIA case that raises this very issue with respect to USDS, and at least six other pending FOIA cases against USDS raise the same issue—including the two cases in which courts have issued preservation orders. Indeed, one of those cases has now advanced to a stage where a petition regarding the appropriateness of discovery is currently pending before the Supreme Court. The remedy that FOIA would provide if any of those plaintiffs—including POGO—were to prevail is entirely adequate because it would resolve the issue of USDS's status, and whether it is subject to FOIA and the FRA or not. Under these circumstances, the APA cause of action—restricted to situations where "no other adequate remedy" exists, 5 U.S.C. § 704—is unavailable. Yet rather than pursuing the issue of USDS's agency status through its FOIA case, Plaintiff tries to bypass FOIA in this case. It apparently does so because it hopes to use the FRA as a mechanism to seek a broader preliminary injunction than it could conceivably obtain in a FOIA case. But with no request for records at issue here, and no established threat of imminent

destruction, an injunction of any scope is even less appropriate than it would be in a FOIA case.

Finally, Plaintiff also fails to show that USDS has been granted authority beyond providing advice to the President and other agencies, such that it could properly be deemed an "agency" itself. Plaintiff's request for emergency relief should be denied.

## STATUTORY FRAMEWORK

Executive Branch records are governed by either the FRA, 44 U.S.C. Chapters 21, 29, 31, and 33, or the PRA, 44 U.S.C. §§ 2201-2209. *See Armstrong v. EOP* ("*Armstrong II*"), 1 F.3d 1274, 1290 (D.C. Cir. 1993). The FRA governs records that are "made or received by a Federal agency under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government or because of the informational value of data in them." 44 U.S.C. § 3301(a)(1)(A). Under the FRA, agencies must "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities." *Id.* § 3101. In doing so, agencies are subject to the overarching authority of the National Archives and Records Administration (NARA), which is responsible for providing guidance and assistance to agencies in carrying out their recordkeeping obligations and, in limited circumstances, conducting inspections of an agency's records or records management practices. *Id.* §§ 2904, 2906. NARA regulations allow agencies to purge nonrecord materials without approval, 36 C.F.R. § 1222.16(b)(3), and to schedule categories of records deemed "temporary" for destruction, *id.* § 1225.16.

The PRA, by contrast, applies to Presidential records—defined as materials that are "created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2). The PRA directs the President to take "all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory or other official or ceremonial duties are adequately documented and that such records are maintained as Presidential records pursuant to the requirements of this section and other provisions of law." *Id.* § 2203(a). The PRA also directs the President, "to the extent practicable," to "categorize[]" materials as Presidential records or personal records "upon their creation or receipt" and to "file[] [them] separately." *Id.* § 2203(b). In light of this statutory language, the D.C. Circuit recognizes that "the PRA accords the President virtually complete control over his records during his term of office." *Armstrong v. Bush* ("*Armstrong I*"), 924 F.2d 282, 290 (D.C. Cir. 1991); *see CREW v. Trump*, 924 F.3d 602, 603 (D.C. Cir. 2019) ("Although the PRA makes clear that the United States, 'retain[s] complete ownership, possession, and control of Presidential records,' 44 U.S.C. § 2202, it also provides that the President, during his term in office, shall assume 'exclusive[] responsib[ility] for custody, control, and access to such Presidential records,' *id.* § 2203(f).").

The category of "agencies" subject to the FRA is "coextensive" with the category of agencies subject to FOIA. *CREW v. Off. of Admin.*, 593 F. Supp. 2d 156, 159 (D.D.C. 2009). Thus, records subject to the FRA may be requested at any time pursuant to FOIA. Public access to records subject to the PRA is delayed, but such records may be accessible as soon as five years after the

President leaves office. 44 U.S.C. § 2204(b)(2), (c)(1).

The existence of two separate records regimes—one, under the FRA, governing agencies' federal records, and the other, under the PRA, governing Presidential records—reflects Congress's concern to avoid encroaching on the President's authority to manage his own records during his term in office. This concern is further reflected in the PRA's express exclusion from the definition of Presidential records of any materials that qualify as "official records of an agency (as defined in [the Freedom of Information Act (FOIA), 5 U.S.C. § 552(f)[1]])." 44 U.S.C. § 2201(2)(B). The Supreme Court has recognized that with respect to the EOP, "the President's immediate personal staff" as well as "units in the Executive Office whose sole function is to advise and assist the President" are not included within FOIA's (or the FRA's) definition of "agency." *See Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980). Thus, for example, the National Security Council and the Domestic Policy Council are subject to the PRA rather than the FRA. *E.g.*, *Democracy Forward Found. v. White House Office of Am. Innovation*, 356 F. Supp. 3d 61, 66 (D.D.C. 2019); *Indiana v. Biden*, 652 F. Supp. 3d 995, 1006-07 (S.D. Ind. 2023).

Accordingly, whether an EOP component is governed either by the PRA or by the FRA depends on whether that component exists solely to advise and assist the President. But both categories of EOP components are subject to recordkeeping obligations.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    Relevant Presidential Issuances Regarding USDS

Shortly after taking office, the President signed a series of Executive Orders ("EOs") and a presidential memorandum that "describe distinct—and limited—roles for" USDS, a temporary

---

[1] Although the PRA, 44 U.S.C. § 2201(2)(B), refers to subsection (e) of the FOIA, that subsection has been re-codified at 5 U.S.C. § 552(f).

organization within USDS called the U.S. DOGE Service Temporary Organization (USDSTO), and agency DOGE Teams. Declaration of Amy Gleason ("Gleason Decl.") ¶ 25 (attached to Plaintiff's first PI Motion as Exhibit C [ECF 11-2, at 6]).

EO 14158, signed on January 20, 2025, directs changes to the previously established U.S. Digital Service to implement the President's "DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity." EO 14158 § 1. This EO redesignated the U.S. Digital Service as the U.S. DOGE Service; moved it out of the Office of Management and Budget (OMB); and made it a free-standing EOP component, whose head (the USDS Administrator) reports directly to the White House Chief of Staff. *Id*. § 3(a). Similarly, pursuant to 5 U.S.C. § 3161, it established within USDS the temporary organization USDSTO, which will terminate on July 4, 2026. EO 14158 § 3(b). The USDSTO "shall be headed by the USDS Administrator and shall be dedicated to advancing the President's 18-month DOGE agenda." *Id.* "

EO 14158 also requires agency heads to "establish within their respective agencies a DOGE Team of at least four employees, which may include Special Government Employees." *Id.* § 3(c). Such teams, employed by and located within the agencies, must "coordinate their work with USDS and advise their respective Agency Heads on implementing the President's DOGE Agenda." *Id.* The EO further tasks USDS with "commenc[ing] a Software Modernization Initiative to improve the quality and efficiency of government-wide software, network infrastructure, and information technology (IT) systems" and directs agency heads to "take all necessary steps, in coordination with the USDS Administrator and to the maximum extent consistent with law, to ensure USDS has full and prompt access to all unclassified agency records, software systems, and IT systems," while also noting that "USDS shall adhere to rigorous data protection standards." *Id.*

§§ 4(a)-(b).

A collection of other EOs and a presidential memorandum describe other elements of the DOGE Agenda and the USDS Administrator's responsibilities, which include consulting with and advising agency personnel on various presidential initiatives. In particular, EO 14170, also signed on January 20, 2025, directs the Assistant to the President for Domestic Policy, "in consultation with the Director of [OMB], the Director of the Office of Personnel Management, and the Administrator of" USDS to "develop and send to agency heads a Federal Hiring Plan that brings to the Federal workforce only highly skilled Americans dedicated to the furtherance of American ideals, values, and interests." *Id.* § 2(a). EO 14170 further states that the resulting federal hiring plan "shall provide specific best practices for the human resources function in each agency, which each agency head shall implement, *with advice and recommendations* as appropriate from" USDS. *Id.* § 2(d) (emphasis added).

