# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PROJECT ON GOVERNMENT OVERSIGHT, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 25-527 (JEB) |
| | ) |
| DONALD J. TRUMP, et al., | ) |
| | ) |
| Defendants. | ) |

## REPLY IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION .........................................................................................................1

ARGUMENT .................................................................................................................3

I.    Plaintiff Will Suffer Irreparable Harm Absent The Requested Injunction......3

II.    USDS's March 25, 2025 Record keeping Guidance Does Not Obviate The
       Need For A Preliminary Injunction. ..................................................................8

III.   Plaintiff's Claims Are Cognizable Under the FRA And PRA. .......................11

IV.    The FOIA Provides No Remedy For Plaintiff's Adequately Pleaded FRA
       And PRA Claims.......................................................................................... 14

V.     DOGE Exercises Substantial Independent Authority It Is An Agency Subject
       To The FRA .....................................................................................................17

VI.    The Balance Of Hardships Favors The Requested Injunction. ......................21

VII.   A Security Bond Is Not Warranted Here. .......................................................22

CONCLUSION ............................................................................................................23

## **TABLE OF AUTHORITIES**

### **Cases**

*Am. First Legal Found v. Becerra*,
   2024 U.S. Dist. LEXIS 151534 (D.D.C.Aug. 9, 2024) ....................................................13

*Am. Oversight v. U.S. Dep't of Gov't Efficiency*,
   No. 25-cv-409 (D.D.C.Apr. 2, 2025 ........................................................................5

*Animal Legal Def. Fund, Inc. v. Vilsack*,
   111 F.4th 1219 (D.C. Cir. 2024)..........................................................................12

*Armstrong v. Bush*,
   924 F.2d 282 (D.C. Cir. 1991).............................................................................13

*Armstrong v. Exec. Office of the President*,
   F.3d 1274 (D.C.Cir. 1993) ................................................................................ 11

*Armstrong v. Exec. Office of the President*,
   90 F.3d 553 (D.C. Cir. 1996)..............................................................................20

*Competitive Enter. Inst. v. Off. of Science & Tech. Policy*,
   82 F. Supp. 3d 228 (D.D.C. 2015)....................................................................15, 16

*Competitive Enter. Inst. v. Off. of Science & Tech. Policy*,
   No. 14-cv-765, 2016 WL 106776292 (D.D.C. Dec. 12, 2016) .........................................6

*CREW v. Cheney*,
   593 F. Supp. 2d 194 (D.D.C. 2009)...................................................................4, 5

*CREW v. U.S. DOGE Serv.*,
   No. 25-cv-511 (CRC), 2025 U.S. Dist. LEXIS 42869 (D.D.C. Mar. 20, 2025)..............4, 6

*CREW v. USDS*,
   No. 25-cv-511, Opinion and Order, March 19, 2025...............................................18, 19

*DSE, Inc. v. United States*,
   169 F.3d 21 (D.C. Cir. 1999) ............................................................................22

*Feinman v. FBI*,
   713 D. Supp. 2d 70 (D.D.C. 2010) .....................................................................16

*Jones v. U.S. Secret Serv.*,
   701 F. Supp. 3d 4 (D.D.C. 2023)........................................................................12

*Judicial Watch, Inc. v. DOJ,*
  No. 18-cv-154 (RBW), 2018 WL 11457399, (D.D.C. Nov. 13, 2018) ............................7

*Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump,*
  2025 WL 573764 (D. Md. Feb. 21, 2025) ...................................................................22

*Nat'l Council of Nonprofits v. OMB,*
  2025 WL 597959 (D.D.C. Feb. 25, 2025) ...................................................................22

*Nat. Res. Def. Council, Inc. v. Morton,*
  337 F. Supp. 167 (D.D.C. 1971) .................................................................................22

*Norton v. SUWA,*
  542 U.S. 55 (2004) ......................................................................................................14

*Pacito v. Trump,*
  2025 WL 893530 (W.D. Wash. Mar. 24, 2025) ...........................................................22

*P.J.E.S. ex rel. Escobar Francisco v. Wolf,*
  502 F. Supp. 3d 4921 (D.D.C. 2020) ..........................................................................22

*United States v. Philip Morris USA, Inc.,*
  566 F.3d 1095 (D.C. Cir. 2009) ..................................................................................14

## **Statutes**

5 U.S.C. § 552(a)(4)(B) ......................................................................................................15
44 U.S.C. § 2201(2) ............................................................................................................9
44 U.S.C. § 2209(a) ............................................................................................................10

## INTRODUCTION

In opposing Plaintiff's renewed motion for a preliminary injunction Defendants[1] essentially attempt to recast the Amended Complaint as arising under the Freedom of Information Act ("FOIA) and limited to the relief available under that statute. But, as the express claims of the Amended Complaint make clear, Plaintiffs have pled violations of the Federal Records Act ("FRA")—a statute with which Defendants concede they have not complied—and challenge a records policy Defendants issued pursuant to the Presidential Records Act ("PRA") that unlawfully sweeps in federal records. Accepting Defendants' arguments would nullify the FRA and leave agencies like DOGE free to ignore their mandatory FRA-imposed obligations to create and preserve agency records free from any consequences whatsoever. These circumstances give rise to the threatened irreparable loss of agency records that are of great value and interest to Plaintiff and the public and satisfy the requirement that Plaintiff demonstrate irreparable injury absent the requested injunction.

DOGE's efforts to justify their recordkeeping practices and avoid the issuance of a preservation order by citing to recordkeeping guidance they issued under the PRA must fail. The imprecise language of the guidance and the clear gaps between it and the PRA's requirements provide no assurance that DOGE's agency records are being properly maintained and preserved even under the PRA, a statute with no applicability here. Indeed, that guidance supports, not refutes, the need for the requested preservation order.

