UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PROJECT ON GOVERNMENT OVERSIGHT, INC., <br><br> Plaintiff, <br><br> v. <br><br> DONALD J. TRUMP, *et al.*, <br><br> Defendants. | Civil Action No. 25-527 (JEB) |

**MEMORANDUM OPINION**

Project on Government Oversight has filed this suit against several entities falling under the umbrella of the Department of Government Efficiency, alleging violations of the entities' statutory recordkeeping obligations. To that end, it seeks a preliminary injunction ordering the DOGE entities to preserve all records pursuant to the Federal Records Act. Because POGO has not shown a likelihood of irreparable harm, it does not stick the landing. The Court will thus deny its Motion.

**I.    Background**

    A.    Legal Background

As this action implicates the respective obligations imposed by two related statutes, the Court begins there. First, the Federal Records Act "governs the creation, management and disposal of federal records." Armstrong v. Bush, 924 F.2d 282, 284 (D.C. Cir. 1991). To ensure "[a]ccurate and complete documentation of the policies and transactions of the Federal Government," while "prevent[ing] the creation of unnecessary records," 44 U.S.C. § 2902, the FRA defines federal records as "all recorded information, regardless of form or characteristics,

1

made or received by a Federal agency under Federal law or in connection with the transaction of public business and preserved or appropriate for preservation by that agency or its legitimate successor as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government or because of the informational value of data in them." Id. § 3301(a)(1)(A). It dictates that agencies must "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency." Id. § 3101. It also requires that agencies "establish safeguards against the removal or loss of records." Id. § 3105.

The Presidential Records Act likewise imposes recordkeeping requirements on the federal government, but on the President and Vice President rather than on executive-branch agencies. Id. § 2201(2)(B)(i). The PRA defines presidential records as "documentary materials . . . created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." Id. § 2201(2). It excludes records "of a purely private or nonpublic character which do not relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." Id. § 2201(2)(B)(ii), (3). The statute requires the President to "take all such steps as may be necessary to assure that the activities, deliberations, decisions, and policies that reflect the performance of the President's constitutional, statutory, or other official or ceremonial duties are adequately documented and that such records are preserved and maintained as Presidential records." Id. § 2203(a).

B.  Factual and Procedural Background

On January 20, 2025, the newly inaugurated President Trump issued Executive Order 14158, which "establishe[d] the Department of Government Efficiency to implement the President's DOGE Agenda, by modernizing Federal technology and software to maximize governmental efficiency and productivity." Establishing and Implementing the President's "Department of Government Efficiency", 90 Fed. Reg. 8441, 8441 (Jan. 20, 2025). In the Order, the President renamed the United States Digital Service as the United States DOGE Service (USDS), created the U.S. DOGE Service Temporary Organization (USDSTO), established a USDS Administrator, and directed federal agencies to establish internal DOGE teams. Id. A few weeks later, Trump issued another Executive Order, this time elaborating on DOGE's role in "eliminating waste, bloat, and insularity" from the "Federal bureaucracy." Implementing the President's "Department of Government Efficiency" Workforce Optimization Initiative, 90 Fed. Reg. 9669, 9669 (Feb. 11, 2025). POGO alleges that, across dozens of agencies, the DOGE entities have since slashed personnel, eliminated contracts, gained access to sensitive data, and directed policy initiatives. See ECF No. 16 (Am. Compl.), ¶¶ 51–56, 61.

According to POGO, DOGE has done so while "run[ning] roughshod over record keeping requirements designed, in part, to bring greater transparency and accountability to the government." Id., ¶ 57. The DOGE entities and their employees have allegedly "wrapped themselves in secrecy," id., ¶ 60, in an effort to "ensure no records exist." Id., ¶ 62. DOGE has consequently been the subject of several lawsuits seeking to promote greater public insight into its operations. In the course of that litigation, two judges of this district court have already ordered DOGE to preserve large swaths of records. See Citizens for Resp. & Ethics in Wash. v.

3

U.S. DOGE Serv. (CREW), 2025 WL 752367, at *16–17 (D.D.C. Mar. 10, 2025); Am. Oversight v. U.S. Dep't of Gov't Efficiency, No. 25-409, Minute Order of Apr. 2, 2025 (D.D.C.).