EO 14210, signed on February 11, 2025, directs OMB to submit a plan to reduce the size of the Federal Government's workforce, *id.* § 3(a), and directs *agency heads* to, among other things, "promptly undertake preparations to initiate large-scale reductions in force," *id.* § 3(c). The Executive Order tasks the leader of each agency team, as defined in EO 14158, with certain responsibilities, including consulting with the agency head on a hiring plan, id. § 3(b); consulting on "new career appointment hiring decisions," *id.* § 3(b)(i); deciding whether "any vacancies for career appointments . . . should be filled," *id.* § 3(b)(ii); and providing the USDS Administrator "with a monthly hiring report for the agency," *id.* § 3(b)(iii).

EO 14218, signed on February 19, 2025, directs the OMB Director and the USDS Administrator, in coordination with the Assistant to the President for Domestic Policy, to "identify all other sources of Federal funding for illegal aliens," and to "recommend additional agency

actions to align Federal spending with the purposes of this order, and, where relevant, enhance eligibility verification systems." EO 14218 § 2(b)(i)-(ii).

EO 14219, also signed on February 19, 2025, directs that "Agency heads shall, in coordination with their DOGE Team Leads and the Director of [OMB], initiate a process to review all regulations subject to their sole or joint jurisdiction for consistency with law and Administration policy." EO 14219 § 2. "Additionally, agency heads shall consult with their DOGE Team Leads and the Administrator of [the Office of Information and Regulatory Affairs] on potential new regulations as soon as practicable." *Id.* § 4.

EO 14222, signed on February 26, 2025, states that "[e]ach Agency Head shall, with assistance as requested from the agency's DOGE Team Lead," among other steps "build a centralized technological system within the agency to seamlessly record every payment issued by the agency." EO 14222 § 3(a); *see also id.* §§ 3(a)(i), (3)(b), 3(c), 3(d)(i) (identifying additional steps to be taken by agency heads in consultation with the agency's DOGE Team Lead). This EO also directs each DOGE Team Lead to provide the USDS Administrator with "a monthly informational report on contracting activities," *id.* § 3(d)(ii), and, "to the extent consistent with law," with a "monthly informational report listing each agency's justifications for non-essential travel," *id.* § 3(e).

Finally, EO 14248, signed on March 25, 2025, states that the USDS Administrator will "coordinat[e]" with the Department of Homeland Security (DHS) to enable DHS to "review each state's publicly available voter registration list . . . alongside Federal immigration databases and state records requested . . . , for consistency with Federal requirements." *Id.* § 2(b)(iii).

In addition to these EOs, a January 20, 2025, presidential memorandum directs the OMB Director, "in consultation with" the Office of Personnel Management (OPM) Director and USDS

Administrator, to "submit a plan to reduce the size of the Federal Government's workforce through efficiency improvements and attrition." Presidential Memorandum, *Hiring Freeze*, *available at* https://www.whitehouse.gov/presidentialactions/2025/01/hiring-freeze/. The memorandum further states that this hiring freeze will remain in place for the Internal Revenue Service (IRS) "until the Secretary of the Treasury, in consultation with the Director of OMB and the Administrator of USDS, determines that it is in the national interest to lift the freeze." *Id.*

## II.    Pending FOIA Litigation

To date, at least seven cases have been filed (including one by POGO) and remain pending before members of this and other Courts, involving specific FOIA requests submitted to USDS and bringing claims pursuant to FOIA's cause of action, 5 U.S.C. § 552(a)(4)(B), on the theory that USDS is an "agency" subject to FOIA (and thus to the FRA, *CREW v. Off. of Admin.*, 593 F. Supp. 2d at 159). *See Ctr. for Biological Diversity v. OPM*, No. 1:25-cv-165 (D.D.C. filed Jan. 20, 2025); *Am. Oversight v. U.S. Dep't of Gov't Efficiency* ("*American Oversight* FOIA case"), No. 1:25-cv-409 (D.D.C. filed Feb. 11, 2025); *CREW v. USDS* ("*CREW* FOIA case"), No. 1:25-cv-511 (D.D.C. filed Feb. 20, 2025); *The Intercept Media, Inc. v. USDS*, 1:25-cv- 2404 (S.D.N.Y. filed Mar. 24, 2025); *MSW Media, Inc. v. USDS*, No. 3:25-cv-2881 (N.D. Cal. filed Mar. 28, 2025); *Am. Oversight v. U.S. Dep't of Gov't Efficiency*, No. 1:25-cv-1251 (D.D.C. filed Apr. 23, 2025); *POGO v. USDS* ("*POGO* FOIA case"), 1:25-1295 (D.D.C. filed Apr. 28, 2025).

In two of these cases, plaintiffs sought and received preservation orders. *See CREW* FOIA case, No. 1:25-cv-511, 2025 WL 752367, at *17 (D.D.C. Mar. 10, 2025) (requiring preservation of "all records that may be responsive to CREW's FOIA requests" but declining to order production while USDS's status as an "agency" remained in dispute); Order of Apr. 2, 2025, ECF 15, *Am. Oversight* FOIA case, No. 1:25-cv-409 (D.D.C. Apr. 2, 2025) (requiring preservation of

"all records that may be responsive to any of plaintiff's FOIA requests at issue in this case").

In addition, in the *CREW* FOIA case, the issue of whether discovery is appropriate to address whether USDS qualifies as an "agency" for purposes of FOIA is currently pending before the Supreme Court. *See USDS v. CREW*, No. 24A1122 (U.S. application for stay filed May 21, 2025). On May 23, 2025, the Supreme Court issued an administrative stay of the district court's orders allowing for discovery pending the Court's further consideration of the issue. Order of May 25, 2025, *USDS v. CREW*, No. 24A1122 (U.S.).

## III.    Procedural History

Plaintiff filed a Complaint on February 21, 2025, naming as defendants President Trump, the "U.S. Department of Government Efficiency,"[2] USDS, USDSTO, and the USDSTO Administrator. Compl. [ECF 1]. Over two months later, on March 24, 2025, Plaintiff filed a Motion for Preliminary Injunction (first "PI Motion") [ECF 11]. In opposition to that Motion, Defendants argued, among other things, that Plaintiff lacked standing because, at the time it filed its Complaint, it had never sought records from USDS under FOIA. *See* Def. Opp. [ECF 12], at 10-12. Defendants further argued that Plaintiff had failed to identify any deficiencies in USDS's current records retention policy and that its claims amounted to an impermissible broad programmatic attack on USDS's records practices as a whole. *Id.* at 17-18. On April 8, 2025, the day after Defendants filed their opposition brief, Plaintiff submitted a FOIA request to USDS. *See* ECF 14-1, at 2-6. On April 28, 2025, Plaintiff filed its separate FOIA challenge, referenced above, relating to that April 8, 2025 request. *See POGO* FOIA case, No. 1:25-cv-1295 (D.D.C. filed Apr. 28, 2025). To date, Plaintiff has not sought a preservation order in that case that would cover the records potentially

---

[2] As the above description indicates, the "U.S. Department of Government Efficiency," or DOGE, is the term used for the President's DOGE policy agenda. It is not a distinct entity separate from USDS, USDSTO, or agency DOGE Teams and is therefore not a proper defendant in this case.

responsive to its request.

In this case, following a hearing, the Court denied Plaintiff's first PI Motion without prejudice on the understanding that Plaintiff would file an Amended Complaint and a new PI Motion. *See* Minute Order of Apr. 9, 2025. Nearly a month later, on May 7, 2025, Plaintiff submitted a second FOIA request to USDS. *See* Am. Compl. ¶ 8. Plaintiff then filed an Amended Complaint on May 9, 2025 [ECF 16], and a second PI Motion on May 15, 2025 [ECF 17].