On the merits of Plaintiff's claims DOGE once again fails to address the growing body of

---

[1] In addition to President Donald Trump, Defendants here include the U.S. Department of Government Efficiency ("DOGE"), the U.S. DOGE Service ("USDS"), the USDS Administrator, and the U.S. DOGE Service Temporary Organization ("USDSTO"). They are referred to herein collectively as "DOGE."

evidence that DOGE is an agency exercising substantial independent authority. Defendants discount the substantial evidence of DOGE's power and authority as inadmissible hearsay. Critically, however, they offer nothing to refute that evidence, relying instead on a series of executive orders and presidential memoranda that actually demonstrate how DOGE is functioning as an agency exercising broad discretion, not merely advising the President. Further, far from the broad programmatic attack that Defendants allege, Plaintiff's claims flow from the failure of DOGE to perform discrete, non-discretionary actions imposed by the FRA, including the creation and implementation of an FRA-compliant recordkeeping policy.

With its actions DOGE has demonstrated an almost unparalleled penchant for secrecy, seeking to shield its actions from judicial review and public accountability. DOGE has launched stealth attacks on agencies, draining their databases for undescribed purposes and putting the sensitive data of countless numbers of Americans at risk. Hundreds of thousands of federal employees and government contractors across 27 federal agencies have lost their jobs because of DOGE's actions, and that number is growing. *See* Sara Dorn, "Trump's Great Rehiring: Over 26,000 Fired By DOGE Likely To Return – So Far," *Forbes*, Apr. 4, 2025, https://www. forbes.com/sites/saradorn/2025/04/04/trumps-great-rehiring-over-26000-fired-by-doge-likely-to-return-so-far/. Exercising unchecked power, DOGE has dismantled and interfered with the functions of federal departments and programs. Perniciously, DOGE has sought to hide its actions by taking control of agency communication systems and communicating with ephemeral message apps designed to ensure no record of the communication is preserved. And it has flaunted its self-proclaimed authority to avoid any judicial scrutiny for whether and how it implements the FRA's document creation and preservation requirements. These are not the actions of an entity that exists solely to advise the President. Nor are they the actions of an entity

holding itself accountable to those it governs.

In these circumstances, the requested preliminary injunction is critical to ensure all of DOGE's records are preserved before DOGE places them forever beyond the reach of the Plaintiff, this Court, and the public, especially as key DOGE members are leaving and heading back to their private sector jobs. *See, e.g.*, Will Steakin and Rachel Scott, "In addition to Musk, multiple top DOGE officials leaving Trump administration: Sources," *ABC News*, May 29, 2025, https://abcnews.go.com/US/addition-musk-multiple-top-doge-officials-leaving-trump/story?id=122321780.

## **ARGUMENT**

### I.    **Plaintiff Will Suffer Irreparable Harm Absent The Requested Injunction.**

Defendants' refusal to comply with the FRA's recordkeeping obligations and its insistence on shrouding itself in secrecy pose a grave risk that DOGE records will not be preserved, depriving Plaintiff, the public, and Congress of the ability to hold DOGE accountable for its actions. Destruction of and failure to preserve federal records yields a loss that cannot be remedied. Nevertheless, Defendants insist there is no imminent risk of harm because "none of Plaintiff's claims have anything to do with the imminent destruction of records." Ds' Opp. at 13. This claim reflects a fundamental misunderstanding of the nature of Plaintiff's claims and evidence necessary to establish irreparable injury when seeking a preservation order like that Plaintiff has requested here.

In support of its standing to bring claims under the FRA and PRA Plaintiff has demonstrated a deep and ongoing interest in a wide range of issues related to DOGE, including but not limited to, conflicts of interest and vetting issues, that go well beyond the subject of its FOIA requests. POGO has expressed that interest through numerous articles it has authored, congressional testimony it has provided, and specific FOIA requests it has made of DOGE and

3

other agencies for DOGE-related documents. POGO has attested to its intent to file requests with DOGE in the future, Brockmyer Decl. ¶ 10, seeking records that would expand on POGO's knowledge about how DOGE and its leaders operate. Accordingly, while the underlying merits of Plaintiff's FRA and PRA claims do not challenge the threatened destruction of DOGE's agency records, they rest on a demonstrated interest in and need for access to DOGE's records now and in the future—an interest that cannot be satisfied if those records are not preserved. Accordingly, the requested injunction corresponds directly to the nature of Plaintiff's alleged harm.

Plaintiff's equities in the full swath of DOGE records differ significantly from the interests a FOIA requester has in preserving records responsive only to its FOIA request—the situation in both the *CREW* and *American Oversight* cases. In this regard, Plaintiff stands in similar shoes as those of the plaintiff in *CREW v. Cheney*, 593 F. Supp. 2d 194 (D.D.C. 2009), where the court issued a preliminary injunction requiring the preservation of *all* vice presidential records to ensure their availability "for future generations." *Id.* at 340. There, as here, the parties disagreed as to the scope of the government recordkeeping statute. And while, as Defendants point out, the injunction ultimately was vacated when the court granted summary judgment for the defendants, it was not—as Defendants falsely suggest—because the court determined that, contrary to its earlier finding, plaintiffs had failed to substantiate an imminent risk of destruction. *See* Ds' Opp. at 19; *CREW v. Cheney*, 593 F. Supp. 2d at 231. Instead, at the summary judgment stage, the Court concluded the plaintiffs had failed to demonstrate that all vice-presidential records were not being treated as such and properly preserved under the PRA.