POGO "is a nonpartisan independent organization" that "champions reforms to achieve a more effective, ethical, and accountable federal government that safeguards constitutional principles." Am. Compl., ¶ 4. To advance that mission, the organization conducts "investigations using FOIA, interviews, and other fact-finding strategies." Id. As such, POGO is "a frequent FOIA requester" and "has a strong operational interest in government compliance with the recordkeeping obligations that the FRA imposes on all federal agencies and agency heads." Id., ¶ 5.

Plaintiff filed this lawsuit in February, claiming that DOGE's recordkeeping policies (or lack thereof) violate the FRA. See ECF No. 1 (Compl.), ¶ 1. It named President Trump, DOGE, USDS, USDSTO, and the Acting USDS Administrator as Defendants. Id., ¶¶ 7–11. (As noted above, the catch-all term "DOGE" actually refers to an array of DOGE-affiliated entities; given that Plaintiff's arguments appear to apply to USDS alone, this Opinion uses DOGE and USDS interchangeably.) POGO sought a preliminary injunction "requiring Defendants to collect, retain, and preserve their records, including all electronic records, pursuant to a recordkeeping policy that complies with the FRA and guidance from [the National Archives and Records Administration]." ECF No. 11-1 (First PI Mot.) at 2. In opposing that Motion, Defendants submitted a copy of USDS's March 25, 2025, Records Retention Policy, which declares that USDS personnel "are subject to certain records retention obligations under the [PRA]." ECF No. 12-1 (Records Retention Policy). Dubious that POGO had demonstrated irreparable injury in light of other courts' preservation orders and the Records Retention Policy, this Court denied the Motion without prejudice and permitted Plaintiff (with Defendants' agreement) to submit an

Amended Complaint and a renewed preliminary-injunction Motion. See ECF No. 15 (May 2 Hrg. Tr.) at 14:2–15:21. POGO filed those pleadings shortly thereafter. See Am. Compl.; ECF No. 17-1 (Mot.). As these proceedings have unfolded, POGO has submitted several FOIA requests with USDS and other affiliated government entities, and it expresses an intent to file additional requests with DOGE in the future. See Am. Compl., ¶¶ 7–10.

## II.     Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Sherley v. Sebelius, 644 F.3d 388, 392 (D.C. Cir. 2011) (alterations in original) (quoting Winter, 555 U.S. at 20). "The moving party bears the burden of persuasion and must demonstrate, 'by a clear showing,' that the requested relief is warranted." Hospitality Staffing Solutions, LLC v. Reyes, 736 F. Supp. 2d 192, 197 (D.D.C. 2010) (quoting Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006)).

Before the Supreme Court's decision in Winter, courts weighed these factors on a "sliding scale," allowing "an unusually strong showing on one of the factors" to overcome a weaker showing on another. Davis v. Pension Benefit Guar. Corp., 571 F.3d 1288, 1291–92 (D.C. Cir. 2009) (quoting Davenport v. Int'l Bhd. of Teamsters, 166 F.3d 356, 361 (D.C. Cir. 1999)). "The basis of injunctive relief," regardless, "has always been irreparable harm." Sampson v. Murray, 415 U.S. 61, 88 (1974) (cleaned up) (quoting Beacon Theatres, Inc. v. Westover, 359 U.S. 500, 506–07 (1959)). The inability "to demonstrate that irreparable injury is

likely in the absence of an injunction" will thus defeat a motion.  See Winter, 555 U.S. at 22 (emphasis omitted).

**III.    Analysis**

POGO once again seeks "a preliminary injunction requiring Defendants to collect, retain, and preserve their records, including all electronic records, pursuant to a recordkeeping policy that complies with the FRA and guidance from NARA."  Mot. at 2.  Plaintiff bases its claim of irreparable harm on the risk that DOGE's records will be irretrievably destroyed, foreclosing its ability to obtain them later on.  Id. at 30.  As POGO explains, that threat "extends to records specifically requested in its pending FOIA request with USDS," "records responsive to future requests POGO intends to file with DOGE," and "a wide range of DOGE-related issues beyond what i[t] has specifically requested in its FOIA requests."  Id.  Plaintiff's concerns, however, are amply addressed by USDS's repeated and explicit commitment to comply with the PRA, its Records Retention Policy, and the preservation orders entered against DOGE in other litigation.  In discussing those three bases below, the Court ultimately concludes that POGO cannot show that its claimed injury, which turns solely on the risk of document destruction, is "certain and great," "actual and not theoretical," and "of such imminence that there is a clear and present need for equitable relief."  Chaplaincy of Full Gospel Churches, 454 F.3d at 297 (cleaned up).  It will consequently deny POGO's Motion on that ground without considering the other Winter factors.