Plaintiff's Amended Complaint, like its original Complaint, asserts four claims: Count 1 seeks a declaratory judgment that the "policies and practices" of Defendants, including through USDS's March 25, 2025 Records Retention Policy, "to treat the records of DOGE and its agency components" as "subject to the PRA" rather than the FRA are "arbitrary, capricious, and contrary to law." Am. Compl. ¶¶ 71, 74. Count 2 seeks injunctive relief and a writ of mandamus requiring Defendants "to treat the records of DOGE and its agency components as agency records subject to the FRA and publicly accessible through the FOIA." *Id.* ¶ 76. Count 3 seeks a declaratory judgment that Defendant the USDS/USDSTO Administrator has violated the FRA by "fail[ing] to create and implement a recordkeeping policy that treats" USDS records "as agency records subject to the FRA and publicly accessible through the FOIA" and that the Administrator's "policy and practice" of treating USDS and USDSTO records as subject to the PRA is "arbitrary, capricious, and contrary to law." *Id.* ¶¶ 84, 86-87. Count 4 seeks injunctive relief and a writ of mandamus alleging the failure "to create and implement a recordkeeping policy that treats" USDS records "as agency records under the FRA," and seeking to compel the Administrator "to comply with her statutory duty to make and preserve [USDS] records" as "agency records subject to the FRA and the FOIA." *Id.* ¶ 92.

## ARGUMENT

### I.    Legal Standard

Preliminary injunctive relief is an "extraordinary remedy never awarded as of right."
*Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The party seeking relief must,
"by a clear showing, carr[y] the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C.
Cir. 2004). A court should grant a preliminary injunction only when the moving party shows "(1) a
substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the
injunction were not granted, (3) that an injunction would not substantially injure other interested
parties, and (4) that the public interest would be furthered by the injunction." *Chaplaincy of Full
Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). The third and fourth factors
"merge when the government is the opposing party." *Trump v. Thompson*, 20 F.4th 10, 31 (D.C.
Cir. 2021) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).[3]

### II.   Plaintiff Fails To Demonstrate That It Will Suffer Irreparable Harm Absent an Emergency Injunction

Although Plaintiff's pending FOIA requests may now suffice to establish its standing at
the pleading stage, Plaintiff fails to establish any likelihood that records potentially responsive to
its requests are at imminent risk of destruction due to the fact that USDS regards itself as subject
to the PRA rather than the FRA. It thus fails to establish irreparable harm warranting emergency

---

[3] Although Plaintiff urges application of a "sliding scale" approach to the preliminary injunction
factors, "[t]he continued viability of the sliding scale approach is highly questionable . . . in light
of the Supreme Court's holding in *Winter*." *Singh v. Carter*, 185 F. Supp. 3d 11, 16 (D.D.C. 2016)
(citing *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013), for the proposition that all four
prongs of the preliminary injunction standard must be met before injunctive relief can be granted);
*see also Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (recognizing
"tension" between *Winter* and sliding-scale approach); *Sherley v. Sebelius*, 644 F.3d 388, 392–93
(D.C. Cir. 2011) (reading *Winter* "to suggest if not to hold" that likelihood of success is a free-
standing requirement for a preliminary injunction). In any event, regardless of which standard is
applied, preliminary injunctive relief is inappropriate here.

relief. "[T]he basis of injunctive relief in the federal courts has always been irreparable harm." *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)). Indeed, "the failure to show a likelihood of irreparable harms remains, standing alone, sufficient to defeat [a preliminary injunction] motion." *Navajo Nation v. Azar*, 292 F. Supp. 3d 508, 512 (D.D.C. 2018). To constitute irreparable injury, the harm must be "certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm." *League of Women Voters v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) (citation and alteration omitted). Further, where Plaintiff's standing is based on an alleged informational injury due to asserted violations of the FRA, the "irreparable harm" showing likewise must consist of informational harm to *Plaintiff*; Plaintiff cannot rely on alleged harms faced by third parties. *See, e.g.*, *Alcresta Therapeutics, Inc. v. Azar*, 318 F. Supp. 3d 321, 326 (D.D.C. 2018) (noting that "injuries to third parties are not a basis to find irreparable harm"). Plaintiff has the burden to put forth sufficient evidence to satisfy this high standard. "The movant cannot simply make 'broad conclusory statements' about the existence of harm. Rather, [the movant] must 'submit[ ] . . . competent evidence into the record . . . that would permit the Court to assess whether [the movant], in fact, faces irreparable harm . . . .'" *Aviles-Wynkoop v. Neal*, 978 F. Supp. 2d 15, 21 (D.D.C. 2013) (quoting *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008)).

Plaintiff fails to meet its burden here. The only informational harm that could conceivably warrant emergency relief is the imminent risk that records responsive to Plaintiff's pending FOIA requests may otherwise be destroyed. But Plaintiff has established no such risk. Tellingly, unlike cases where plaintiffs seek to compel administrative enforcement under the FRA or PRA, none of Plaintiff's claims have anything to do with imminent destruction of records. Moreover, Plaintiff

concedes that, even though Defendants disagree that USDS is an "agency" subject to the FRA and FOIA, USDS does consider itself subject to the PRA. P.Br. 29. Plaintiff further acknowledges that Administrator Gleason has attested to USDS's preservation of records pursuant to the PRA and that USDS has in place a Records Policy requiring such retention. P.Br. 31-32; Gleason Decl. ¶¶ 25-26 (attached as Exhibit C to Pl. First PI Mot. [ECF 11-3]; USDS Records Policy (attached as Exhibit A to Def. First PI Opp. Ex. A [ECF 12-1].[4]

Plaintiff's attempt nevertheless to show irreparable harm fails to meet its heavy burden for preliminary emergency relief. Plaintiff first points out that Ms. Gleason executed her declaration before March 25, 2025, the date of the USDS Records Policy. But the USDS Records Policy on its face references "prior USDS records retention guidance." USDS's most recent effort to memorialize PRA requirements is a sign that it takes its records preservation obligations seriously and cannot plausibly be viewed as showing the opposite.

Plaintiff next suggests that "[t]he differences between what qualifies as a record and the respective retention obligations under the FOIA and PRA further underscore th[e] need for a preservation order." P.Br. 32. But this bald assertion is unexplained and incorrect.[5] By its terms, the PRA covers *all* documents created or received by any advisory unit within the EOP except for documents that qualify as personal records or agency records subject to the FRA (in which case

---

[4] Plaintiff appears to aim its argument in section I.D of its brief regarding the USDS Records Policy at the issue of irreparable harm even though it is not in the "irreparable harm" section. Defendants address that argument *infra* III.C.

[5] Plaintiff's sole support for this assertion is a similarly bare statement in the *American Oversight* FOIA case's Minute Order of Apr. 2, 2025. *See* P.Br. 32. That decision, in turn, evidently relied on the plaintiff's brief in that case, which suggested as the sole example of how the PRA was supposedly narrower in scope that Elon Musk's calendar entries would not be covered. *See Am. Oversight* PI Br. 17 [ECF 12-1] (filed Mar. 24, 2025). But no explanation for that suggestion was provided, and such entries are more likely covered by the PRA than the FRA, given that Musk is not an employee of any agency, nor of USDS, regardless of its status.

they would be subject to the relevant agency's preservation obligations). 44 U.S.C. § 2201(2)(B). The FRA, on the other hand, is limited to records that an agency preserves or deems "appropriate for preservation" as evidence of the government's "organization, functions, policies, decisions, procedures, operations, or other activities," or "because of the informational value of data in them." 44 U.S.C. § 3301(a)(1)(A). NARA regulations allow agencies to "distinguish records from nonrecord materials," 36 C.F.R. § 1222.16(a); *see id.* § 1222.12, and to establish disposition schedules for records deemed "temporary," *id.* § 1225.16.

There is no reason to think that anything responsive to Plaintiff's current or even future FOIA requests would not be covered by the PRA, and thus by USDS's Records Policy. Moreover, while the PRA grants the President some discretion regarding disposition of Presidential records that are determined to have no administrative, historical, informational, or evidentiary value, he still must allow the Archivist the opportunity to take steps to preserve such records before their disposition. 44 U.S.C. § 2203(c)-(e). The notion that any records potentially responsive to Plaintiff's pending FOIA requests are at imminent risk of destruction through this process before this case can be adjudicated on the merits is pure speculation.