DOGE also argues that POGO will suffer no harm because DOGE adheres to the PRA, pointing to the attestation of Administrator Amy Gleason that USDS is preserving records

pursuant to a recordkeeping policy. Ds' Opp. at 14. But, as Defendants concede, Ms. Gleason made that representation before the March 25, 2025 records policy went into effect. And while that policy, as Defendants point out, references "prior USDS records retention policy," *see id.*, it provides no details about that prior policy or what, if any, specific assurances Ms. Gleason was provided, giving the Court no basis to conclude it properly reflects the requirements of either the PRA or the FRA. In short, without more, the vague reference to some prior policy of unknown origin, date, or contents provided to an unknown number of DOGE employees provides no "sign" whatsoever that Defendants take their preservation obligations seriously.

The need for a preservation order in these circumstances is further underscored by the differences between "what qualifies as a record and the respective retention obligations" under the FOIA and PRA. *Am. Oversight v. U.S. Dep't of Gov't Efficiency*, No. 25-cv-409 (D.D.C. Apr. 2, 2025), Minute Order. Those differences coupled with DOGE's refusal to acknowledge its preservation obligations under the FRA led Judge Beryl A. Howell to issue a preservation order, *id.,* a course this Court should follow for identical reasons. Defendants dismiss this language as nothing more than a "bare statement" not backed up by any explanation beyond the fact that the calendar entries of Elon Musk sought by the plaintiff in that case would not be covered by the FRA. Ds' Opp. at 14 n.5. Here, however, Plaintiff seeks a preservation order that would encompass all of DOGE's records, not merely those responsive to a specific FOIA request.

In short, Plaintiff's need for access to DOGE's records extends well beyond the specific records it has requested in specific FOIA requests to instead encompass broad areas of interest and concern in how DOGE functions and on what authority. In this context, the differences in scope between the PRA and FRA matter. Tellingly, Defendants offer no argument that the FRA and PRA impose identical obligations, instead stressing the differences between the two

recordkeeping regimes. *See* Ds' Opp. at 3-4, 14-15. And while Defendants suggest the PRA's scope of what constitutes a presidential record exceeds that of the FRA, *id.* at 14, they ignore the contradictions between their recordkeeping policy purporting to implement the PRA and what the PRA, in fact, requires. As explained in Plaintiff's opening brief, the conflicts between Defendants' recordkeeping policy and key provisions of the PRA illustrate precisely why a preliminary injunction is necessary and appropriate here to obviate the risk that DOGE's records will not be fully preserved even under the PRA. *See* P's Renewed PI Mem. at 27-29.

Defendants also challenge what they describe as the lack of "any direct indication that any specific USDS records are at risk of imminent destruction." Ds' Opp. at 15. But, as set forth in Plaintiff's opening brief, two other judges facing comparable requests for preliminary injunctions to preserve DOGE records under comparable circumstances concluded preservation orders were necessary based on a range of facts also present here. *See* P's Renewed PI Mem. at 33-34. Defendants dismiss these opinions as few in number but fail to offer any persuasive argument on how or why they were wrongly decided. *See* Ds' Opp. at 17-18. Instead, Defendants mischaracterize the *CREW* decision as involving only a processing order, ignoring the preservation order the court also imposed. *Id.* at 18.

Defendants also quibble with Plaintiff's citation to *Competitive Enter. Inst. v. Off. of Science & Tech. Policy*, No. 14-cv-765, 2016 WL 10676292, at *2 (D.D.C. Dec. 12, 2016), where the court relied in part on the status of the records custodian as a political appointee soon to leave office to justify a preservation order. *See* Ds' Opp. at 18. But, as Defendants conveniently ignore, that is the precise situation here. Elon Musk—whose precise role at DOGE has never been fully explained—has declared his departure, his "Chief Lieutenant" also has departed, other political appointees with uncertain tenures staff DOGE, and media reports

abound on the otherwise high turnover at DOGE. *See, e.g.*, Shalini Ramachandran & Josh

Dawsey, "Elon Musk's Chief Lieutenant at DOGE Leaves Agency," *Wall Street Journal*, May

29, 2025, https://www.wsj.com/us-news/steve-davis-leaves-doge-411a2d1b; Alex Gangitano,

"Top DOGE officials leaving as Musk departs," *The Hill*, May 29, 2025), https://thehill.com/

homenews/administration/5324467-doge-officials-exit-trump-adminstration/. These facts

coupled with the lack of any evidence that DOGE employees—many of them new to

government and lacking any experience with handling government records—are knowledgeable

about any recordkeeping policy provide a recipe for disaster or, at least, a high risk of document

destruction.

 Moreover, the mere existence of a recordkeeping policy standing alone— particularly

one formulated under the PRA, not the FRA, which controls here— fails to establish that DOGE

employees are in fact complying with that policy. Nor does it counter the evidence Plaintiff has

offered that DOGE records are at risk of destruction because of the actions of DOGE employees.

As outlined in Plaintiff's memorandum in support of its renewed motion for a preliminary

injunction, the secrecy in which DOGE operates and its reported use of messaging apps that are

designed to erase messages after a specified time provide strong evidence that DOGE's records

are at risk. *See* P's Renewed PI Mem. at 31. And that risk continues. At bottom, the absence of

countervailing evidence speaks volumes about the palpable risk of records being destroyed,

whether by design or accident, absent the requested preliminary injunction.