   A.  Relationship Between FRA and PRA

USDS, as noted, has issued a Records Retention Policy implementing its "obligations under the [PRA]," and it has promised Plaintiff that it "has taken all steps to preserve all USDS records consistent with its obligations under the PRA."  Am. Compl., ¶ 67.  It has, moreover, submitted in another case a sworn declaration from its Administrator averring that the DOGE

6

entities "have obligations to maintain records and do so pursuant to the [PRA]." ECF No. 11-2, Exh. C (Amy Gleason Decl.), ¶ 25. That is not enough, says POGO. The watchdog insists that USDS must instead satisfy the requirements of the FRA. That is because POGO believes that USDS qualifies as an agency (which falls under the purview of the FRA), not an entity whose function is to advise the President (which is within the PRA's ambit). Besides, Plaintiff argues, the Records Retention Policy is deficient under the PRA.

At this early stage of the litigation, POGO's contention regarding the applicability of the FRA is immaterial. To be sure, Plaintiff has raised difficult merits questions about USDS's status *vel non* as an agency under the FRA, which at least one judge has already decided in POGO's favor. See CREW, 2025 WL 752367, at *10–12. This Court may indeed have to grapple with that issue as this litigation progresses. For now, however, Plaintiff seeks an injunction requiring document preservation for the sole purpose of "prevent[ing] any irrevocable removal, loss, or destruction of DOGE records during the pendency of this case." Mot. at 2. In other words, as long as some policy protects the records, POGO is safe from the threat of destruction.

Such is the case here given that any PRA-compliant records-retention policy necessarily also obeys the strictures of the FRA. That is because the PRA, by its own terms, covers a broader set of records than does the FRA. The latter statute encompasses only records that are "preserved or appropriate for preservation by [an] agency . . . as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the United States Government or because of the informational value of data in them." 44 U.S.C. § 3301(a)(1)(A). The FRA therefore covers records that are either actually maintained or deemed appropriate for maintenance by the agency, authorizing an agency to exercise discretion in determining which records should be preserved. See 36 C.F.R. § 1222.10(b)(5)–(6). The PRA's definition of

records, on the other hand, leaves no comparable room for an official's judgment; it includes all "documentary materials . . . created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2). It contains no discretionary language and excludes only personal records from its reach. Id. § 2201(2)(B)(ii), (3). The PRA, moreover, contains a provision specifically requiring and detailing the preservation of records reflecting "official business conducted using non-official electronic messaging accounts," id. § 2209, while the FRA does not.

In addition to defining records differently, the PRA and FRA impose different retention and disclosure requirements. Presidential records are presumed to be permanent. During his term of office, the President may dispose of a presidential record only after obtaining the Archivist's written views regarding the value of its preservation, id. § 2203(c); after the presidential term has concluded, the Archivist must deposit all of the records in a government-operated archival facility, id. § 2203(g)(2), and may dispose of them only if she determines that they lack sufficient value to justify continued preservation. Id. § 2203ss(g)(4). Federal records, however, have no such presumption of permanence. Agency heads regularly submit to the Archivist lists of records, including categories of records, that they believe do not warrant continued preservation and intend to dispose of, id. § 3303, and the Archivist authorizes them to do so if she agrees. Id. § 3303a. Indeed, while "[a]ll . . . presidential records are considered permanent records and are eventually preserved at the appropriate NARA-administered presidential library for public access," "only 2%–3% of all federal records are transferred to

8

NARA for permanent retention."  Meghan M. Stuessy, Cong. Rsch. Serv., R43072, Common Questions About Federal Records and Related Agency Requirements 4 (2015); see also David S. Ferriero, NARA's Role Under the Presidential Records Act and the Federal Records Act, Prologue Mag. (2017), https://perma.cc/D5DJ-5H4Z ("While only [less than 5 percent] of agency records are permanent, all presidential records are considered permanent . . . .").

Last, presidential records are subject to a presumption of disclosure to the public.  The Archivist has "an affirmative duty" to make presidential records "available to the public as rapidly and completely as possible."  44 U.S.C. § 2203(g)(1).  That duty is subject to narrow carveouts, id. § 2204, which are themselves subject to exceptions. Id. § 2205.  The FRA, by contrast, instructs agencies only to "identify[] records of general interest or use to the public that are appropriate for public disclosure" and to "post[] such records in a publicly accessible electronic format." Id. § 3102(2).  There is no additional duty to disclose federal records to the public.