Nowhere in Plaintiff's brief is there any direct indication that any specific USDS records are at risk of imminent destruction, much less records responsive to Plaintiff's FOIA requests. Instead, Plaintiff asks the Court to draw negative inferences and make assumptions based on hearsay news reports that even on their face say nothing about destruction of USDS records. The suggestion that "DOGE set up a new server at OPM" to send "government-wide emails," P.Br. 30, fails to indicate those emails were destroyed; indeed, OPM is an agency subject to the FRA and

FOIA, and many if not all of the emails at issue have been publicly disseminated.[6] A news report suggesting that DOGE employees may have tried (apparently unsuccessfully) to "cover their tracks" when accessing a National Labor Relations Board (NLRB) system[7] is similarly irrelevant since NLRB is also an agency, and any technical information about IT systems access at NLRB or other agencies would presumably be embedded within their systems, not at USDS. Nor has Plaintiff requested such data under FOIA. And such news reports in any case are inadmissible hearsay that should not be dispositive in assessing irreparable harm. *Democracy Forward Found. v. Pompeo*, 474 F. Supp. 3d 138, 150 (D.D.C. 2020) (rejecting hearsay in newspaper articles as inadmissible when offered by plaintiff asserting FRA violation); *see also Metro. Council of NAACP Branches v. FCC*, 46 F.3d 1154, 1165 (D.C. Cir. 1995) ("We seriously question whether a New York Times article is admissible evidence of the truthfulness of its contents.").

Plaintiff also cites anonymous sources in news stories for a "reported use of messaging apps" with autodelete capabilities, such as Signal. P.Br. 32. Even that, however, does not establish a risk of imminent destruction. USDS's Records Policy instructs employees to preserve all work-related records and communications regardless of format, including communications exchanged on private messaging platforms such as Signal. *See* USDS Records Policy. Employees are instructed to "[d]isabl[e] auto-delete features on any such messaging services" to "help with retention and compliance." *Id*. Employees are also advised to use government-issued devices for work-related communications and forward any work-related messages that they receive on

---

[6]    Indeed, the original email is reproduced on OPM's website. *See* https://www.opm.gov/fork/original-email-to-employees/.

[7]    *See* https://www.npr.org/2025/04/15/nx-s1-5355896/doge-nlrb-elon-musk-spacex-security, cited by P.Br. 33.

personal email or other personal messaging accounts to their government accounts. *Id.* Even the most recent article cited by Plaintiff merely speculates about a "potential[]" recordkeeping violation "if" such messages were not backed up to federal systems, with no indication that such failures had occurred or are likely.[8] The situation here thus more closely resembles that in *Judicial Watch, Inc. v. DOJ*, No. 18-cv-154 (RBW), 2018 WL 11457399 (D.D.C. Nov. 13, 2018), where the Court denied a preservation order because, even though it was undisputed that "personal email accounts" had been used, there was no evidence that "loss or removal of records occurred because emails were copied/forwarded to the appropriate government accounts." *Id.* at *2. Plaintiff's claimed harm remains too vague and speculative to support the drastic remedy of a preliminary injunction. *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (citing the "well known and indisputable principle[]" that an "unsubstantiated and speculative" harm cannot constitute "irreparable harm" sufficient to justify injunctive relief).

Plaintiff is also wrong to suggest that other courts have "readily entered preservation orders" in the absence of any evidence of a risk of imminent destruction. P.Br. 33. Plaintiff identifies only three cases in this supposed category, but two of them—the *CREW* and *American Oversight* FOIA cases—relied on vague reports that USDS employees did not wish to reveal their names when interacting with agency officials and that these employees are new to the Federal Government. *Id.* 33-34 (citing *CREW* FOIA case, 2025 WL 752367, at *16-17, which concluded based on such assertions that USDS has operated in "unusual secrecy"; *Am. Oversight* FOIA case, Minute Order of Apr. 2, 2025, which largely relied on the *CREW* decision). Respectfully, the evidentiary basis for the Courts' findings of irreparable harm in those cases, both of which remain

---

[8] *See* https://www.reuters.com/technology/artificial-intelligence/musks-doge-using-ai-snoop-us-federal-workers-sources-say-2025-04-08/, cited by P.Br. 32.

pending, appears tenuous at best. Indeed, in the *CREW* Court's view, the paramount harm appeared to arise from the plaintiff's desire for expedited processing to make allegedly time-sensitive information quickly available to the public. *See CREW* FOIA case, 2025 WL 752367, at *14. The Court's preservation order thus appeared aimed as much at providing a head start on USDS's processing of the FOIA request at issue, in the event USDS is determined to qualify as an "agency," as at addressing any risk of records destruction. *See id.* at *16. Both decisions at least limited the relief provided to records responsive to the FOIA requests at issue—even as they found no explicit connection between those records and the risks they purported to identify. *CREW* FOIA case, 2025 WL 752367, at *17; Order of Apr. 2, 2025, ECF 15, *Am. Oversight* FOIA case.

Yet preservation orders are not the norm even in the FOIA context, as the third case cited by Plaintiff makes clear. *See Competitive Enter. Inst.* ("*CEI*") *v. Off. of Science & Tech. Policy,* No. 14-cv-765, 2016 WL 10676292, at *2 (D.D.C. Dec. 12, 2016) (recognizing analytical framework for injunctive relief applies). That case is inapposite because the Court there did find an imminent risk that the records at issue might become unavailable, even if not actually destroyed, reasoning that their custodian, a political appointee, was about to leave office, and the continuing applicability of records retention obligations was uncertain. *Id.* at *3.[9] Plaintiff shows no similar risk here.

Plaintiff next argues that its alleged irreparable harm justifies an injunction covering all USDS records because it asserts violations of the FRA and PRA rather than FOIA. But the only two cases it cites relied on circumstances not present here that the Court viewed as creating a risk

---

[9] In *CEI*, the Court accepted the government's proposal that the preservation order minimize any intrusion on the appointee's privacy by not requiring a search before it was deemed necessary; instead, the order required the appointee to maintain a thumb drive containing all his emails so that, if necessary, they could be searched in the future. *Id.*

of destruction for the entire set of records covered by the injunction. In *CREW v. Cheney*, 577 F. Supp. 2d 328 (D.D.C. 2008) (cited by P.Br. 35), where the harm at issue was the potential removal or destruction of PRA-covered records as the Vice President prepared to leave office, the Court issued a preliminary injunction only after the parties' original efforts to reach an agreement regarding the scope of voluntary preservation failed due to an apparent dispute over the PRA's scope. *See id.* at 332-33, 339. However, the Court reversed its decision at summary judgment because, despite the defendants' "initially confusing declaration," it turned out that there was no actual dispute over the PRA's scope and the plaintiffs failed to substantiate their assertion of an imminent risk of destruction. *CREW v. Cheney*, 593 F. Supp. 2d 194, 231 (D.D.C. 2009). In *Am. First Legal Found. v. Becerra*, No. 24-cv-1092 (RC), 2024 WL 3741402 (D.D.C. Aug. 9, 2024) (cited by P.Br. 36), it had already been established through an investigation conducted by NARA that the agency at issue (CDC) was following a policy of deleting lower-level employee emails within months of their departure, which was inconsistent with the policy that NARA had approved. *Id.* at *4. The Court's injunction covered only those employees' emails. *See id.* at *17.