 In arguing to the contrary, Defendants also rely on *Judicial Watch, Inc. v. DOJ*, No. 18-

cv- 154 (RBW), 2018 WL 11457399, (D.D.C. Nov. 13, 2018). *See* Ds' Opp. at 17. In that case,

however, the court refused to enter a preservation order based on two factors not present here.

First, the National Archives and Records Administration had already conducted an investigation

of the deleted emails at issue and concluded no records were lost or removed, thereby eliminating the need for a preservation order. Second, the court pointed to the sworn declarations of the two individuals whose emails were at issue, in which they testified they were complying with their preservation obligations. Tellingly, no such evidence exists here.

## II.    USDS's March 25, 2025 Recordkeeping Guidance Does Not Obviate The Need For A Preliminary Injunction.

Although Defendants rely in part on the March 25, 2025 recordkeeping guidance to negate the need for a preservation order, they argue at the same time it has no place in the Court's consideration because it forms no part of any claim raised in the Amended Complaint. Ds' Opp. at 26. Again, Defendants confuse evidence supporting the need for a temporary preservation order—like the 2025 guidance—with the merits of Plaintiff's claims, which are two distinct things. And they ignore that Defendants introduced the recordkeeping guidance into the record in the first place in responding to Plaintiff's initial motion for a preliminary injunction, highlighting Defendants' belief of its relevance to the present motion.

Defendants also offer tepid and unconvincing arguments on why their PRA guidance aligns with the statute. Defendants justify its lack of precision as the product of "a plain language style[.]" Ds' Opp. at 26. To the contrary, the language seems purposely designed to narrow the scope of records falling within the PRA in conflict with the language of the statute itself. For example, Defendants argue the policy's reference to the requirement to preserve "all work-related communications and records . . . mirrors the PRA." *Id.* But the PRA does not employ this language; instead, it defines a presidential record much more specifically and precisely as:

> documentary materials, or any reasonably segregable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect

> upon the carrying out of the constitutional, statutory, or other official
> or ceremonial duties of the President. Such term— (A) includes any
> documentary materials relating to the political activities of the
> President or members of the President's staff, but only if such
> activities relate to or have a direct effect upon the carrying out of
> constitutional, statutory, or other official or ceremonial duties of the
> President[,]

44 U.S.C. § 2201(2). The term "work-related" simply fails to capture the breadth of the PRA's definition of record.

Beyond this Defendants take issue with three key inconsistencies between the PRA and Defendants' guidance that Plaintiff has identified. *See* P's Renewed PI Mem. at 27-29. First, they insist the policy's exclusion from its reach of "[p]urely personal records that have no relation to, or effect on, government work" and "certain materials without historical value" corresponds with the PRA's definition of excluded records. But the policy never defines the otherwise vague term "government work," leaving it to each DOGE employee to determine its meaning, divorced from the very specific language of the PRA.

Defendants also offer no justification for the policy's exclusion of "certain materials without historical value"—another term absent from the PRA. The policy suggests this category includes uncirculated "notes, drafts, or similar documents." *See* Ds' Opp. at 27. Defendants offer the self-serving explanation that this term is "perfectly valid and consistent with statutory requirements," *id.*, but point to no provision in the PRA that mirrors this exclusion. Instead, Defendants note it tracks NARA's regulations implementing the *FRA's* exclusions. *Id.* But this merely highlights the differences in scope between the FRA and PRA. At bottom both exclusions in Defendants' PRA policy impose a gloss that the statute itself fails to support.

Second, Defendants fail to address the gap between the PRA's use of "official messaging account[s]" as the appropriate means of storing messages received on unofficial accounts and the

9

policy's reference to "work device[s]," another undefined term. Nor have Defendants proffered any evidence that DOGE has in place an automated means of archiving messages despite Plaintiff's identification of this evidentiary gap. *See* P's Renewed PI Mem. at 28.

Third, Defendants offer no cogent justification for the policy's failure to address work-related messages *sent* (versus received) on personal devices, suggesting instead that Plaintiff has "twist[ed] the words of the USDS Records Policy[.]" Ds' Opp. at 28. But Defendants cannot ignore that the PRA explicitly address both work-related messages sent and received on personal devices, *see* 44 U.S.C. § 2209(a), while the March 25, 2025 guidance does not. Ensuring preservation of both types of messages is especially critical at DOGE given the reports of its employees using ephemeral messaging apps like Signal to conduct official business.

Defendants' one-page 2025 PRA guidance stands in stark contrast to the PRA recordkeeping guidance from the first Trump presidency. *See* Memorandum For All Personnel re: Presidential Records Act Obligations, Feb. 22, 2017, www.archives.gov/files/foia/Memo% 20to%20WH%20Staff%20Re%20Presidential%20Records%20Act%20(Trump,%2002-22- 17)_redacted%20(1).pdf. That memo outlined each employee's obligation to preserve and maintain presidential records under the PRA and, unlike the guidance at issue here, tracks the language of the PRA in explaining the statute's requirements. For example, in explaining what a presidential record is the memo cites directly to the PRA's definition.

In sum, Defendants' one-page 2025 PRA guidance suffers from numerous flaws that cannot be explained away as "plain language." The importance of ensuring the preservation of both federal and presidential records, especially those coming from an entity as powerful and influential as DOGE, cannot be overstated: they represent a critical piece of our nation's history. The flaws, omissions, and imprecise language of DOGE's 2025 guidance threaten the

preservation of that history and raise a question as to why DOGE has opted to deviate from the statute's precise language. At a minimum, they evidence the significant risk that DOGE's records will not be preserved, a risk justifying the requested preservation order.