So why does POGO care which statute covers the records?  "[W]hile both laws require the preservation of records, the procedures to prevent improper destruction of documents covered by the FRA are significantly more demanding."  Armstrong v. Exec. Off. of the Pres., 90 F.3d 553, 556 (D.C. Cir. 1996).  Another important difference between the statutes is that presidential records — unlike federal records — are not subject to FOIA because they were not created by an agency.  See Armstrong v. Exec. Off. of the Pres., Off. of Admin., 1 F.3d 1274, 1292 (D.C. Cir. 1993).  Such differences, however, are immaterial for current purposes.  Our Circuit has held that guidelines that purport to implement the PRA are reviewable for compliance with that statute, thereby foreclosing any government efforts to "effectively shield all federal records . . . from the provisions of the FRA." Armstrong, 1 F.3d at 1293–94.  The necessary

corollary to that holding is that a PRA-compliant recordkeeping policy cannot be a mechanism for evading the FRA's recordkeeping requirements. That is because, given that the PRA requires the preservation of a broader scope of records than does the FRA, the Government could not use the former to avoid preserving records under the latter. Put differently, any PRA-compliant records policy necessarily protects from destruction all the records that would be safeguarded under the FRA — regardless of which regime is actually appropriate. Indeed, Plaintiff has already conceded as much. See June 5 Hrg. Tr. at 8:20–8:22. Consequently, if POGO ultimately prevails on its argument that DOGE should be subject to the FRA such that its desired records may be obtained through FOIA, those records will be available regardless of the regime from which USDS currently understands its preservation obligations to flow. For the instant irreparable-harm analysis, then, the point is that the preservation Plaintiff seeks is required under both statutes.

B. Compliance with PRA

Defendants have given the Court ample reasons to believe that they are complying with the PRA, and Plaintiff has not refuted those representations. DOGE informed POGO that it "has taken all steps to preserve all USDS records consistent with its obligations under the PRA," Am. Compl., ¶ 67, and its Administrator has sworn that the DOGE entities "have obligations to maintain records and do so pursuant to the [PRA]." Gleason Decl., ¶ 25. But DOGE's Records Retention Policy is the most detailed assurance of all. It instructs personnel that "the basic rule is to <u>preserve all work-related communications and records</u>, regardless of format." It then explains:

> "[R]ecord" is a broad term that includes — but is not limited to — any of the following to the extent they relate top government business:
> - Memoranda, letters, notes, reports, and other written communications, including with persons at other federal agencies and outside of government;

- Drafts, mark-ups, or comments on drafts that are circulated or shown to others;
- Official government forms, such as financial disclosures and ethics paperwork;
- Directives and policy statements;
- Emails, chats, text messages, and other electronic communications (e.g., on Mattermost);
- Voicemails or audio recordings; and
- PowerPoint slides, videos, photographs, and other media.

Id.

The Policy exempts "[p]urely personal records that have no relation to, or effect on, government work," as well as "certain materials without historical value, such as notes, drafts, or similar documents that are not circulated or that are not created or saved for purposes of documenting the activities or deliberations of the Administration." Id. It strongly encourages personnel to comply with those requirements by "us[ing] work devices for all work-related activities" or, if they "happen to receive work-related messages on [their] personal device[s] — whether via text, Signal, a personal email address, or otherwise" — to "make sure to capture and transmit those messages to [their] work device[s]." Id. It finally advises employees to "[d]isabl[e] auto-delete features on any such messaging services." Id.

The Court is hard pressed to see how such a policy contravenes the PRA. In fact, the Policy is perhaps even broader than what the PRA requires, ordering employees to preserve "all work-related communications and records," id. (emphasis altered), as opposed to only those records "relat[ing] to or hav[ing] an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President." 44 U.S.C. § 2201(2). Although POGO points to discrepancies between the Policy's directives and the statutory language, see Mot. at 27–29, those deviations do not appear to create any substantive difference in coverage. For example, Plaintiff unpersuasively objects to the Policy's instruction to "make sure to capture and

11

transmit [work-related messages received on a personal device] to your work device" as insufficiently precise or mandatory. Id. at 28. It also believes that the Policy's directive to forward such messages to a "work device" is inconsistent with the statutory requirement to forward them to an "official electronic messaging account." Id. POGO does not explain, and the Court cannot discern, how an instruction to "make sure" to transmit messages could be interpreted as confusing or optional; how a "work device" would not necessarily include an "official electronic messaging account"; or, more generally, how the Policy could lead to fewer records being preserved than the statute requires. The differences in terminology can instead largely be chalked up to the Policy's effort, as Defendant explains, to use a "plain language style so that it can be easily understood by USDS employees." ECF No. 19 (Opp.) at 26. The Court, furthermore, finds it even more difficult to understand why the Policy would not also fulfill any document-preservation obligations imposed by the less inclusive FRA.