Here, on the other hand, Plaintiff has made no attempt to limit its requested relief to records at risk of destruction, nor has Plaintiff shown any such risk for any category of USDS records. Instead, Plaintiff seeks an injunction of unlimited scope, untethered to its asserted injury or interests. As this Court recognized at the prior hearing, the preservation orders already issued in the *CREW* and *American Oversight* FOIA cases cover a broad range of subjects overlapping the records Plaintiff has sought. *Cf. CREW* FOIA case, PI reply attach. A [*CREW* ECF 13, at 34]; *Am. Oversight* FOIA case, Compl. ¶¶ 46, 47 [*Am. Oversight* ECF 1]. All told, Plaintiff has failed to establish the irreparable harm that would be necessary for its requested emergency relief. Instead, it simply asks the Court to require Defendants to do "what the [FRA] already mandates," P.Br. 37,

even though the PRA, which Defendants follow, is already broader in scope. In the absence of any evidence that records are likely to be destroyed, there is no justification for issuing the "follow the law" injunction that Plaintiff proposes here. *See Norton v. SUWA*, 542 U.S. 55, 66 (2004) ("general orders compelling compliance with broad statutory mandates" are inappropriate); *L.A. v. Lyons,* 461 U.S. 95, 109 (1983) (injunction to "follow the law" in the absence of some allegedly imminent violation of the law is inappropriate); *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1137–38 (D.C. Cir. 2009) (distinguishing case before it from an impermissible "generalized injunction to obey the law" because "a proclivity for unlawful conduct has been shown"); *Caudle v. D.C.,* 825 F. Supp. 2d 73, 81 (D.D.C. 2011) ("an impermissible 'obey the law' injunction is one that is not meaningfully more specific than the law in question").

## III.    Plaintiff Is Unlikely To Succeed on the Merits of Its Claims

### A.    Plaintiff Is Barred from Bringing a Broad Programmatic Attack on USDS's Recordkeeping Practices

Plaintiff is also unlikely to succeed on the merits of the claims raised in this case. Plaintiff raises no permissible FRA or PRA claim. The D.C. Circuit held in *Armstrong I* that the PRA "precludes judicial review of the President's recordkeeping practices and decisions." *Armstrong I*, 924 F.2d at 291. Meanwhile, the FRA "does not contain an express or implied private right of action." *Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 954 (D.C. Cir. 2016) (citing *Kissinger*, 445 U.S. at 148-50). Accordingly, a plaintiff seeking to assert a violation of the FRA must rely on the causes of action set forth in the APA, 5 U.S.C. § 706. And the APA limits a plaintiff to challenging a final "discrete agency action"; it cannot simply mount a "'broad programmatic attack' on an agency's compliance with a statutory scheme." *CREW v. DHS*, 387 F. Supp. 3d 33, 49 (D.D.C. 2019), *amended*, 2019 WL 11307644 (D.D.C. July 22, 2019).

The upshot of these limitations is that the only permissible challenge in this context would

be one that challenges a specific recordkeeping guideline or directive as somehow inadequate under the PRA or FRA. For example, in *Armstrong II*, the court recognized a limited exception to the PRA's bar on judicial review: Where a plaintiff had submitted a FOIA request and then brought suit claiming White House guidelines improperly classified certain material as Presidential records when in fact (according to the plaintiff) they qualified as "agency records subject to the FRA," a court could "review guidelines outlining what is, and what is not, a 'presidential record,'" as opposed to a federal record. *See Armstrong II*, 1 F.3d at 1280, 1290, 1294. In *Armstrong I*, the court similarly allowed an APA claim that an agency's "recordkeeping guidelines and directives do not adequately describe the material that must be retained as 'records' under the FRA." *Armstrong I*, 924 F.2d at 292.[10]

Here, Plaintiff raises four separate claims, none of which is sufficiently limited to comport with the restrictions of *Armstrong I*, *Armstrong II*, or the APA. Rather than challenging a discrete written guideline, Plaintiff purports to challenge unidentified "policies and practices," Am. Compl. ¶¶ 71, 74, 79, 87, or the alleged wholesale failure to "create and implement a recordkeeping policy" under the FRA, *id.* ¶¶ 86, 91; and seeks generally to compel USDS to comply with the FRA's and FOIA's statutory schemes, *id.* ¶¶ 80, 92. Essentially, these claims ask the Court to order Defendants to design and implement an entire FRA recordkeeping and FOIA response scheme for USDS records. Even Plaintiff's passing reference to the USDS Records Policy in Claim 1 simply identifies it as an example of the broader "policy and practice" that Plaintiff asks the Court to rule wholly invalid. *See id.* ¶ 74.

---

[10] The court in *Armstrong I* also recognized that plaintiffs may seek "judicial review of the agency head's or Archivist's refusal to seek the initiation of an enforcement action by the Attorney General" under 44 U.S.C. § 3106. *Armstrong I*, 924 F.2d at 295; *cf. CREW v. Pruitt*, 319 F. Supp. 3d 252, 258 (D.D.C. 2018). Plaintiff has not asserted any such claim.

Such broad, programmatic relief, which calls on the Court to undertake an ongoing oversight role in order to implement wholesale improvement of government practices, is prohibited under the APA and far outside the scope of the limited review that *Armstrong I* and *II* permit. *See, e.g.*, *Animal Legal Def. Fund, Inc. v. Vilsack*, 111 F.4th 1219, 1232 (D.C. Cir. 2024) (Katsas, J., concurring) (APA requires plaintiffs "to focus their claims on 'discrete' as opposed to 'programmatic' agency actions"); *Jones v. U.S. Secret Serv.,* 701 F. Supp. 3d 4, 17 (D.D.C. 2023) (dismissing claim alleging "ongoing 'failure to properly train' officers" because APA did not allow programmatic challenge seeking "wholesale improvement" by court decree of an alleged "ongoing unlawful practice"). Plaintiff's insistence that it merely seeks "the discrete action of adopting and implementing a recordkeeping policy under the FRA, no less and no more," P.Br. 20, is disingenuous at best. Simply put, "adopting and implementing" an FRA recordkeeping policy in conformity with all statutory and regulatory requirements is not a discrete agency action. Instead, an order compelling such relief would involve ongoing programmatic oversight—the very type of claim that is prohibited under the APA.

**B.    To the Extent Plaintiff's Claims Are Construed To Seek a Simple Ruling Regarding USDS's Status, They Are Barred Under 5 U.S.C. § 704 and the Mandamus Act Because FOIA Provides an Adequate Remedy**

Even if the Court were to construe Plaintiff's claims narrowly to avoid a broad programmatic attack, and instead view them as seeking nothing more than a ruling that USDS is an "agency" under the FRA and FOIA (thus leaving it to USDS to take any further appropriate actions in conformity with that ruling), that remedy is also barred under the circumstances here. As described above, Plaintiff's four claims invoke the APA's cause of action in 5 U.S.C. § 706. Am. Compl. ¶ 1. However, that cause of action is unavailable where there exists another "adequate remedy in a court." 5 U.S.C. § 704. The same restrictions apply to mandamus relief under the

Mandamus Act, 28 U.S.C. § 1361, also invoked by Plaintiff as a source of jurisdiction, *see* Am. Compl. ¶ 2. *CREW v. EOP*, 587 F. Supp. 2d 48, 63 (D.D.C. 2008).[11] Thus, where FOIA provides a remedy, a plaintiff cannot seek such relief through a separate APA claim that alleges an FRA violation, nor can it seek mandamus relief for such a claim. *CEI v. Off. of Science & Tech. Policy*, 82 F. Supp. 3d 228, 234 (D.D.C. 2015) (dismissing APA claim "[b]ecause FOIA provides its own remedial scheme"), *reversed on other grounds*, 827 F.3d 145 (D.C. Cir. 2016); *cf. Feinman v. FBI*, 713 F. Supp. 2d 70, 76–77 (D.D.C. 2010) (recognizing FOIA claims allow for challenges to agency policies as well as an agency's response to a specific FOIA request).