### III.    Plaintiff's Claims Are Cognizable Under the FRA And PRA.

In arguing that the Administrative Procedure Act ("APA") recognizes only a challenge to the adequacy of a specific recordkeeping guideline or directive, Ds' Opp. at 21, Defendants essentially seek to immunize from judicial review their conduct and the conduct of any entity that ignores its recordkeeping obligations entirely. There is no support for such a radical position, which would allow DOGE to continue to ignore its responsibilities under the FRA solely because a specific records guideline or directive does not address its conduct. This makes no sense from a legal and practice perspective and, even more critically, ignores binding precedent that supports the very claims Plaintiff has raised here.

First, Defendants are wrong that Plaintiff has failed to challenge a discrete guideline, policy, or practice. Claim One specifically claims that recordkeeping guidelines issued or implemented by Defendants violate both the PRA and the FRA. *See* Am. Compl. ¶¶ 68-74. In support, the Amended Complaint expressly references the March 25, 2025 PRA records policy. *Id.* at ¶¶ 64-65. As such, this claim draws direct support from *Armstrong v. Exec. Office of the President*, 1 F.3d 1274, 1293 (D.C. Cir. 1993), recognizing the viability of claims challenging "guidelines that purport to implement the PRA." Here, that means the formal recordkeeping policy DOGE has just adopted and Defendants' prior expressed intent to control DOGE records by treating them as presidential records are subject to this Court's review. As part of that review, the Court must give full force to the PRA's definition of presidential records and its exclusion of agency records, because "the FOIA trumps the definition of 'agency' records in the PRA." *Id.* Thus, Plaintiff raises a clearly permissible challenge under the PRA

that is subject to this Court's review.

Defendants essentially ignore this binding authority and the specificity of Plaintiff's claims as spelled out in the Amended Complaint, and make the nonsensical claim that the challenged March 25, 2025 PRA policy is merely part of a "policy and practice" not properly subject to judicial review. Ds' Opp. at 21. The irony of their position cannot be overstated—when Plaintiff failed to include the policy in its initial complaint (because it had not yet been issued) Defendants' counsel challenged that omission during the May 2, 2025 Preliminary Injunction Hearing and, at the Court's suggestion, Plaintiff subsequently amended its complaint to include both the policy and its newly-submitted FOIA request to DOGE.

Moreover, Defendants provide no support for their suggestion that a challenge to an agency's policy and practice fails to state a claim under the APA. Instead, they argue that a policy and practice claim is really a request for "broad programmatic relief" that the APA prohibits. Ds' Opp. at 22. But the cases they cite do not support this conclusion. The issue in *Animal Legal Def. Fund, Inc. v. Vilsack*, 111 F.4th 1219 (D.C. Cir. 2024), was standing, not the viability of a policy and practice claim. Nevertheless, Defendants cite to Judge Katsas's concurrence, which strayed well beyond the issue of standing before the court to observe that, in his view, the plaintiff's challenge to an agency pattern was more a programmatic challenge not subject to APA review. *Id.* at 1232. As pure dicta lacking any meaningful analysis it provides no basis to similarly construe Plaintiff's claims here.

Defendants' reliance on *Jones v. U.S. Secret Serv.*, 701 F. Supp. 3d 4 (D.D.C. 2023), is equally misplaced. That court dismissed the APA claim challenging the failure of the Secret Service to adequately train officer in how to deal with a specified situation because "the Complaint [was] devoid of any allegation that the agency is required to train its officers 'in dealing with the members of the public who are recording video.'" *Id.* at 19 (cleaned up). Here,

by contrast, the Amended Complaint contains allegations concerning the discrete, mandatory obligations of the FRA that Defendants have failed to perform and Defendants do not demonstrate otherwise.

Moreover, because Defendants have opted out entirely of an FRA recordkeeping system, disclaiming its applicability in the first place, there is no specific guideline or directive in place under the FRA for Plaintiff to challenge. As courts have recognized, where, as here, an agency ignores entirely its statutory obligations the court has a role to play—any other conclusion would leave DOGE free to flout its mandatory recordkeeping obligations free from any consequences whatsoever.

For example, in *Am. First Legal Found v. Becerra*, 2024 U.S. Dist. LEXIS 151534 (D.D.C. Aug. 9, 2024), the court considered a challenge under the FRA to the practice of the CDC to delete the emails of its former employees. The court relied in part, on precedent in *Armstrong v. Bush*, 924 F.2d 282, 293-94 (D.C. Cir. 1991), that courts may hear an APA-based challenge under the FRA claiming "that an agency failed to employ adequate recordkeeping guidelines and directives[.]" 2024 U.S. Dist. LEXIS 151534, *34 (cleaned up). This precedent supported judicial review of a challenge to an agency's compliance "with whatever on-public recordkeeping policy the agency chose to adopt in its stead." *Id.* at *36. Here, too, this precedent recognizes this Court's ability to review Plaintiff's challenge to the failure of DOGE to adopt FRA-compliant recordkeeping guidance.

As the Amended Complaint makes clear, Plaintiff seeks to compel Defendants under the APA to perform the discrete, nondiscretionary actions that the FRA imposes on them, including the adoption and implementation of a recordkeeping policy under the FRA (not the PRA) and the creation, maintenance and preservation of records pursuant to that policy. This is a far cry from

the relief at issue in *Norton v. SUWA*, 542 U.S. 55, 66 (2004) (cited in Ds' Opp. at 20), where the plaintiff was seeking relief that asked the court to oversee "general deficiencies in compliance." *Id.* Unlike *Norton*, Plaintiff here has not asked this Court to dictate the contents of DOGE's recordkeeping policy or to take specified actions to compel agency compliance with that policy—actions more akin to those the *Norton* court found could not justify an injunction. Instead, Plaintiff merely seeks to compel DOGE to adopt and implement a recordkeeping policy under the FRA. As such, the requested relief "sufficiently specif[ies] the activities enjoined as to provide Defendants with fair notice of the prohibited conduct," rather than "abstractly enjoin[ing] Defendants from violating" the FRA. *United States v. Philip Morris USA, Inc.,* 566 F.3d 1095, 1137 (D.C. Cir. 2009) (cited in Ds' Opp. Mem. at 20).