Perhaps recognizing the comprehensiveness of the Records Retention Policy, Plaintiff suggests that DOGE personnel may not have been informed of the Policy at all and contends that employees are in any case engaging in widespread noncompliance. See Mot. at 7, 32–33. In the hearing on this Motion, moreover, the watchdog protested that "the Government has offered no evidence that any employee of DOGE has been trained about the record requirements and . . . that they fully appreciate their obligations to preserve federal records." June 5 Hrg. Tr. at 15:15–16:9. POGO, however, places the responsibility on the wrong party. It is Plaintiff's burden to show a risk of irreparable harm. See Sea Containers Ltd. v. Stena AB, 890 F.2d 1205, 1210–11 (D.C. Cir. 1989). The Government also enjoys a presumption of administrative regularity and good faith absent a clear showing to the contrary. See FTC v. Owens-Corning Fiberglas Corp., 626 F.2d 966, 975 (D.C. Cir. 1980); Ass'n of Nat'l Advertisers, Inc. v. FTC, 627

F.2d 1151, 1170, 1173–74 (D.C. Cir. 1979). Buttressed by a sworn declaration from a knowledgeable government official, that presumption cannot be defeated by "the mere allegation of bad faith." Carter v. U.S. Dep't of Com., 830 F.2d 388, 393 (D.C. Cir. 1987); see also Hayden v. Nat'l Sec. Agency/Cent. Sec. Serv., 608 F.2d 1381, 1387 (D.C. Cir. 1979) ("mere allegation of agency misrepresentation or bad faith" and "past agency misconduct in other unrelated cases" insufficient). Courts instead withhold the presumption only when plaintiffs present "tangible evidence of bad faith." Carter, 830 F.2d at 393. As POGO has not done so here, the Court must extend the presumption of regularity to Defendants. Plaintiff's arguments regarding DOGE's compliance with the PRA therefore do not prevail.

    C.   Preservation Orders

Even if Defendants' apparent compliance with the PRA's preservation obligations were not enough, the DOGE entities are also subject to broad preservation orders as a result of other litigation. Pursuant to one court order, USDS must preserve "any and all communications between employees of OMB and any other individual purporting to represent, work for, or communicate on behalf of Elon Musk or Steve Davis"; "all memoranda, directives, or policies regarding changes to the operations of USDS"; "all communications with the office of the Administrator of the USDS regarding actual or potential changes to USDS operations"; and "all communications between USDS personnel and personnel of any federal agency outside of the Executive Office of the President regarding that agency's staffing levels (including any effort to reduce staffing), treatment of probationary employees, contract and grant administration, access to agency information technology systems, or the authority of USDS in relation to that agency." CREW v. U.S. DOGE Serv., No. 25-511, ECF No. 13 (Reply) at ECF pp. 33–34 (D.D.C. Mar. 4,

2025); see also CREW, 2025 WL 752367, at *17 (ordering preservation of all documents responsive to those requests).

Under a different order, USDS must also preserve (among other things) "all email communications between Elon Musk," or "[a]nyone serving as Elon Musk's chief of staff, secretary, scheduler, assistant, senior advisor, and/or special advisor," and anyone communicating on behalf of Tesla, SpaceX, Starlink, The Boring Company, xAI, X, Neuralink, and several other external entities. See Am. Oversight v. U.S. DOGE, No. 25-409, ECF No. 5 (Am. Compl.), ¶ 120 (D.D.C. Mar. 5, 2025); see Am. Oversight, No. 25-409, Minute Order of Apr. 2, 2025 (ordering preservation of all documents responsive to those requests). Given the breadth of those preservation orders, many — if not most — of the documents of interest to POGO will already be preserved.

\* \* \*

In sum, Plaintiff's fear of document destruction has been allayed several times over. POGO is therefore in little danger of losing access to documents to which it may be entitled if it prevails in its litigation against DOGE, much less at risk of irreparable harm. It consequently cannot demonstrate that it is entitled to a preliminary injunction.

## IV.  Conclusion

For the foregoing reasons, the Court will deny Plaintiff's Motion for Preliminary Injunction. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  June 17, 2025