Plaintiff's claims here, though separated into four, all seek the same determination from the Court—that USDS is an "agency" for purposes of the FRA and FOIA and is therefore subject to FRA rather than PRA recordkeeping requirements as well as FOIA's framework for making nonexempt agency records publicly available. *See* Am. Compl. ¶¶ 1, 71, 79, 86, 92. Significantly, Plaintiff does not invoke unique FRA/PRA remedies by, for example, seeking to compel those statutes' administrative enforcement mechanisms to recover removed records or avoid their destruction. *Cf. Armstrong I*, 924 F.2d at 295-96 (describing challenge to agency's or Archivist's decision not to initiate enforcement action); *Democracy Forward Found.*, 474 F. Supp. 3d at 144 (claim sought to compel administrative enforcement action). Nor do any of Plaintiff's claims seek

---

[11] Plaintiff also cites the Declaratory Judgment Act and the All Writs Act, Am. Compl. ¶ 1, but neither statute provides an independent basis for Plaintiff's action. *LeBlanc v. U.S. Priv. & C.L. Oversight Bd.*, No. 25-cv-542 (RBW), 2025 WL 1454010, at *24 (D.D.C. May 21, 2025) ("The Declaratory Judgment Act 'provides neither jurisdiction nor a cause of action, but rather a form of relief when the case is already properly before the Court.'"); *In re Nat'l Nurses United*, 47 F.4th 746, 752 & n.4 (D.C. Cir. 2022) (All Writs Act "does not grant jurisdiction to issue a writ of mandamus" but operates "in aid of jurisdiction this court already has or will have as a result of issuing the writ," and a writ of mandamus is inappropriate unless "there is no other adequate remedy available to plaintiff" (internal quotation omitted)).

to correct supposed defects in USDS's Records Policy, whether under the FRA or the PRA, or challenge the scope of the policy, other than the fact that it is based on PRA rather than FRA requirements.[12] Instead, Plaintiff seeks a ruling that USDS is an "agency." Indeed, as discussed above, that is the only relief this Court could grant without becoming enmeshed in impermissible oversight of the development and implementation of an entire FRA recordkeeping scheme. But that remedy is already available through the FOIA causes of action raised in the *CREW* FOIA case, the *American Oversight* FOIA case, and several other similar FOIA cases listed above. *E.g.*, *CREW* Compl. ¶ 5 [ECF 1, *CREW* FOIA case][13]; *Am. Oversight* Compl. ¶¶ 69, 70 [ECF 1, *Am. Oversight* FOIA case]. Thus far, the *CREW* FOIA case has proceeded furthest in adjudicating the issue, and the issue is likely to be resolved, one way or another, through that case.

And indeed, the issue of whether an entity qualifies as an "agency" has typically been adjudicated through FOIA, not through the FRA. *See, e.g.*, *Main St. Legal Servs., Inc. v. NSC*, 811 F.3d 542, 543–44 (2d Cir. 2016) (FOIA case, affirming district court's decision that NSC was not an "agency" subject to FOIA, and recognizing "the FOIA's agency requirement to relate to the court's remedial power"); *CREW v. Off. of Admin.*, 566 F.3d 219, 220-21 (D.C. Cir. 2009) (FOIA case, affirming district court's determination that Office of Administration is not an "agency" subject to FOIA); *Meyer v. Bush*, 981 F.2d 1288, 1298 (D.C. Cir. 1993) (FOIA case, holding President's Task Force on Regulatory Relief was not an "agency"); *Rushforth v. Council of Econ.*

---

[12] As discussed *infra* III.C, the Amended Complaint asserts that the USDS Records Policy is inconsistent with the PRA in certain respects, Am. Compl. ¶ 65, but none of Plaintiff's claims alleges a PRA violation on this basis.

[13] The *CREW* FOIA case separately asserts FRA and Mandamus Act claims of the very type Plaintiff here does not assert, *see id.* ¶¶ 115-22 (Count 2), ¶¶ 124-28 (Count 3). Such claims are meritless, but the relevant point here is that the *CREW* plaintiffs seek the remedy that Plaintiff seeks here under FOIA (their Count 1) rather than the FRA.

*Advisers*, 762 F.2d 1038, 1038–40, 1043 (D.C. Cir. 1985) (FOIA case, affirming district court's conclusion that Council of Economic Advisers is not an "agency"); *Soucie v. David*, 448 F.2d 1067, 1070 (D.C. Cir. 1971) (FOIA case, holding Office of Science and Technology was an "agency"); *Indiana v. Biden*, 652 F. Supp. 3d 995, 1006-07 (S.D. Ind. 2023) (FOIA case, holding Domestic Policy Council was not an "agency"); *Democracy Forward Found.*, 356 F. Supp. 3d at 62 (FOIA case, holding White House Office of American Innovation was not an "agency"); *see also Pac. Legal Found. v. Council on Env't Quality*, 636 F.2d 1259, 1261 (D.C. Cir. 1980) (on claim brought pursuant to Sunshine Act's right of action, holding Council on Environmental Quality is an "agency"). Plaintiff has cited not a single case to the contrary.

The remedy available through FOIA is thus undoubtedly adequate. A final ruling on the plaintiff's FOIA claim in the *CREW* FOIA case will determine whether USDS is an agency for FRA and FOIA purposes or not. If the final ruling is that USDS is an agency, USDS will presumably take the necessary steps to conform its recordkeeping and FOIA response protocols accordingly. And regardless of the outcome, that ruling will render Plaintiff's claims here moot. Given that remedy, already underway when Plaintiff filed suit, it appears that the only reason Plaintiff has brought this case at all, and has tried to do so pursuant to the FRA and PRA, is to seek a PI that is far broader than would be appropriate in a FOIA case. To that end, Plaintiff has gone to such lengths in its effort to avoid a FOIA cause of action in this case as to file a separate lawsuit to raise FOIA claims in connection with its first FOIA request. But none of that makes the remedy available under FOIA inadequate. To the contrary, Plaintiff's separate FOIA action, like the *CREW* and *American Oversight* FOIA cases, also seeks a ruling that USDS is an "agency" and thus reinforces the availability of an adequate remedy under FOIA *See POGO* FOIA Compl. ¶¶ 41-42

(alleging that USDS wrongfully withheld agency records).[14] Accordingly, under § 704, the APA's cause of action is not available in this circumstance. For this reason also, Plaintiff's claims are unlikely to succeed.

### C.    The Other Defects that Plaintiff Asserts in the USDS Records Policy Are Not Part of Any Claim and Are Meritless

Plaintiff's Memorandum criticizes the USDS Records Policy in certain respects, but it does not do so in connection with any claim raised in Plaintiff's Amended Complaint. Rather, Plaintiff purports to preemptively respond to an argument it suggests Defendants might make—that the USDS Records Policy "provides an adequate substitute for an FRA-complaint policy." P.Br. 27. Plaintiff then devotes this section of its brief to the argument that the USDS Records Policy is inconsistent with the PRA, evidently conceding that if the USDS Records Policy *were* consistent with the PRA, it *would* be "an adequate substitute." To the extent the point of this argument can be understood at all, it appears aimed more at the supposed risk of irreparable harm than at the merits.

In any event, Plaintiff's suggestion is incorrect. To be sure, the Records Policy is written in a plain language style so that it can be easily understood by USDS employees. To that end, the Policy states that "the basic rule is to preserve all work-related communications and records, regardless of format." That rule mirrors the PRA, which requires preservation of all records "created or received" by an advisory unit employee "in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President," unless (as relevant here) they qualify as "personal" records. 44 U.S.C. § 2201(2).

---

[14] Paragraph 42 of the *POGO* FOIA Complaint asserts that "Defendant DOJ wrongfully withheld agency records," but that appears to be a typo, as USDS, not DOJ, is the defendant in the case.

Plaintiff identifies three supposed inconsistencies, but none is valid. First, Plaintiff suggests that the USDS Records Policy improperly excludes from preservation requirements "[p]urely personal records that have no relation to, or effect on, government work," and "certain materials without historical value, such as notes, drafts, or similar documents that are not circulated or that are not created or saved for purposes of documenting the activities or deliberations of the Administration." P.Br. 27. But the first clause of the description of excluded "personal records" simply incorporates the notion from the PRA's definition that covered records "relate to or have an effect upon the carrying out of" official duties. *See* 44 U.S.C. § 2201(2). It thus states that "[p]urely personal records that have no relation to, or effect on, government work need not be preserved." USDS Records Policy.

The second clause describes materials such as personal notes or an employee's initial drafts that have not been circulated to others or created for the purpose of documenting work activities. The exclusion of such material from the PRA's scope is perfectly valid and consistent with statutory requirements. NARA regulations similarly exclude such material from the category of FRA records. *See* 36 C.F.R. §§ 1222.10, .12 (indicating that "[w]orking files, such as preliminary drafts and rough notes, and other similar materials," qualify as records only if they have been "circulated or made available to" others "for official purposes," and if they "contain unique information, such as substantive annotations or comments, that adds to a proper understanding of the agency's formulation and execution" of its activities). Plaintiff fails to provide any reasoned basis to conclude that the USDS Records Policy is incorrect in suggesting that such material is "personal" and is thus not subject to the PRA's preservation requirements.