Further, judicial review here would not require the court to issue "broad, programmatic relief" that would require undertaking "an ongoing oversight rol[e.]" Ds' Opp. at 22. Instead, Plaintiff has asked the Court to "compel[] Defendants to comply with their statutory duties to treat the records of DOGE, USDS and USDSTO as agency records subject to the FRA and the FOIA." Am. Compl. ¶ 80. This is achieved through the discrete action of adopting and implementing a recordkeeping policy under the FRA, no less and no more.

## IV.    The FOIA Provides No Remedy For Plaintiff's Adequately Pleaded FRA And PRA Claims.

Defendants make the remarkable argument that no APA review lies here because Plaintiff has an adequate remedy under the FOIA. This is so, Defendants argue, because four separate cases involving FOIA requests of DOGE also seek a determination that DOGE is an agency. Ds' Opp. at 23.[2] While inventive, this argument improperly conflates the FOIA and FRA and has no support in law or logic.

---

[2]    The *CREW* case is now before the Supreme Court but solely on the issue of whether the district court properly granted the plaintiff leave to conduct discovery.

First, the FOIA confers on district courts "jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). The underlying relief Plaintiff's Amended Complaint seeks here, however, is not the production of specifically requested records under the FOIA that an agency has wrongfully withheld. Rather, Plaintiff seeks a ruling compelling Defendants to comply with their mandatory recordkeeping obligations under the FRA and invalidating a records policy Defendants issued pursuant to the PRA. The two kinds of relief could not be more different.

Second, the fact that both FOIA and FRA cases rest on a defendant's agency status as defined in the APA and may implicate overlapping defenses does not mean the two types of cases are interchangeable or comparable for purposes of APA review. Nor do the cases Defendants cite provide otherwise. Indeed, *Competitive Ent. Inst. v. Off. of Science & Tech. Policy* ("*CEI*"), 82 F. Supp 3d 228 (D.D.C. 2015), cited in Ds' Opp. at 23, provides to the contrary. The plaintiff in that case brought its suit under the FOIA, not the FRA, and raised the issue of whether the agency had control over an employee's personal email account for purposes of responding to a FOIA request. In response to the plaintiff's expressed concern that if the court ruled the agency lacked control agency employees would escape FOIA coverage by using their personal accounts the Court stated:

> Congress never intended when it enacted [] FOIA, to displace the statutory scheme embodied in the Federal Records Act and the Federal Records Disposal Act providing for administrative remedies to safeguard against wrongful removal of agency records as well as to retrieve wrongfully removed records.

*Id.* at 234. To be sure, the court dismissed the APA claim but expressly because it sought a remedy "made available by FOIA." *Id.* (cleaned up). Here, by contrast, the FOIA provides no

remedy for violations of the FRA and PRA that, as the *CEI* court recognized, are not displaced by the FOIA.

Another case on which Defendants rely for their novel argument, *Feinman v. FBI*, 713 F. Supp. 2d 70 (D.D.C. 2010), is similarly inapt. The plaintiff in that case challenged the agency's procedural policies for processing FOIA requests and thus raised a claim falling squarely within the statutory and equitable remedies available under the FOIA. *See id.* at 77. This ruling accords with the judicial recognition that courts lack jurisdiction over APA claims seeking remedies available under the FOIA, *id.*, which is not the case here where Plaintiff seeks to compel DOGE's compliance with the FRA.

Third, Defendants' argument that review may be found here only under the FOIA rests on a misconstruction of Plaintiff's claims. DOGE's status as an agency is not a claim, standing alone, for which Plaintiff seeks relief. Rather, it is a necessary predicate to the application of the FRA to DOGE's records. Moreover, it is Defendants—not Plaintiff—that have raised the defense that the FRA does not apply because DOGE is not an agency. And the relief Plaintiff seeks, by its express terms, omits any reference to a declaration that DOGE is an agency. See Am. Compl., Prayer for Relief, ¶¶ 1-3.

Fourth, that the question of a defendant's agency status typically arises in the FOIA context provides no basis to bar Plaintiff's FRA claims here. As discussed, Plaintiff has raised viable FRA and PRA claims for which this Court has jurisdiction under the APA. Nothing in the cases Defendants cite, Ds' Op. at 24-25, even hints at the FOIA as being the exclusive avenue for resolving an agency's failure to comply with the FRA because it holds itself out as a PRA entity—the situation here.

Finally, there can be no serious question that the remedies available under the FOIA are

far from adequate to address Defendants' noncompliance with the FRA. A determination in any

of the other four cases raising the issue of DOGE's agency status will not remedy the claim for

which Plaintiff seeks declaratory and injunctive relief compelling Defendants to adopt and

implement recordkeeping guidance implementing the FRA. Ironically, Defendants charge

Plaintiff with going to great lengths to avoid a FOIA cause of action, Ds' Opp. at 25, when it is

Defendants who seek to avoid resolution of their agency status because of the broad

ramifications of such a ruling beyond the FRA.