Second, Plaintiff argues that the USDS Records Policy is inconsistent with the PRA's requirement in 44 U.S.C. § 2209(a) that any records sent through non-official electronic message

accounts be forwarded to an official account within 20 days. However, the USDS Records Policy directs that employees who receive work-related messages on their personal devices, "whether via text, Signal, a personal email address, or otherwise," must "capture and transmit" those messages to their work device "such as by screenshotting and forwarding." It also states that "[d]isabling auto-delete features on any [personal] messaging services will help with retention and compliance." While not identical to the statutory language, the Policy makes clear that USDS employees are to ensure such messages are preserved.

Third, Plaintiff twists the words of the USDS Records Policy to suggest that it directs USDS employees to copy and preserve only work-related messages *received* through personal messaging apps like Signal, but not messages that are *sent* through such channels. P.Br. 28. The Policy makes no such distinction. Instead, it makes clear that employees must preserve "all work-related communications and records, regardless of format." It specifically reminds employees that "the easiest way to comply with these obligations is to use work devices for all work-related activities." It then states that, for any "work-related messages" that an employee nevertheless happens to receive on a personal device, they must be captured and transmitted to the employee's work device. The Policy does not address messages that an employee might *send* through private channels more specifically because it advises that employees should avoid using such channels in the first place. But the overall direction is clear—if an employee were to send a work-related message through Signal, the Policy requires that such a message be preserved because it would be a "work-related communication[], . . . regardless of format."

Plaintiff's suggestion that the "gaps and differences" created by these supposed inconsistencies "raise a substantial risk that not all records will be preserved," P.Br. 29, is thus far fetched and entirely unsupported. Plaintiff's further vague reference to the differences between

"what qualifies as a record and the respective retention obligations" under the PRA and FOIA adds nothing to its argument because, as explained above, the PRA is broader, not narrower, in scope. Certainly, these vague assertions fail to establish the significant risk of irreparable harm that would be needed to support a preliminary injunction, nor do they show a likelihood of success on the merits.

### D.    Plaintiff Fails To Establish that USDS Is an "Agency"

Finally, Plaintiff is also unlikely to succeed on its central argument that USDS qualifies as an "agency" under FOIA and the FRA. Again, the category of "agencies" subject to the FRA is coextensive with FOIA's definition of "agency" in 5 U.S.C. § 552(a). *Armstrong v. EOP* ("*Armstrong III*"), 90 F.3d 553, 556 (D.C. Cir. 1996). The Supreme Court has recognized that Congress did not intend FOIA to apply to "'the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President.'" *Kissinger*, 445 U.S. at 156 (quoting H.R. Conf. Rep. No. 1380, 93d Cong., 2d Sess. 15 (1974)). The Court thus held that notes made by Henry Kissinger in his role as the President's National Security Adviser were not subject to FOIA. *Id.* at 157-58. When analyzing *Kissinger*, the D.C. Circuit observed that the Supreme Court's interpretation of FOIA relied on the 1974 House Conference Report, issued in connection with the 1974 FOIA amendments, that indicated Congress's intent to codify the D.C. Circuit's earlier decision in *Soucie*. *Meyer*, 981 F.2d at 1291-92. In *Soucie*, the D.C. Circuit held that the then-named Office of Science and Technology—an entity "outside the White House Office, but within the Executive Office of the President," *Soucie*, 448 F.2d at 1074—qualified as an "agency" under FOIA because it exercised "substantial independent authority" beyond advising and assisting the President. *See Meyer*, 981 F.2d at 1291-92 (discussing *Soucie*); *see also Main St. Legal Servs., Inc.*, 811 F.3d at 548 (discussing development of *Soucie* analysis).

The D.C. Circuit has subsequently assessed whether an entity within the EOP qualifies as an "agency" under FOIA by analyzing the entity's function, in order to distinguish between entities that advise and assist the President (which are not subject to FOIA), and those that are substantially independent (which are subject to FOIA). *CREW v. Off. of Admin.*, 566 F.3d at 222. In *Rushforth*, for example, the court found that the Council of Economic Advisers (CEA) is not an "agency" for FOIA purposes because, although the CEA (unlike USDS) has duties prescribed by statute, each of its enumerated statutory duties is directed at providing advice and assistance to the President,[15] and neither the governing statute nor any executive order gives CEA any regulatory power. *Rushforth*, 762 F.2d at 1043; *cf. Meyer*, 981 F.2d at 1292 (discussing *Rushforth*).

Similarly, in *Armstrong III*, the D.C. Circuit found that the National Security Council (NSC) is not a FOIA agency because neither the President nor Congress has delegated any function to the NSC other than that of advising and assisting the President. 90 F.3d at 553. Although NSC is authorized, among other things, to review and provide guidance and direction for the conduct of intelligence activities, and to provide overall policy direction for the information security program, *see id.* at 561, there was no showing that the "NSC exercises meaningful non-advisory authority." *Id.* at 565. As the court found, "to the extent that the NSC assists the President in coordinating the activities of the various agencies with national security responsibilities, it exercises no authority of its own." *Id.* at 561.

Likewise, in *Meyer*, the D.C. Circuit held that the President's ad hoc Task Force on

---

[15] The CEA's governing statute, 15 U.S.C. § 1023, authorizes the CEA to (1) assist and advise the President in the preparation of the Economic Report; (2) gather, compile and submit to the President timely and authoritative information concerning economic developments and economic trends; (3) appraise the various programs and activities of the Federal Government and make recommendations to the President; (4) develop and recommend to the President national economic policies to foster and promote free competitive enterprise; and (5) make and furnish whatever material a President may request on matters of Federal economic policy.

Regulatory Relief was exempt from FOIA, even though the Executive Director of the Task Force (who was the OMB Director) had the authority, among other things, to review regulatory impact analyses (RIAs) and to issue guidelines both for filing the RIAs and for identifying major rules. *Meyer*, 981 F.2d at 1290. In fact, the Executive Order creating the Task Force also gave the OMB Director—subject to the Task Force's guidance—the authority (1) to designate regulations as major rules; (2) to require agencies to seek additional information in connection with a regulation; (3) to require interagency consultation designed to reduce conflicting regulations; (4) to develop procedures for estimating the annual social costs and benefits of regulations; and (5) to prepare recommendations to the President for changes in agency statutes. *See* EO 12291, § 6.

Nevertheless, the D.C. Circuit found that the Task Force lacked "substantial independent authority to direct executive branch officials." *Meyer*, 981 F.2d at 1297 (internal quotation omitted). As the court noted, the Executive Order creating the Task Force specified the President's intent "only to improve the internal management of the Federal Government." *Id.* at 1290 (quoting EO 12291, § 9). And that Executive Order "did not confer any power to prevent an agency from carrying out its legal duty," as it "cautioned that the agencies must follow its provisions only 'to the extent permitted by law.'" *Id.* (quoting EO 12291, § 2).

In *CREW v. Off. of Admin.*, the D.C. Circuit boiled down the proper analysis for determining whether an entity within the Executive Office of the President was an agency into one question—whether the entity at issue "wield[s] substantial authority independently of the President." *CREW*, 566 F.3d at 222. Applying this test to the Office of Administration, which resides within the EOP, the court in *CREW* concluded, based on its review of the Office's charter documents and website, that the Office "lacks substantial independent authority and is therefore not an agency under FOIA." *See id.* More recent decisions applying this test have found, for

example, that the Presidential Advisory Commission on Election Integrity was not an "agency" for purposes of the Paperwork Reduction Act, *United to Protect Democracy v. Presidential Advisory Comm'n on Election Integrity*, 288 F. Supp. 3d 99, 115 (D.D.C. 2017); and that the Office of American Innovation was not a FOIA agency "because it is within the White House Office and because it does not exercise substantial authority independent of the President." *Democracy Forward Found.*, 356 F. Supp. 3d at 64.