> **V.      Because DOGE Exercises Substantial Independent Authority
> It Is An Agency Subject To The FRA.**

As Defendants concede, DOGE was born out of an FRA entity housed within OMB, the

U.S. Digital Service. ("USDS"). Although recast by executive order as a new entity divorced

from OMB, DOGE has been charged with responsibilities that echo many of those with which

USDS was charged and apparently enjoys much of the same independence and authority that

USDS exercised. *See, e.g.*, Natalie Alms, "White House budget request includes $45 million in

additional DOGE funding," *Nextgov,com*, June 2, 2025, https://www.nextgov.com/
policy/2025/06/white-house-budget-request-includes-45-million-doge-funding/405744/

(describing the budgetary request for DOGE to implement a "software modernization initiative"

as "a setup that the U.S. Digital Service was using before President Donald Trump remade the

organization into DOGE."). Nevertheless, Defendants insist DOGE is not an agency but, instead,

exists solely to advise the President.

To the contrary, as multiple courts have concluded, DOGE is an agency because it

exercises substantial independent authority, the touchstone for determining agency status of

those entities like DOGE that are housed within the Executive Office of the President. In

reaching this conclusion those courts have pointed to the myriad independent actions DOGE has

taken as catalogued in numerous press reports and its governing executive order charging DOGE

with implementing the President's DOGE agenda. As summarized by Judge Cooper in an order

denying DOGE's motion for reconsideration, DOGE "has reportedly led the charge on personnel

cuts across federal agencies; eliminated government contracts, and sent teams of employees to

federal agencies to gain access to sensitive and classified data." *CREW v. USDS*, No. 25-cv-511,

Opinion and Order, March 19, 2025 (ECF No. 23). Neither here nor in any other case have

Defendants proffered any evidence to undermine these conclusions beyond labelling the news

reports as inadmissible hearsay and pointing to executive orders and presidential memoranda that

mention DOGE. As Judge Cooper pointed out, however, DOGE's decision to "deliberately . . .

forego" a "host of arguments" as to why it is not an agency was a "litigation choice[.]" *Id.*

Apparently DOGE has made that same litigation choice here, leading to the conclusion it has

nothing substantive to rebut the evidence of its substantial independent authority. That may, I

fact, explain why DOGE is resisting discovery so vigorously.

   At the same time, stories mount about the substantial independent authority DOGE

continues to wield. For example, a March 3, 2025 press report explains DOGE's role in

deactivating thousands of credit cards issued to government agencies and individuals. *See* Kate

Knibbs & Aarian Marshall, "Elon Musk's $1 Spending Limit Is Paralyzing Federal Agencies,"

*Wired*, Mar. 3, 2025, https://www.wired.com/story/doge-elon-musk-spending-cuts-federal-

workers/. The results have been near catastrophic, threatening mission-critical projects across

the government. While nominally done in the interest of preventing fraud, federal employees

note that "[t]here are so many controls in place to make sure fraud doesn't happen[.]" *Id. See*

*also* Hannah Natanson, Lisa Rein & Maryl Kornfield, "How DOGE's grand plan to remake

Social Security is backfiring," *Washington Post*, May 16, 2025, https://www.washingtonpost.

com/politics/2025/05/16/doge-social-security-musk-trump-cuts/; Dan Diamond, Hannah

Natanson & Carolyn Y. Johnson, "DOGE takes over federal grants website, wresting control of

billions," *Washington Post*, Apr. 11, 2025, https://www.washingtonpost.com/politics/2025/

04/11/doge-controls-federal-grant-postings/.

     In labelling the numerous and growing press reports of DOGE's substantive actions as

mere hearsay, Defendants ask this Court to turn a blind eye to the reality of what is playing out

throughout the federal government. According to Defendants, this Court should ignore that

DOGE is leading the charge to eliminate entire agencies; that DOGE has directed the layoffs of

hundreds of thousands of federal employees and government contractors across 27 agencies, *see*

Dorn, *Forbes*, Apr. 4, 2025; that DOGE is directing the collection of a vast swath of sensitive

data across the government for unexplained reasons; and that DOGE has emerged as the most

powerful entity in President Donald Trump's administration all because these actions have been

reported in the press. But the fact that only the press has been able to pierce the veil of secrecy

surrounding DOGE heightens, not detracts from, the utility of its reporting. At a minimum, the

reality of how DOGE operates raises a factual question of its agency status that can be resolved

only through discovery. *See CREW v. USDS*, No. 25-cv-511, Opinion and Order, March 19,

2025, at 12.

     In lieu of evidence demonstrating how DOGE in fact functions, Defendants point to a

number of executive orders and presidential memoranda charging OMB with consulting,

coordinating, and advising together with DOGE and other entities on various issues. Defendants

argue these orders and memoranda constitute "[t]he full extent of USDS's authority to date[.]"

Ds' Opp. at 32. But while these presidential EOs and memoranda outline DOGE's

responsibilities, among those of other agencies, none involves providing advice and assistance to

the president. To the contrary, they illustrate how DOGE has been given a substantive role such as the "initiat[ion] of a software modernization initiative." Ds' Opp. at 33. They outline tasks for USDS and DOGE agency teams, working with OMB and other agencies, to gather information; slash the government workforce (EO 14210); and terminate government contracts, grants, and leases. *See, e.g.*, Anna Bower, "On DOGE, Directives, and DOJ," *Lawfare*, Apr. 27, 2025, https://www.lawfaremedia.org/article/on-doge--directives--and-doj (detailing DOGE's role in terminating government contracts with Acacia Center for Justice and including emails dictating that termination). They thrust DOGE into hiring decisions (EO 14210), charge it with developing a federal hiring plan (EO 14170), making spending decisions at the border (EO 14218), assisting agencies in building a centralized technology system (EO 14222), and reviewing state voter registration lists (EO 14248). These are not the actions and authorities of an entity that solely advises and assists the president.