By contrast, the D.C. Circuit has held EOP components to be agencies only when they wield significant formal authority independent of the President. In *Soucie*, as discussed, the D.C. Circuit held that OSTP was a FOIA agency because it had independent authority "to evaluate federal scientific research programs, initiate and fund research projects, and award scholarships." *CREW v. Office of Admin*, 566 F.3d at 223 (discussing *Soucie*, 448 F.2d at 1073-75). The court held that OMB was a FOIA agency because it has a statutory duty to provide budget information to Congress, along with "numerous other statutory duties." *Sierra Club v. Andrus*, 581 F.2d 895, 902 (D.C. Cir. 1978), *rev'd on other grounds*, 442 U.S. 347 (1979); *see also id.* at 902 n.25 (noting OMB's authority to "assemble, correlate, revise, reduce, or increase the requests for appropriations of the several departments or establishments"). And the court held that the Council on Environmental Quality (CEQ) is a FOIA agency because it has independent authority to coordinate federal environmental regulatory programs, issue guidelines for preparing environmental impact statements, and promulgate regulations—legally binding on the agencies—for implementing the procedural provisions of the National Environmental Policy Act. *See Pac. Legal Found.*, 636 F.2d at 1262-63.

USDS lacks the formal "substantial independent authority" that would render it an "agency" for purposes of FOIA or the FRA. The full extent of USDS's authority to date is set forth

32

in the EOs and Presidential Memorandum listed above. Under those documents, USDS's role is to initiate a software modernization initiative, requiring agency heads to provide USDS access to their electronic systems, EO 14158; provide advice and recommendations to agencies regarding their hiring plans, EO 14170; provide recommendations to align federal spending with the purposes of EO 14218; coordinate with DHS to enable its review of various electronic systems, EO 14248; and consult with the OMB and OPM Directors regarding a plan to reduce the size of the Federal workforce, Presidential Memorandum. On their face, these functions are purely advisory. In regard to certain initiatives, it is the embedded DOGE Teams—which are part of other agencies, not part of USDS—that play a role regarding new hiring decisions, EO 14210; review of regulations, EO 14219; and assisting in building a centralized payment system, EO 14222.

The Court in the *CREW* FOIA case reached a contrary conclusion—at least, as the Court emphasized, "on th[e] preliminary record" before it when issuing a preservation order. *CREW v. USDS*, 2025 WL 752367, at *10.[16] But that decision, by its own admission, relied heavily on hearsay media reports—which as discussed above are inadmissible and failed to distinguish between USDS as an EOP entity and DOGE Teams within other agencies. *See id.* at *12. It also emphasized the phrasing of EO 14158 when describing the purpose of "the President's 'Department of Government Efficiency'" as to "implement the President's DOGE agenda." *Id.* at *11. Of course, the abstract notion of "implement[ing]" a policy "agenda" cannot be dispositive regarding whether an entity wields substantial independent authority, and as described, the tasks that the EOs assign to USDS are limited and advisory in nature.

Moreover, EO 14158 makes clear that its stated purpose is to be carried out by the totality

---

[16] In contrast to the *CREW* FOIA case, the Court's Minute Order in the *American Oversight* FOIA case, explaining its decision to issue a preservation order, did not address the merits of this issue. Minute Order of Apr. 2, 2025, *Am. Oversight*, No. 1:25-cv-409 (D.D.C. Apr. 2, 2025).

of the "DOGE Structure," which includes not only USDS and USDSTO, but also the DOGE Teams

that are in agencies, selected by agency leadership, and comprised of agency personnel. EO 14158,

§ 3(a)-(c). To the extent any part of the DOGE Structure plays an implementation role, the EOs

indicate that it is the agency DOGE Teams, advising and consulting with agency heads regarding

implementation actions within agencies, as discussed above. The opinion in the *CREW* FOIA case

failed to appreciate this distinction. *E.g.*, *CREW*, 2025 WL 752368, at *11 (describing EO that

"grants the USDS Team Lead the power to keep vacant career positions open unless an agency

overrides their decision"); *id.* at *12 (including "DOGE teams" as part of USDS's "defined staff"

rather than part of an agency's staff). Any authorities or activities of DOGE Teams are irrelevant

to the question of whether USDS itself is an "agency." Of course, the fact that DOGE Teams are

already part of the agencies where they are embedded means that their records are already

governed by the agencies' FRA requirements and are subject to FOIA to the same extent any other

records within those agencies might be. Thus, if the Court reaches this issue, Plaintiff is unlikely

to succeed on the merits here as well.

> **E.**    **The Court Lacks Jurisdiction To Enjoin the President**

To the extent Plaintiff's claims seek declaratory or injunctive relief against the President

himself, they are also unlikely to succeed because no such relief may be awarded. Courts should

not issue injunctive or declaratory relief against the President concerning his performance of

official duties, due to the extraordinary separation of powers concerns that such an order would

raise. *See Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) ("[I]n general this court has no

jurisdiction of a bill to enjoin the President in the performance of his official duties." (citation and

quotation marks omitted)); *Newdow v. Roberts*, 603 F.3d 1002, 1012 (D.C. Cir. 2010) ("A court—

whether via injunctive or declaratory relief—does not sit in judgment of a President's executive

decisions."); *see also id.* at 1013 ("With regard to the President, courts do not have jurisdiction to enjoin him."); *Severino v. Biden*, 71 F.4th 1038, 1042–43 & n.1 (D.C. Cir. 2023) (recognizing the court likely could not order any injunctive relief against the President but declining to dismiss claim because redress was available from other defendants). Apart from all the other defects of Plaintiff's request for preliminary emergency relief, any such relief should not be ordered against the President himself.[17]

## IV.    The Balance of Hardships and Public Interest Do Not Favor Emergency Injunctive Relief

The remaining factors required for preliminary injunctive relief—balancing of the harm to the opposing party and the public interest—also weigh against emergency relief here. These factors merge when the Government is the opposing party. *Nken*, 556 U.S. at 435. Here, the harm to the government and the public is that USDS would be required to overlay its existing USDS Records Policy (not to mention the existing preservation orders issued by the courts in the *CREW* and *American Oversight* FOIA cases, addressing the subsets of records potentially responsive to those plaintiffs' FOIA requests) with yet another Court order requiring preservation of the same records. Even an inadvertent loss of a single record could potentially expose USDS to sanctions, potentially even from three different courts, if the record were potentially responsive to FOIA requests in both *CREW* and *American Oversight*. Such a prospect amounts to burdensome judicial overkill. On the other hand, as explained above, Plaintiff has no legitimate claim to harm in light of USDS's in-place Records Policy that instructs employees to preserve all work-related records and communications. The Court should deny the requested preliminary injunction in this case.

---

[17] The President, moreover, is not an "agency" subject to the FOIA, the APA or the FRA. *See Franklin*, 505 U.S. at 802–03.

**V.      Any Preliminary Injunction Should Require Security**

Finally, the Court should order security with any preliminary injunction. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party fond to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The D.C. Circuit in a per curiam opinion recently noted that "injunction bonds are generally required." *Nat'l Treas. Empl. Union v. Trump.*, No. 25-5157, 2025 WL 1441563, at n.4 (D.C. Cir. May 16, 2025) (rejecting district court's reasoning that a bond would conflict with plaintiff's right to seek judicial review). Thus, in the event the Court issues an injunction here, the Court should require Plaintiff to post an appropriate bond commensurate with the scope of any injunction. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond).

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiff's Renewed Motion for a Preliminary Injunction.

Dated:  May 28, 2025                    Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General
ELIZABETH J. SHAPIRO
Deputy Director, Federal Programs Branch

*/s/ Kathryn L. Wyer*
KATHRYN L. WYER
Federal Programs Branch
U.S. Department of Justice, Civil Division
1100 L Street, N.W., Room 12014
Washington, DC  20005
Tel. (202) 616-8475
kathryn.wyer@usdoj.gov
*Attorneys for Defendants*

36