Further, Defendants overlook the most applicable executive order—Executive Order 14158—creating DOGE and charging it with "*implement[ing]* the President's DOGE agenda[.]" (emphasis added). Defendants dismiss this language as nothing more than an "abstract notion," Ds' Opp. at 33, but it is no more abstract than the language of the other orders on which Defendants rely. Moreover, as the D.C. Circuit has recognized, "the more general the goal" set by a president for an entity within the EOP "the greater the likelihood that the responsible entity is vested with some element of discretion and is not just advising or assisting the President." *Armstrong v. Exec. Office of the President*, 90 F.3d 553, 565 (D.C. Cir. 1996). In charging DOGE with the broad goal of implementing his DOGE agenda President Trump clearly vested DOGE with substantial discretion. That charge as memorialized in EO 14158, when coupled with the actual actions of DOGE, amply supports DOGE's agency status.

Finally on the question of DOGE's agency status Defendants point to the DOGE teams embedded within agencies and suggest it is those teams that are actually implementing the President's DOGE agenda. Ds' Opp. at 34. According to Defendants, because the DOGE teams are agency employees their records are governed by the FRA, implying a preservation order is unnecessary. *Id.* Here too, however, Defendants have offered no evidence whatsoever about how those DOGE teams function, the specific tasks they perform, and at whose direction. In fact, as press reports document, those teams are working hand in hand with DOGE employees. *See, e.g.*, Alms, *Nextgov.com*, June, 2, 2025. This Court simply has no basis to conclude that an order requiring the preservation of all DOGE records is unnecessary because all DOGE records currently are being preserved as federal records under the FRA.

## VI.    The Balance Of Hardships Favors The Requested Injunction.

Defendants argue that "yet another Court order requiring the preservation of the same records" that currently are subject to other preservation orders would cause them harm that outweighs the public interest and would constitute "judicial overkill." Ds' Opp. at 35. But defendants ignore a key difference between the *CREW* and *American Oversight* cases and this one: here Plaintiff seeks a preservation order covering *all* DOGE records, not merely those responsive to specific FOIA requests. Thus, far from "judicial overkill," the requested preservation order would fill in a critical gap between the records at issue in those FOIA cases and this one.

Defendants further argue they would be harmed by the requested injunction because "an inadvertent loss of a single record could potentially subject USDS to sanctions[.]" Ds' Opp. at 35. This could be said about any preservation order, however. Moreover, although Defendants risk sanctions for the purposeful destruction of documents subject to a preservation order there is

nothing to suggest they would be sanctioned for "an inadvertent loss."

In short, Defendants' failure to offer any compelling reason for denying the requested

relief highlights why that relief is necessary.[3]

**VII.    A Security Bond Is Not Warranted Here.**

Finally, Defendants argue the Court should order Plaintiff to post a security bond based

solely on the language of Fed. R. Civ. P. 65(c). Ds' Opp. at 36. Defendants overlook the "broad

discretion" that Rule 65(c) vests in district courts "to determine the appropriate amount of an

injunction bond," *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), "including the

discretion to require no bond at all[.]" *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp.

3d 4921, 520 (D.D.C. 2020). A bond is especially unnecessary where the defendants will

personally face no monetary injury from the injunction. *Nat. Res. Def. Council, Inc. v. Morton*,

337 F. Supp. 167, 168 (D.D.C. 1971).

Here, where Plaintiff's claims do not seek the expenditure of money or monetary

damages and the balance of equities tilts strongly in Plaintiff's favor, a bond would not be

appropriate. *See Nat'l Council of Nonprofits v. OMB*, 2025 WL 597959, at *19 (D.D.C. Feb. 25,

2025) (denying request for injunction bond); *Pacito v. Trump*, 2025 WL 893530, at *14 (W.D.

Wash. Mar. 24, 2025) (denying injunction bond in a case involving expenditure of money); *Nat'l

Ass'n of Diversity Officers in Higher Educ. v. Trump*, 2025 WL 573764, at *29 (D. Md. Feb. 21,

2025) (setting a nominal bond of zero dollars because granting the defendants' request "would

essentially forestall [the] [p]laintiffs' access to judicial review"). Indeed, Defendants offer no

monetary justification for a bond, relying solely on the language of Rule 65(c). In any event

---

[3]    Defendants further argue that the Court lacks jurisdiction to enjoin the President. Ds'
Opp. at 34-35. The Court need not resolve this issue in the context of the requested preliminary
injunction, which would not require the President himself to take any specific action.

Defendants' requested bond  appears to be part of a larger effort by the Trump administration, as reflected in  a March 11, 2025 presidential memorandum, "Ensuring the Enforcement of Federal Rule of Civil Procedure 65(c)," https://www.whitehouse.gov/presidentialactions/2025/03/ensuring-the-enforcement-of-federal-rule-of-civil-procedure-65c/, to intimidate and dissuade lawful and legitimate challenges to administration policies that are plainly unlawful.

## **CONCLUSION**

For the foregoing reasons and those set forth in Plaintiff's opening brief, the Court should grant Plaintiff's renewed motion for a preliminary injunction.

Respectfully submitted,

/s/Anne L. Weismann
Anne L. Weismann (D.C. Bar No. 298190)
5335 Wisconsin Avenue, NW, Suite 640
Washington, D.C. 20015
(301) 717-6610
Weismann.anne@gmail.com

Dated: June 4, 2025                 *Attorney for Plaintiff*